# Exhibit A

Docusign Envelope ID: 25823C20-4747-4831-9A4E-31AC6EE8DBED

# Christian School Pension Plan



Christian School Pension Plan & Trust Fund

*Effective September 1, 2024*

# CHRISTIAN SCHOOL PENSION PLAN

## TABLE OF CONTENTS

Page

TABLE OF DEFINITIONS ........................................................................................ x


ARTICLE 1 - Establishment of Plan and Trust ..................................................... 1

    1.1    Establishment of Plan ................................................................... 1
        (a)    Employer......................................................................... 1
        (b)    Participating Employer .................................................... 1
        (c)    Multiple Employer Plan .................................................. 2
    1.2    Trust Fund ................................................................................... 3
        (a)    Trust Agreement ............................................................ 3
        (b)    Trust Fund...................................................................... 3
        (c)    Trustee.......................................................................... 3
    1.3    Compliance With Law ................................................................. 3
    1.4    Effective Dates of Plan Provisions ............................................. 3
    1.5    Application to Inactive and Former Participants......................... 4


ARTICLE 2 - Definitions ....................................................................................... 4

    2.1    Accrued Benefit Derived From Employee Contributions............. 4
    2.2    Accrued Benefit Derived From Employer Contributions............. 4
    2.3    Accumulated Contributions .......................................................... 4
        (a)    Rate of Interest Prior to Freeze..................................... 5
        (b)    Rate of Interest After Freeze......................................... 5
    2.4    Break in Service.......................................................................... 6
    2.5    Employee Contributions............................................................... 6
    2.6    Employer Contributions................................................................ 6
    2.7    Employer Group........................................................................... 6
    2.8    Highly Compensated Employee................................................... 7
        (a)    Definition ........................................................................ 7
        (b)    Determination Rules....................................................... 7
    2.9    Hour of Service ........................................................................... 7
        (a)    Generally........................................................................ 7
        (b)    Back Pay ........................................................................ 7
        (c)    No Duties Performed....................................................... 7
        (d)    Qualified Maternity or Paternity Absence ...................... 8
        (e)    Qualified Military Service ................................................ 8
        (f)    No Duplication ................................................................ 9
        (g)    Service for Vesting ........................................................ 9

(h)    Periods Credited ................................................................ 9
(i)    Additional Hours .............................................................. 9
(j)    Predecessor Plan ............................................................. 9
(k)    Leased Employee .............................................................. 9
(l)    Equivalency .................................................................. 9
2.10    Person .............................................................................. 10
2.11    Plan Year ........................................................................... 10
2.12    Termination Date ............................................................... 10
(a)    Transfer or Status Changes ................................................ 10
(b)    Cessation of Employment with Participating Employer ............... 10
(c)    Continuous Employment .................................................... 10
2.13    Valuation Date ................................................................... 10


ARTICLE 3 - Eligibility to Participate .............................................. 11

3.1    Eligibility Requirements ........................................................ 11
(a)    Employee .................................................................... 11
(b)    Covered Employment ......................................................... 11
3.2    Participation Rules ............................................................. 11
(a)    Termination of Participation ............................................... 11
(b)    Transfer From Covered Employment ........................................ 11
3.3    Leased Employee ................................................................. 12
(a)    Definition .................................................................. 12
(b)    Exceptions .................................................................. 12


ARTICLE 4 - Contributions ......................................................... 12

4.1    Amount of Employer Contribution ............................................ 12
(a)    Minimum Funding ............................................................. 13
(b)    Forfeitures ................................................................. 13
(c)    Additional Contributions ................................................... 13
4.2    Contributions by Participating Employers ................................... 13
(a)    Contribution Factor ........................................................ 13
(b)    Limitations ................................................................. 14
(c)    Prevention of Funding Deficiency .......................................... 14
4.3    Contributions by Participants ................................................ 15
4.4    Timing of Contributions ....................................................... 15
(a)    Quarterly Payments .......................................................... 15
(b)    Final Payment ............................................................... 15
4.5    Remittance of Contributions ................................................... 15
4.6    Return of Employer Contributions ............................................ 16
(a)    Mistake of Fact ............................................................. 16
(b)    Amount ...................................................................... 16

ARTICLE 5 - Amount of Benefits ................................................................ 16

5.1    Normal Retirement ................................................................ 16
       (a)    Normal Retirement Date ................................................ 16
       (b)    Normal Retirement Benefit ............................................. 16
       (c)    Accrued Benefit ............................................................ 16
5.2    Early Retirement ................................................................... 16
       (a)    Early Retirement Date ................................................... 17
       (b)    Early Retirement Benefit ............................................... 17
       (c)    Early Payment .............................................................. 17
5.3    Late Retirement .................................................................... 17
       (a)    Late Retirement Date .................................................... 17
       (b)    Late Retirement Benefit ................................................ 17
5.4    Deferred Vested Retirement ................................................. 18
       (a)    Deferred Vested Benefit ................................................ 18
       (b)    Vested Accrued Benefit ................................................. 18
       (c)    Early Payment .............................................................. 18
5.5    Death Benefits ..................................................................... 19
       (a)    Death Before Vesting .................................................... 19
       (b)    Death Before Annuity Starting Date ............................... 19
       (c)    Death After Annuity Starting Date ................................. 21
5.6    Benefit Rules ....................................................................... 21
       (a)    Controlling Provisions ................................................... 21
       (b)    Single Benefit ............................................................... 21
       (c)    Previously Paid Benefits ............................................... 21
       (d)    Transfer ....................................................................... 21
       (e)    Minimum Benefit/Accumulated Contribution ................... 21
       (f)    Minimum Payment ........................................................ 21
5.7    Maximum Annual Benefits .................................................... 22
       (a)    Annual Benefit .............................................................. 22
       (b)    Defined Benefit Dollar Limit .......................................... 22
       (c)    Compensation Limit ...................................................... 23
       (d)    Section 415 Compensation ............................................ 23
       (e)    Limitation Year ............................................................. 25
       (f)    Aggregation Rules ........................................................ 25
5.8    Adjustments to Maximum Annual Benefits ............................. 26
       (a)    Annual Benefit Actuarial Adjustment .............................. 27
       (b)    Adjustments to Defined Benefit Dollar Limit and
              Compensation Limit ...................................................... 28
       (c)    $10,000 Minimum Benefit .............................................. 30
       (d)    Grandfathered Annual Benefit ....................................... 30
       (e)    Cost of Living Adjustment ............................................. 30

ARTICLE 6 - Determination of Vested Percentage ............................................... 31

6.1     Year of Vesting Service ........................................................................... 31
        (a)     Vesting Service ........................................................................... 31
        (b)     Definitions ................................................................................... 31
6.2     Vested Percentage .................................................................................. 31
        (a)     100% Vesting .............................................................................. 31
        (b)     Vesting Schedule ........................................................................ 31
        (c)     Normal Retirement Date .............................................................. 31
6.3     Forfeiture/Cashout .................................................................................. 32
        (a)     Zero Vesting ............................................................................... 32
        (b)     Withdrawal of Accumulated Contributions ................................... 32
6.4     Death After Termination/Lost Recipient .................................................. 32
        (a)     Death After Termination .............................................................. 32
        (b)     Lost Recipient ............................................................................. 32

ARTICLE 7 - Payment of Benefits .................................................................... 33

7.1     Time of Payment ...................................................................................... 33
        (a)     Normal Retirement Benefit .......................................................... 33
        (b)     Early Retirement Benefit ............................................................. 33
        (c)     Late Retirement Benefit ............................................................... 33
        (d)     Deferred Vested Benefit .............................................................. 34
        (e)     Death Benefit .............................................................................. 34
        (f)     Immediate Benefit/Payment of Lump Sum .................................. 35
        (g)     QDRO ......................................................................................... 35
        (h)     Plan Termination ......................................................................... 36
        (i)     Minimum Benefit .......................................................................... 36
        (j)     Withdrawal of Accumulated Contributions ................................... 36
7.2     Determination of Benefits ........................................................................ 36
        (a)     Actuarially Equivalent .................................................................. 36
        (b)     Actuarially Equivalent/Lump Sum ................................................ 37
7.3     Form of Payment ..................................................................................... 37
        (a)     Standard Form of Payment .......................................................... 37
        (b)     Optional Forms of Payment ......................................................... 37
        (c)     Modifications to Forms of Payment .............................................. 38
        (d)     Direct Rollover to Another Plan ................................................... 39
        (e)     Automatic Rollover to IRA/Mandatory Cashout ........................... 40
7.4     Required Distribution Rules ..................................................................... 40
        (a)     Time of Distribution ..................................................................... 41
        (b)     General Annuity Requirements .................................................... 41
        (c)     Requirements For Annuity Distributions That Commence
                During Participant's Lifetime ........................................................ 42
        (d)     Requirements For Minimum Distributions Where Participant
                Dies Before Date Distributions Begin .......................................... 43

| | (e) | Definitions | 43 |
| | (f) | Actuarial Increase After 70 1/2 | 43 |
| 7.5 | | Waiver of QJSA; Election of Method and Time of Benefit Payments | 44 |
| | (a) | Waiver of QJSA | 44 |
| | (b) | Spousal Consent | 44 |
| | (c) | Permitted Elections | 45 |
| | (d) | Participant Consent | 45 |
| | (e) | Exceptions | 46 |
| | (f) | Election Requirements | 47 |
| | (g) | Failure to Elect | 48 |
| | (h) | Additional Information | 48 |
| | (i) | Time of Payment | 48 |
| 7.6 | | Determination of Beneficiary | 49 |
| | (a) | Beneficiary | 49 |
| | (b) | Successor Beneficiaries | 49 |
| | (c) | Married Participant; Spousal Consent | 49 |
| | (d) | Default Determination | 49 |
| | (e) | Death of Beneficiary | 50 |
| | (f) | No Surviving Beneficiary | 50 |
| | (g) | Alternate Payee | 50 |
| | (h) | Beneficiary Treated as Predeceased | 50 |
| | (i) | Determination | 51 |
| 7.7 | | Facility of Payment | 51 |
| | (a) | Incapacity | 51 |
| | (b) | Legal Representative | 51 |
| | (c) | Annuity Contract Purchase | 51 |
| 7.8 | | Penalties | 52 |
| | (a) | Payment Before Age 59 1/2 | 52 |
| | (b) | Failure to Receive Minimum Payments | 52 |
| 7.9 | | Suspension of Benefit Payments | 52 |
| | (a) | Suspension | 52 |
| | (b) | Notification | 53 |
| | (c) | Resumption of Payment | 53 |
| | (d) | Amount Suspended | 54 |
| | (e) | Offset | 54 |
| | (f) | Not Applicable | 54 |
| ARTICLE 8 - Administration of the Plan | | | 55 |
| 8.1 | | Responsibilities of CSI | 55 |
| | (a) | Employer Contributions | 55 |
| | (b) | Trustee | 55 |
| | (c) | Amendment | 55 |
| | (d) | Plan Termination | 55 |
| | (e) | Merger | 55 |
| 8.2 | | Action by CSI | 55 |

8.3    Plan Administrator; Named Fiduciary ........................................................ 55
8.4    Administrator Operation and Organization ............................................... 55
        (a)    Bylaws ........................................................................................... 55
        (b)    Membership ................................................................................... 55
        (c)    Actions ........................................................................................... 56
        (d)    Agent .............................................................................................. 56
        (e)    Compensation ............................................................................... 56
        (f)    Conflict of Interest ....................................................................... 56
8.5    Duties, Powers, and Responsibilities of the Administrator ..................... 56
        (a)    Plan Interpretation and Administration ....................................... 56
        (b)    Investment Manager ..................................................................... 56
        (c)    Investment Adviser ....................................................................... 57
        (d)    Custodian ....................................................................................... 57
        (e)    Participant Rights ......................................................................... 57
        (f)    Limits; Tests .................................................................................. 57
        (g)    Benefits and Vesting .................................................................... 57
        (h)    Errors ............................................................................................. 57
        (i)    Claims and Elections .................................................................... 57
        (j)    Benefit Payments .......................................................................... 57
        (k)    QDRO Determination ................................................................... 57
        (l)    Administration Information .......................................................... 57
        (m)    Recordkeeping ............................................................................. 58
        (n)    Reporting and Disclosure ............................................................. 58
        (o)    Advisers ......................................................................................... 58
        (p)    Expenses, Fees, and Charges ....................................................... 58
        (q)    Nondiscrimination ........................................................................ 58
        (r)    Delegation ..................................................................................... 58
        (s)    Bonding .......................................................................................... 58
        (t)    Other Powers and Duties .............................................................. 58
8.6    Delegation of Duties .................................................................................. 58
        (a)    General ........................................................................................... 58
        (b)    Fiduciary Duties ............................................................................ 58
        (c)    Conflict .......................................................................................... 59
8.7    Interrelationship of Fiduciaries; Discretionary Authority ...................... 59
        (a)    Performance of Duties .................................................................. 59
        (b)    Reliance on Others ....................................................................... 59
        (c)    Discretionary Authority of Fiduciaries ........................................ 59
8.8    Indemnification .......................................................................................... 59
        (a)    Expenses ........................................................................................ 59
        (b)    Insurance ....................................................................................... 60
8.9    Fiduciary Standards ................................................................................... 60
        (a)    Prudence ........................................................................................ 60
        (b)    Exclusive Purpose ......................................................................... 60
        (c)    Prohibited Transaction .................................................................. 60

8.10    Claims; Appeal Procedures ................................................................. 60
        (a)    Claims ................................................................................. 60
        (b)    Notification of Adverse Determination ........................................ 61
        (c)    Appeal to Administrator ........................................................... 61
        (d)    Administrator Decision ............................................................ 61
        (e)    Appeal to CSI ....................................................................... 61
        (f)    CSI Decision ........................................................................ 61
        (g)    Notification of Adverse Determination on Appeal ......................... 61
        (h)    Extensions ........................................................................... 62
        (i)    Full and Fair Review .............................................................. 62
        (j)    Authorized Representative; Hearings........................................... 62
8.11    Seeking Review of a Claim in Court ..................................................... 62
        (a)    Exhaustion of Appeal Procedures Required ................................ 62
        (b)    Filing Deadline ..................................................................... 62
        (c)    Forum Selection .................................................................... 63
        (d)    Administrator's Failure to Follow Appeal Procedures..................... 63
8.12    Participating Employer Responsibilities ................................................. 63
        (a)    Employee Information ............................................................. 63
        (b)    Payment of Employer Contribution............................................. 63
        (c)    Payment of Assessments Due to Incorrect Information ................. 63
        (d)    Penalties; Excise Taxes .......................................................... 63
        (e)    Records................................................................................ 63
        (f)    Financial Information .............................................................. 63
        (g)    Payment of Withdrawal Liability ................................................ 63
        (h)    Additional Information ............................................................. 63
        (i)    Other Acts ........................................................................... 63
8.13    Participant's Responsibilities.............................................................. 64
        (a)    Requests .............................................................................. 64
        (b)    Furnish Information ................................................................ 64
8.14    Electronic Administration .................................................................. 64
8.15    Qualified Domestic Relations Orders .................................................... 64
        (a)    QDRO .................................................................................. 64
        (b)    Alternate Payee...................................................................... 65


ARTICLE 9 - Funding............................................................................... 65


ARTICLE 10 - Amendment, Mergers, Successor Employer............................ 66

10.1    Amendment by CSI........................................................................... 66
        (a)    Prohibitions .......................................................................... 66
        (b)    Notice ................................................................................. 66
        (c)    Material Amendment ............................................................... 66

10.2    Amendment by Warner Norcross + Judd LLP ......................... 66
    (a)    Pre-Approved Plan Sponsor ..................................... 66
    (b)    Authorized Amendments............................................ 67
    (c)    Termination of Authority ........................................... 67
10.3    Amendment by Participating Employer.................................. 67
    (a)    Participating Employer Termination ........................ 67
    (b)    Material Changes....................................................... 67
    (c)    Procedures.................................................................. 68
10.4    Merger .................................................................................. 69
    (a)    CSI ............................................................................. 69
    (b)    Participating Employer .............................................. 69
10.5    Successor Employer .............................................................. 69

ARTICLE 11 - Termination ................................................................... 70

11.1    Right to Terminate Plan ........................................................ 70
    (a)    CSI ............................................................................. 70
    (b)    Pension Benefit Guaranty Corporation..................... 70
11.2    Termination of Participating Employer Status ..................... 70
    (a)    Voluntary Termination .............................................. 71
    (b)    Involuntary Termination............................................ 72
11.3    Automatic Termination of Participating Employer Status .... 73
11.4    Termination of Plan .............................................................. 73
    (a)    Termination ............................................................... 73
    (b)    Priorities .................................................................... 73
    (c)    Rules For Application ................................................ 74
11.5    Effect of Termination or Partial Termination....................... 75
    (a)    Nonforfeitability ....................................................... 75
    (b)    Distribution ............................................................... 75
    (c)    Recourse Only Against Trust Assets........................ 75
11.6    Reversion of Assets .............................................................. 76
11.7    Highest Paid Restriction........................................................ 76
    (a)    Restrictions on Termination ..................................... 76
    (b)    Restrictions on Distributions.................................... 76
    (c)    Payment of Restricted Benefit in Full ..................... 76
    (d)    Payments Prior to January 1, 1994 .......................... 77

ARTICLE 12 - General Provisions.......................................................... 78

12.1    Spendthrift Provision............................................................. 78
    (a)    Not Security .............................................................. 78
    (b)    Crimes and ERISA Violations ................................. 78
    (c)    Attempts Void............................................................ 79
12.2    Effect Upon Employment Relationship ................................ 79
12.3    No Interest in Employer Assets............................................. 79

| 12.4 | Construction | 79 |
|---|---|---|
| 12.5 | Severability | 80 |
| 12.6 | Governing Law | 80 |
| 12.7 | Nondiversion | 80 |
| 12.8 | Correction of Errors and Recoupment | 80 |
| 12.9 | Limitations Applicable to CSEC Plan in Funding Restoration Status | 81 |
| (a) | Funding Restoration Status | 81 |
| (b) | Funding Restoration Plan | 81 |
| (c) | Limitation on Plan Amendments | 81 |
| (d) | Automatic Restoration | 81 |
| 12.10 | Authorization of PTE 80-26 Loan | 81 |
| (a) | Right to Collect | 82 |
| (b) | PTE 80-26 Loan Requirements | 82 |
| (c) | Written Loan Agreement | 82 |

| ARTICLE 13 - Top-Heavy Plan Provisions | | 82 |
|---|---|---|
| 13.1 | Top-Heavy Plan | 82 |
| (a) | Not Required or Permissive Aggregation Group | 82 |
| (b) | Required Aggregation Group | 82 |
| (c) | Permissive Aggregation Group | 82 |
| 13.2 | Top-Heavy Determination | 83 |
| (a) | Top-Heavy Ratio | 83 |
| (b) | Present Value of Accrued Benefits | 83 |
| (c) | Required Aggregation Group | 84 |
| (d) | Permissive Aggregation Group | 84 |
| (e) | Determination Date | 84 |
| (f) | Key Employee | 84 |
| (g) | Top-Heavy Valuation Date | 85 |
| 13.3 | Minimum Benefits | 85 |
| (a) | Top-Heavy Minimum Accrued Benefit | 85 |
| (b) | Top-Heavy Minimum Average Monthly Compensation | 85 |
| 13.4 | Vesting Schedule | 86 |
| (a) | Cessation | 86 |
| (b) | Vesting Schedule Change | 86 |

APPENDIX A - BYLAWS

## TABLE OF DEFINITIONS

| Term | Location |
|------|----------|
| Accrued Benefit | 5.1(c) |
| Accrued Benefit Derived From Employee Contributions | 2.1 |
| Accrued Benefit Derived From Employer Contributions | 2.2 |
| Accumulated Contributions | 2.3 |
| Actuarially Equivalent | 7.2(a); 7.2(b) |
| Actuaries | 8.5(o) |
| Administrator | 8.3 |
| Alternate Payee | 8.15(b) |
| Annual Benefit | 5.7(a) |
| Annual Compensation Limit | 5.7(d)(iii) |
| Annual Contribution | 4.1 |
| Annuity Starting Date | 7.5(d)(ii) |
| Beneficiary | 7.6(a) |
| Benefit Commitments | 11.1(b)(iii) |
| Break in Service | 2.4 |
| Claim | 8.10(a) |
| Claimant | 8.10(a) |
| Code | 1.3 |
| Compensation Limit | 5.7(c); 5.7(c)(ii) |
| Covered Employment | 3.1(b) |
| CSEC | 1.3 |
| Deferred Vested Benefit | 5.4(a) |
| Defined Benefit Dollar Limit | 5.7(b) |
| Determination Date | 13.2(e) |
| Early Retirement Benefit | 5.2(b) |
| Early Retirement Date | 5.2(a) |
| Effective Date | 1.4 |
| Employee | 3.1(a) |
| Employee Contributions | 2.5 |
| Employer | 1.1(a) |
| Employer Contributions | 2.6 |
| Employer Group | 2.7 |
| ERISA | 1.3 |

| Term | Location |
| --- | --- |
| 417(e) Interest Rate | 7.2(b)(i) |
| 417(e) Mortality Table | 7.2(b)(ii) |
| Funding Restoration Status | 12.9(a) |
| Highly Compensated Employee | 2.8(a) |
| Hour of Service | 2.9(a) |
| Investment Manager | 8.5(b)(ii) |
| Key Employee | 13.2(f) |
| Late Retirement Benefit | 5.3(b) |
| Late Retirement Date | 5.3(a) |
| Leased Employee | 3.3(a) |
| Limitation Year | 5.7(e) |
| Look-Back Year | 2.8(b)(i) |
| Material Amendment | 10.3(b) |
| Minimum Benefit | 5.6(e) |
| Normal Retirement Benefit | 5.1(b) |
| Normal Retirement Date | 5.1(a) |
| Participant | 3.1 |
| Participating Employer | 1.1(b) |
| PBGC | 11.1(b) |
| Permissive Aggregation Group | 13.2(d) |
| Person | 2.10 |
| Plan Year | 2.11 |
| Present Value of Accrued Benefits | 13.2(b)(i) |
| QDRO | 8.15 |
| QJSA | 7.3(a)(i)(A) |
| QPSA | 5.5(b)(i)(C) |
| Qualified Maternity or Paternity Absence | 2.9(d)(i) |
| Qualified Military Service | 2.9(e)(i) |
| Regulations | 1.3 |
| Required Aggregation Group | 13.2(c) |
| Required Beginning Date | 7.4(a)(i) |
| Section 203(a)(3)(B) Service | 7.9(a)(i)(B) |
| Section 415 Compensation | 5.7(d) |

| Term | Location |
|------|----------|
| Single Life Annuity | 7.3(b)(i) |
| Spouse | 5.5(b)(i)(A) |
| Surviving Spouse | 5.5(b)(i)(B) |
| | |
| Terminating Employer | 11.2(a) |
| Termination Date | 2.12 |
| Top-Heavy Minimum Accrued Benefit | 13.3(a) |
| Top-Heavy Minimum Average Monthly Compensation | 13.3(b) |
| Top-Heavy Plan | 13.1 |
| Top-Heavy Ratio | 13.2(a) |
| Top-Heavy Valuation Date | 13.2(g) |
| Total Required Contribution | 11.2(a)(iii) |
| Trust Agreement | 1.2(a) |
| Trustee | 1.2(c) |
| Trust Fund | 1.2(b) |
| | |
| USERRA | 2.9(e)(ii) |
| | |
| Valuation Date | 2.13 |
| Vested Accrued Benefit | 5.4(b) |
| Vesting Period | 6.1(a) |
| | |
| Year of Vesting Service | 6.1(a) |

## CHRISTIAN SCHOOL PENSION PLAN

Christian Schools International ("CSI"), a Michigan nonprofit corporation, amends and restates the Christian School Pension Plan.

## ARTICLE 1

## Establishment of Plan and Trust

1.1    Establishment of Plan.

This defined benefit plan was established to provide retirement benefits for eligible Employees of Participating Employers and the beneficiaries of such Employees in the CSI community.

(a)    Employer.  "Employer" means CSI and any member of CSI.

(b)    Participating Employer.  "Participating Employer" means CSI and any other Employer that notified CSI that it wished to participate in the plan and agreed to contribute and be bound by the provisions of the plan.  Participating Employer does not include any Employer located in Canada or any country other than the United States of America.

(i)    Participation Frozen.  Participation in this plan was frozen effective June 30, 2018.  Except as specified in Section 10.5, no additional Employers may become Participating Employers under this plan on or after July 1, 2018.  By becoming a Participating Employer in this plan, each Participating Employer has:

(A)    Duties and Powers.  Acknowledged and accepted that the duties and powers of the plan sponsor of this plan are vested in and exercised solely by CSI, including without limitation the power to amend or terminate this plan and to take any action deemed necessary or appropriate to maintain the qualified, tax-exempt status of this plan and the related Trust Fund, and that all duties and powers of administration with respect to the plan that are not reserved to CSI are vested in and exercised solely by the Trustees;

(B)    Delegation.  Delegated to CSI and to the Trustees full authority to exercise all duties and powers of the sponsor, Administrator, and named fiduciary and all other direct and indirect powers and duties, including all discretionary authority, respectively accorded to CSI and/or the Trustees by this plan and the Trust Agreement;

(C)    Amendment.  Acknowledged the sole power to amend the plan resides with CSI, the Participating Employer shall not have any power or authority to

amend this plan, and each amendment of the plan adopted by CSI applies to and is binding on all Participating Employers; and

      (D)   <u>Termination</u>.  Acknowledged CSI has the sole power to terminate this plan in its entirety, the power to terminate the participation of one or more Participating Employers has been delegated to the Trustees and any involuntary termination with respect to a Participating Employer by the Trustees shall be final and binding, and the power to voluntarily terminate its participation in this plan (as of a date approved and specified in writing by that Participating Employer and the Trustees) resides with the Participating Employer.

      (ii)   <u>Continuation of Participation</u>.  Each Participating Employer in this plan on June 30, 2018, automatically continues as a Participating Employer on or after July 1, 2018, unless such Participating Employer: (i) terminates its participation in this plan though a voluntary termination initiated by the Participating Employer or through an involuntary termination as determined by the Trustees or (ii) ceases to be a member of CSI.  If a Participating Employer ceases to be an eligible Employer due to cessation of its membership with CSI, the Participating Employer's participation will end on the date membership ends and the Participating Employer will be considered a Terminating Employer under Section 11.2 as of that date.  Any Participating Employer that continues participation in this plan after June 30, 2018, will continue to be subject to all provisions of this plan applicable to Participating Employers, including the contribution requirements of Article 4 and the withdrawal liability provisions in Section 11.2.

     (c)   <u>Multiple Employer Plan</u>. This plan is a single plan for multiple Participating Employers. Adoption of this plan by an Employer other than CSI did not create a separate plan for any Participating Employer.

      (i)   <u>Treated as Single Employer</u>. Each Employer Group is treated as single employer for the following purposes:

      (A)   <u>Service</u>.  Employment with any Employer Group, including simultaneous employment with multiple Employer Groups, counts toward service for all purposes under this plan; and

      (B)   <u>Maximum Annual Benefits</u>.  A Participant's Annual Benefits and Section 415 Compensation from all Employer Groups shall be aggregated for purposes of determining compliance with the limitation on Annual Benefits under Section 5.7.

      (ii)   <u>Treated as Separate Employer</u>. Each Employer Group shall be treated as a separate employer for the following purposes:

      (A)   <u>Top-Heavy</u>.  Determination of top-heavy status and application of the top-heavy requirements under Article 13; and

(B)    Coverage and Nondiscrimination.   Determination of Highly Compensated Employees and compliance with Code Sections 410(b) and 401(a)(4).

1.2    Trust Fund.

Plan assets will be delivered to the Trustee to be held in trust and administered under the terms of this plan and the Trust Agreement.   The Trust Fund shall be established and operated for the exclusive benefit of Participants and their Beneficiaries and may not be diverted to other purposes, except that assets of the Trust Fund may be used to pay reasonable expenses of administration.

(a)    Trust Agreement.   "Trust Agreement" means the separate trust document known as the Christian School Pension Trust Fund, established under this plan and originally authorized by CSI on August 23, 1944 and amended from time to time.  The provisions of this plan control in any case where there is an inconsistency or ambiguity between the terms of this plan and the terms of the Trust Agreement.

(b)    Trust Fund.   "Trust Fund" means the fund established under the Trust Agreement.  It is intended that the Trust Fund be qualified under Code Section 501(a).

(c)    Trustee.   "Trustee" means any one of the Trustees that serves as a Trustee under the Trust Agreement. "Trustees" means, collectively, the members of the Christian School Pension Trust Fund Board of Trustees, who are appointed by the Board of Directors of CSI and are responsible for the management of the Trust Fund and the administration of this plan.  The duties and rights of the Trustee are governed by the Trust Agreement.

1.3    Compliance With Law.

This benefit program is intended to continue a qualified retirement plan under the Internal Revenue Code of 1986 ("Code") and the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, and all applicable Regulations issued under the Code and ERISA ("Regulations").  This plan qualifies, and is treated, as a Cooperative and Small Employer Charity ("CSEC") plan as defined in Code Section 414(y).

1.4    Effective Dates of Plan Provisions.

CSI originally established this plan as of September 4, 1943, and it has been amended from time to time.  "Effective Date" of this restated plan means September 1, 2024, unless a provision specifies a different effective date.  Each plan provision applies from its effective date until the effective date of an amendment.

1.5    <u>Application to Inactive and Former Participants</u>.

An amendment to this plan shall apply to former Participants and to Participants not employed in Covered Employment on the effective date of the amendment only if it amends a provision of the plan that continues to apply to those Participants or only to the extent it expressly states that it is applicable.  Except as specified in the preceding sentence, if a Participant is not employed in Covered Employment on the effective date of an amendment, the amendment shall not become applicable to the Participant unless the Participant has an Hour of Service in Covered Employment after the effective date of the amendment.


<u>ARTICLE 2</u>

<u>Definitions</u>


Except for the following general definitions, defined terms are located at or near the first major use of the term in this plan.  A table showing the location of all definitions appears immediately after the table of contents.  When used as defined, the first letter of each defined term is capitalized.


2.1    <u>Accrued Benefit Derived From Employee Contributions</u>.

"Accrued Benefit Derived From Employee Contributions" means an annual benefit payable at Normal Retirement Date that is Actuarially Equivalent to the Participant's Accumulated Contributions.  Actuarial equivalence for this purpose shall be determined on the basis of the interest rate and mortality table specified in Section 7.2(b) for determining the amount of a lump sum payment.


2.2    <u>Accrued Benefit Derived From Employer Contributions</u>.

"Accrued Benefit Derived From Employer Contributions" as of any applicable date means the excess, if any, of the Participant's Accrued Benefit over the Participant's Accrued Benefit Derived From Employee Contributions.


2.3    <u>Accumulated Contributions</u>.

"Accumulated Contributions" means the total Employee Contributions made by or attributed to the Participant under this plan prior to September 1, 2019, plus, if the calculation is made before the Participant's Normal Retirement Date, interest compounded to the Participant's Normal Retirement Date as specified below.

(a)    Rate of Interest Prior to Freeze.  For periods prior to September 1, 2019, interest shall be determined on the Employee Contributions made by or attributed to the Participant under this plan prior to September 1, 2019, in accordance with the following:

(i)    Pre-September 1, 1976.  For periods prior to September 1, 1976, interest shall be credited at the rates specified by the terms of this plan as in effect for the applicable periods in compliance with applicable guidance under Code Section 411 (c)(2)(C) and Regulations;

(ii)    Pre-September 1, 1988.  The rate of interest for all periods after August 31, 1976, and ending before September 1, 1988, shall be 5% per annum, compounded annually;

(iii)    Post-August 31, 1988.  The interest rate for all periods beginning after August 31, 1988, and ending on the earlier of (A) the date the Participant's Accrued Benefit Derived From Employee Contributions is determined or (B) August 31, 2019, shall be 120% of the applicable federal mid-term rate (as in effect under Code Section 1274 for the first month of the Plan Year), per annum, compounded annually; and

(iv)    Post-Date of Determination.  Effective September 1, 1996, for periods beginning on or after the date the Accrued Benefit Derived From Employee Contributions is determined until the Participant's Normal Retirement Date or August 31, 2019, if earlier, the interest rate shall be the interest rate specified in Section 7.2(b)(i) for determining the amount of a lump-sum payment.

(b)    Rate of Interest After Freeze.

(i)    No Further Interest Credits.  Employee Contributions, including deemed contributions, attributed to the Participant that were not mandatory after-tax employee contributions as defined in Code Section 411(c)(2)(C) made by the Participant in accordance with the terms of this plan prior to September 1, 2019, will not be credited with interest for periods beginning on or after September 1, 2019. In that case, the amount of the Participant's Accumulated Contributions determined under (a) above shall be frozen as of August 31, 2019, and shall not increase at any time thereafter.

(ii)    Mandatory Employee Contributions.  Employee Contributions that were mandatory after-tax employee contributions as defined in Code Section 411(c)(2)(C) made by the Participant in accordance with the terms of this plan prior to September 1, 2019, will be credited with interest for periods prior to September 1, 2019, under (a) above and for periods beginning on or after September 1, 2019, as follows:

(A)    Post-August 31, 2019.  The interest rate for all periods beginning after August 31, 2019, and ending on the date the Participant's Accrued Benefit Derived From Employee Contributions is determined, shall be 120% of the applicable federal mid-term rate (as in effect under Code Section 1274 for the first month of the Plan Year), per annum, compounded annually; and

        (B)    <u>Post-Date</u> <u>of</u> <u>Determination</u>.  For periods beginning on or after the date the Accrued Benefit Derived From Employee Contributions is determined until the Participant's Normal Retirement Date, the interest rate shall be the interest rate specified in Section 7.2(b)(i) for determining the amount of a lump-sum payment.

2.4    <u>Break</u> <u>in</u> <u>Service</u>.

"Break in Service" means an Employee's failure to complete more than 500 Hours of Service during a 12-consecutive-month period due to the Employee's termination of employment.  An unpaid leave of absence under the Family and Medical Leave Act of 1993 will not be treated as or counted toward a Break in Service.

2.5    <u>Employee</u> <u>Contributions</u>.

"Employee Contributions" are after-tax contributions as defined in Code Section 411(c)(2)(C) and Regulations that were required to be made to this plan by a Participant under the regular contribution alternatives in accordance with the terms of this plan in effect prior to September 1, 2019. For purposes of determining benefits payable under this plan, the term "Employee Contributions" also includes the contributions treated as made by, and attributed to, the Participant under the employer contribution plan alternatives in accordance with the terms of this plan in effect prior to September 1, 2019, and deemed contributions credited to a Participant during periods of disability in accordance with the terms of this plan in effect prior to September 1, 2019.

2.6    <u>Employer</u> <u>Contributions</u>.

"Employer Contributions" means all contributions paid to the Trust Fund by a Participating Employer under Article 4.

2.7    <u>Employer</u> <u>Group</u>.

"Employer Group" means a Participating Employer and (i) each corporation that is a member of a controlled group of corporations, as defined in Code Section 414(b), of which the Participating Employer is a member; (ii) each trade or business, whether or not incorporated, under common control of or with the Participating Employer within the meaning of Code Section 414(c); (iii) each member of an affiliated service group, as defined in Code Section 414(m), of which the Participating Employer is a member; and (iv) any other entity permitted or required to be aggregated with the Participating Employer by Regulations under Code Section 414(o) or Regulations Section 1.414(c)-5.

2.8   <u>Highly</u> <u>Compensated</u> <u>Employee</u>.

(a)   <u>Definition</u>.  "Highly Compensated Employee" for a Plan Year means any Employee who received Section 415 Compensation during the Look-Back Year in excess of $150,000 (as adjusted under Code Section 415(d) for Plan Years beginning after December 31, 2023).

(b)   <u>Determination</u> <u>Rules</u>.  The determination of who is a Highly Compensated Employee for a Plan Year shall be made under Code Section 414(q) and Regulations, including the following rules:

(i)   <u>Look-Back</u> <u>Year</u>.  "Look-Back Year" means the 12-month period immediately preceding the current Plan Year.

(ii)   <u>Former</u> <u>Employees</u>.   A former Employee who was a Highly Compensated Employee at termination of employment or at any time after attaining age 55 shall be a Highly Compensated Employee at all times thereafter.

(iii)   <u>Consistency</u>.  The determination of Highly Compensated Employees must be applied consistently to the determination years of all qualified retirement and non-retirement plans maintained by the Employer Group that begin with or within the same calendar year.  For purposes of this provision, determination year means the plan year for which the determination of Highly Compensated Employees is being made.

2.9   <u>Hour</u> <u>of</u> <u>Service</u>.

(a)   <u>Generally</u>.  "Hour of Service" means each hour that an Employee is directly or indirectly paid or entitled to be paid by the Employer Group for the performance of duties during the applicable period.  These hours will be credited for the period in which the duties are performed.

(b)   <u>Back</u> <u>Pay</u>.  Hours of Service include each hour for which back pay, irrespective of mitigation of damages, is awarded or agreed to by the Employer Group. Back pay hours will be credited to the Employee for the period or periods to which the award or agreement pertains.

(c)   <u>No</u> <u>Duties</u> <u>Performed</u>.  For all purposes under this plan, an Employee will be credited with the first 501 Hours of Service for which the Employee is directly or indirectly paid or entitled to be paid by the Employer Group (including back pay) for each single period of absence from work, even if no duties are performed due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military service, leave of absence, or other similar reasons, even if employment terminates.  However, an Employee is not required to be credited with Hours of Service for periods in which no duties are performed if the Employee is compensated solely as required by worker's compensation, unemployment compensation, or disability insurance laws.  Hours

described in this subsection (c) will be credited to the Employee for the period in which payment is made or amounts payable to the Employee become due.

(d)    Qualified Maternity or Paternity Absence.  Only for purposes of determining whether the Employee has a Break in Service, an Employee will be credited with the first 501 Hours of Service during a Qualified Maternity or Paternity Absence.

(i)    Definition of Qualified Maternity or Paternity Absence.  "Qualified Maternity or Paternity Absence" means an absence from work due to pregnancy of the Employee, birth of a child of the Employee, placement of a child with the Employee in connection with adoption of the child, or caring for a child immediately after the birth or placement of the child with the Employee.

(ii)    Credit.  If necessary to avoid a Break in Service, Hours of Service will be credited for the period in which the absence begins.  If the hours are not necessary to prevent a Break in Service for that period, the hours will be credited for the next period. Hours of Service are credited at the rate the Employee normally would have earned Hours of Service.  If these hours cannot be determined, the hours will be credited at the rate of eight hours per day of absence.

(e)    Qualified Military Service.  If an Employee enters Qualified Military Service and returns to employment with the Employer Group, the Employee will be credited with Hours of Service for the hours the Employee would have been scheduled to work during the period of Qualified Military Service.

(i)    Definition of Qualified Military Service.  "Qualified Military Service" means the performance of duty, on a voluntary or involuntary basis, in a uniformed service under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, and a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty.  For purposes of this definition, a uniformed service means the Armed Forces, the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training, or full-time National Guard duty, the commissioned corps of the Public Health Service, or any other category of persons designated by the President in time of war or national emergency.

(ii)    Qualification/Reemployment.  To qualify for this credit, the Employee must return to employment with the Employer Group in accordance with and within the time limits established by the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") (Chapter 43 of Title 38 of the United States Code).

(iii)    Death Before Reemployment.  If a Participant dies on or after January 1, 2007, while performing Qualified Military Service with reemployment rights under USERRA, the Participant will be credited with Hours of Service in accordance with this provision for purposes of determining the Participant's Years of Vesting Service.

(f)    No Duplication.  There will be no duplication in the crediting of Hours of
Service.  An Employee will not be credited with more than one Hour of Service for each
hour paid at a premium rate.

(g)    Service for Vesting.

(i)    Non-Covered Employment. Hours of Service earned in employment
with the Employer Group that is not Covered Employment count toward service for
determining Years of Vesting Service.

(ii)    Canadian Plan.  If a Participant was covered under the Canadian
Christian School Pension Plan prior to becoming a Participant in this plan, the Participant
will be credited with the service credited under that plan for purposes of determining the
Participant's Years of Vesting Service.

(h)    Periods Credited.  Generally, Hours of Service are credited as provided in
Section 2530.200b of the ERISA Regulations.  Hours of Service under (c) above are
credited under the rules of this section and as provided in Section 2530.200b-2(b) of
those Regulations.  Hours of Service are credited to appropriate periods determined
under the rules set forth in Section 2530.200b-2(c) of those Regulations.

(i)    Additional Hours.  The Administrator may adopt additional written, uniform,
and nondiscriminatory rules that credit more Hours of Service than those required under
the rules set forth in this section.

(j)    Predecessor Plan.  If this plan is required to be treated as a continuation of
the plan of a predecessor employer under Code Section 414(a), an Employee must be
credited with all Hours of Service credited to the Employee under the predecessor's plan.

(k)    Leased Employee.  Hours of Service for purposes of eligibility and vesting
will be credited for any period for which an individual is a Leased Employee or would have
been a Leased Employee but for the requirement that the individual perform services as
described in Section 3.3(a)(i) on a full-time basis for at least a one-year period, including,
but not limited to, due to the individual becoming an Employee prior to the end of the one-
year period.

(l)    Equivalency.  If an Employee is not paid on an hourly basis and records of
hours worked are not maintained, Hours of Service will be credited at the rate of 190
hours per month for each month that the Employee would be credited with at least one
Hour of Service under this section.

2.10 <u>Person</u>.

"Person" means an individual, committee, proprietorship, partnership, corporation, trust, estate, association, organization, or similar entity.

2.11 <u>Plan</u> <u>Year</u>.

"Plan Year" means the 12-month period beginning each September 1.

2.12 <u>Termination</u> <u>Date</u>.

"Termination Date" means the date a Participant's employment relationship with the Participating Employer is completely severed pursuant to the provisions below.

(a) <u>Transfer</u> <u>or</u> <u>Status</u> <u>Changes</u>.  A change in status from an Employee to a Leased Employee or a transfer from Covered Employment to other employment with the Employer Group that is not Covered Employment is not a termination of employment.

(b) <u>Cessation</u> <u>of</u> <u>Employment</u> <u>with</u> <u>Participating</u> <u>Employer</u>.  A Participant's employment is completely severed on the date there is a complete cessation of employment, such that no further services will be provided to the Participating Employer or any other member of the Employer Group.  The personnel policies of the entity (the Participating Employer or other member of the Employer Group) that most recently employed the Participant shall be used in determining whether a bona fide termination of employment has occurred.

(c) <u>Continuous</u> <u>Employment</u>.  A Participant's employment relationship will not be considered completely severed if the Participant is employed by another Participating Employer immediately following employment with the Participating Employer or other member of the Employer Group.

2.13 <u>Valuation</u> <u>Date</u>.

"Valuation Date" means the last day of the Plan Year and any other date specified as a Valuation Date by the Administrator when the assets of the plan are valued at their current fair market value in accordance with a method consistently followed and uniformly applied in accordance with the Code, ERISA, and applicable Regulations.

## ARTICLE 3

## Eligibility to Participate

3.1    Eligibility Requirements.

Participation in this plan is frozen to new and rehired Employees employed (or reemployed) on or after September 1, 2019.  An Employee who was employed by a Participating Employer prior to July 1, 2018, and who was employed in Covered Employment prior to September 1, 2019, previously became a Participant ("Participant") in this plan in accordance with the provisions of the plan in effect at that time.

(a)    Employee.  "Employee" means an individual who is employed by the Employer Group and who receives compensation for personal services to the Employer Group that is subject to withholding for federal income tax purposes.

(b)    Covered Employment.  "Covered Employment" means employment with a Participating Employer, except that Covered Employment does not include employment with an entity in the Employer Group that has not adopted this plan, employment as a Leased Employee (other than an individual who the Administrator has been notified by a Participating Employer is performing services for the Participating Employer through a leasing organization as a result of the Participating Employer's decision to contract with the leasing organization), employment covered by a collective bargaining agreement under which the Participating Employer has engaged in good faith negotiations about retirement benefits, and employment as a nonresident alien receiving no earned income from sources within the United States. "Covered Employment" also excludes the performance of services by any individual who is a resident of Puerto Rico or who is classified by the Participating Employer as other than an Employee (such as an independent contractor) even if it is later determined by a court or administrative agency that the classification is not correct.  If determined by a Participating Employer, "Covered Employment" excludes an ordained minister who is eligible to participate in a retirement plan maintained for employees of a church or other denominational organization.

3.2    Participation Rules.

(a)    Termination of Participation.  Participation shall terminate upon the earlier of the date the Participant is not an Employee and has been paid the full amount due under this plan or the date of the Participant's death.

(b)    Transfer From Covered Employment.  If a Participant transfers to a position that results in the Participant ceasing to be employed in Covered Employment under this plan, the Participant shall be entitled to the Accrued Benefit determined on the date of transfer based solely on the service with the Participating Employer in Covered

Employment prior to the date of the transfer, or, if earlier, August 31, 2019 (the date benefit accruals were frozen under this plan).

3.3    <u>Leased</u> <u>Employee</u>.

(a)    <u>Definition</u>.  "Leased Employee" means an individual described in and required to be treated as employed by the recipient under Code Sections 414(n) and 414(o) and Regulations.  For this definition, the term recipient includes the Employer Group for whom the individual performs services.

(i)    <u>Code</u> <u>Section</u> <u>414(n)</u>.  A Leased Employee under Code Section 414(n) is an individual who is not an Employee but who performs services for the recipient under the primary direction or control of the recipient, pursuant to an agreement between the recipient and a leasing organization, on a full-time basis for at least a one-year period.

(ii)    <u>Code</u> <u>Section</u> <u>414(o)</u>.  A Leased Employee includes a leased owner or a leased manager determined to be a Leased Employee under Code Section 414(o) and the Regulations.

(b)    <u>Exceptions</u>.  A Leased Employee shall not be treated as employed by the recipient if:

(i)    <u>Less</u> <u>Than</u> <u>20%</u>.  Leased Employees determined under (a) above do not constitute more than 20% of the recipient's non-highly compensated work force, and

(ii)    <u>Covered</u> <u>by</u> <u>Plan</u> <u>Described</u> <u>in</u> <u>Code</u> <u>Section</u> <u>414(n)</u>.  The individual is covered by a money purchase pension plan described in Code Section 414(n) maintained by the leasing organization with a nonintegrated employer contribution rate of at least 10% of compensation, immediate participation for all employees of the leasing organization, and full and immediate vesting.  Immediate participation shall not be required for employees who received less than $1,000 in compensation from the leasing organization in each Plan Year during the four-year period ending with the current Plan Year.  For purposes of this provision, compensation means Section 415 Compensation.

<u>ARTICLE 4</u>

<u>Contributions</u>

4.1    <u>Amount</u> <u>of</u> <u>Employer</u> <u>Contribution</u>.

CSI will determine the amount to be contributed to the Trust Fund each Plan Year ("Annual Contribution") taking into account the recommendation of the Trustees.  In

-12-

determining the amount of the Annual Contribution, the plan's funding policy consistent with plan objectives and the funding method adopted on the advice of the Actuary will be considered.

(a)    Minimum Funding.  The Annual Contribution need not be sufficient to fully fund any benefit; however, the contribution must be sufficient to prevent an accumulated funding deficiency (within the meaning of Code Section 433(a)) for the Plan Year, unless CSI obtains a waiver of the minimum funding requirement.

(b)    Forfeitures.  Forfeitures reduce the cost of this plan in the calculations of the Actuary and in no event may forfeitures be applied to increase the benefits payable to or with respect to any Participant.

(c)    Additional Contributions.  If, in the opinion of the Trustees, the financial condition of the Trust Fund is such that additional contributions are required for a Plan Year, CSI may determine to increase the amount of the Annual Contribution at any time during the Plan Year.

4.2    Contributions by Participating Employers.

CSI, in its discretion, shall determine each Participating Employer's share of the Annual Contribution. Unless otherwise determined by CSI and subject to (b) and (c) below, a Participating Employer's share of the Annual Contribution for a Plan Year will be calculated by multiplying the Annual Contribution for that Plan Year by a contribution factor calculated in accordance with (a) below.

(a)    Contribution Factor.  The contribution factor for each Participating Employer shall be the percentage (rounded to 4 decimal places) computed by dividing the Participating Employer's total contributions to this plan for the 25 Plan Years preceding the Plan Year that began on September 1, 2017, by the total contributions of all Participating Employers for that 25-year period.

(i)    Total Contributions.  For the purpose of determining the contribution factor in (a) above, a Participating Employer's total contribution for a Plan Year is the amount of the contribution that was invoiced to the Participating Employer during that Plan Year subject to (A) and (B) below.

(A)    Weighting.  In determining the amount of total contributions to include for a Participating Employer that contributed to this plan for Plan Years beginning before August 31, 2005, the contributions made to this plan by that Participating Employer for such Plan Years will be weighted by multiplying such contributions by 120% to account for the reduction in benefit accrual that occurred effective September 1, 2005.

(B)    Merger of Schools. If a Participating Employer dissolved, merged, consolidated, restructured, or reorganized into, or transferred its assets to,

another Participating Employer during the 25-year period included in the contribution factor determination, the contributions of both Participating Employers made in the 25-year period shall be included in determining the successor Participating Employer's total contributions to this plan for that period.

(ii)    Adjustment.  The contribution factor will be adjusted, as necessary, to remove any Participating Employer who is no longer a Participating Employer at the time of the calculation.

(b)    Limitations.

(i)    Cap.  If a Participating Employer's share of the Annual Contribution for a Plan Year is more than a specified percentage of the total contributions made by that Participating Employer to this plan and any other qualified retirement plan in the Employer Group for the Plan Year ending August 31, 2017, CSI may apply a cap to the increase in the Participating Employer's share of the Annual Contribution for the Plan Year.  CSI, in its discretion, will determine the cap, if any, that will apply for Plan Years beginning on or after the Effective Date.

(ii)    Expense Account. All expenses of administration of the plan, including, but not limited to, fees charged by the plan's Actuaries, accountants, insurers, Investment Managers or advisors, and attorneys, will be paid directly by the plan. CSI will be responsible for paying expenses of the plan that are not or may not be paid or reimbursed by the plan. CSI will establish an account to be used exclusively to pay such expenses. Any deposits CSI makes to such expense account during a Plan Year will, subject to review by the Trustee and the plan's compliance with minimum funding requirements for the Plan Year, reduce the Annual Contribution required to be made by CSI as a Participating Employer for that Plan Year. If deposits are made by CSI during a Plan Year, and any or all of the deposits occur after CSI has made its full share of the Annual Contribution for that Plan Year, the amount deposited by CSI after the date the contribution was made in full will reduce the Annual Contribution for CSI in the following Plan Year, subject to review by the Trustees and the plan's compliance with minimum funding requirements for that Plan Year.

(c)    Prevention of Funding Deficiency.  The Participating Employers shall, with respect to each Plan Year, contribute to the Trust Fund, an amount which, in the aggregate, is not less than the minimum amount necessary to prevent an accumulated funding deficiency (within the meaning of Code Section 433(a)) for that Plan Year.  If CSI determines that the plan may not meet the minimum funding requirements under Code Section 412(a)(2)(D) for a Plan Year due to one or more Participating Employers failing to remit contributions as required or for any other reason, CSI will recalculate each Participating Employer's share of the Annual Contribution for the year to ensure compliance with the minimum funding requirements of the Code, unless CSI obtains a waiver of that requirement.

4.3    Contributions by Participants.

New Employee Contributions shall not be permitted for Plan Years beginning after August 31, 2019.


4.4    Timing of Contributions.

Unless otherwise required by the Code and Regulations, the Trustees shall determine when contributions by Participating Employers must be paid to the Trust Fund. If a contribution is made for a Plan Year after the close of that Plan Year, CSI will designate the Plan Year for which the contribution is being made.

(a)    Quarterly Payments.  When required by Code Section 433, four equal, quarterly installments (not more than 15 days after the end of each quarter) shall be made during the Plan Year.  If there is a failure to pay the full amount of a required installment for a Plan Year, interest on the underpayment shall be charged in accordance with Code Section 433.

(b)    Final Payment.  The entire Employer Contribution shall be made not later than 8 1/2 months after the end of the Plan Year unless a waiver of the minimum funding requirement is obtained.


4.5    Remittance of Contributions.

The Trustees will determine a contribution schedule for each Plan Year and will notify each Participating Employer of the amount and date on which contributions are due for that Plan Year. Each Participating Employer shall timely transmit to the Trustees amounts assessed to the Participating Employer. Unless otherwise determined by the Trustees, 1/9th of the Participating Employer's contribution amount for a Plan Year will be due on the last day of each month in the nine-month period beginning on the first day of the Plan Year.  In the event of failure by a Participating Employer to remit contributions to the Plan as required, the Trustees, pursuant to policies and procedures established for this purpose, shall notify the Participating Employer, in writing, of the delinquency. The Trustees will notify the Participating Employer of the amount(s) due and what interest, if any, must be paid on such amount(s).  Upon continuing failure to pay required amounts to this plan, the Trustees shall take such action as the Trustees deem necessary and appropriate, including, in the event of continuing delinquency, termination of status as a Participating Employer.  If a Participating Employer's status is terminated, the Trustees shall notify the Participating Employer of the effective date of termination of Participating Employer status for the Employer and the Participating Employer's withdrawal liability will be due and payable in accordance with Section 11.2.

4.6     Return of Employer Contributions.

(a)     Mistake of Fact.  Part or all of any Employer Contribution made by mistake of fact shall be returned to the Participating Employer, upon demand, within one year after payment of the contribution.

(b)     Amount.  The amount that may be returned shall be determined as of the Valuation Date coinciding with or most recently preceding the date of repayment.  The amount shall be the excess of the amount contributed over the amount that would have been contributed if the mistake of fact had not occurred.  Earnings attributable to the excess amount shall not be returned.  Losses attributable to the excess amount shall reduce the amount returned.

ARTICLE 5

Amount of Benefits

5.1     Normal Retirement.

A Participant whose Termination Date occurs on the Participant's Normal Retirement Date, for reasons other than death, is eligible for a Normal Retirement Benefit.

(a)     Normal Retirement Date.  "Normal Retirement Date" means the date the Participant attains age 65.

(b)     Normal Retirement Benefit.  "Normal Retirement Benefit" means the Participant's Accrued Benefit.  Notwithstanding any other provision of the plan, a Participant's Normal Retirement Benefit may not be reduced on account of an increase in the Participant's age or service in accordance with Code Section 411(b)(1)(G).

(c)     Accrued Benefit.  "Accrued Benefit" means a monthly pension benefit, payable as a Single Life Annuity, beginning on the first day of the month following the Participant's Normal Retirement Date.  The amount of the Participant's Accrued Benefit shall be determined as of August 31, 2019, under the terms of the plan in effect at that time and shall not increase at any time after August 31, 2019.

5.2     Early Retirement.

A Participant whose Termination Date occurs on or after the Participant's Early Retirement Date and before the Participant's Normal Retirement Date, for reasons other than death, is eligible for an Early Retirement Benefit.

(a)    <u>Early Retirement Date</u>.    "Early Retirement Date" means the date the Participant attains age 55, or if later, the date the Participant completes five Years of Vesting Service.

(b)    <u>Early Retirement Benefit</u>.    "Early Retirement Benefit" means the Participant's Accrued Benefit determined as of August 31, 2019, or if earlier, as of the Participant's Termination Date.

(c)    <u>Early Payment</u>.  If the Participant elects payment of the Early Retirement Benefit beginning earlier than the month that includes the Participant's Normal Retirement Date, the monthly amount of the Participant's benefit will be reduced in accordance with (i) and (ii) below.

(i)    <u>Accruals Before September 1, 2005</u>. Benefits earned prior to September 1, 2005, are subject to the reductions specified below.

(A)    <u>No Reduction</u>.  There is no reduction if payment of the Participant's Early Retirement Benefit begins after the first day of the month coinciding with or next following the date the Participant attains age 62.

(B)    <u>5/12% Per Month Reduction</u>.  If payment of the Participant's Early Retirement Benefit begins prior to the date specified in (A) above, the rate of reduction is 5/12% per month for each month that the benefit is payable prior to that date.

(ii)    <u>Accruals Beginning September 1, 2005</u>.  For benefits earned on and after September 1, 2005, the rate of reduction is 2/3% per month for each month, up to a total of 60 months, that the benefit is payable prior to the month that includes the Participant's Normal Retirement Date and 1/3% per month for each additional month (in excess of 60 months) that the benefit is payable prior to the month that includes the Participant's Normal Retirement Date.

5.3    <u>Late Retirement</u>.

A Participant whose Termination Date occurs, for reasons other than death, after the Participant's Normal Retirement Date or whose employment continues after the Participant's Normal Retirement Date is eligible for a Late Retirement Benefit.

(a)    <u>Late Retirement Date</u>. "Late Retirement Date" means the Participant's Termination Date that occurs after the Participant's Normal Retirement Date.

(b)    <u>Late Retirement Benefit</u>. "Late Retirement Benefit" means a monthly pension benefit equal to (i) or (ii) below.

(i)    <u>Pre-Benefit Commencement Date</u>. If the Participant's Late Retirement Date occurs on or before the date the Participant's benefit commences, the

monthly benefit that is determined as of the date the Participant's benefit commences, including additional benefits accrued, if any, for the period of employment after the Participant's Normal Retirement Date and before the Participant's benefit commences.

(ii)    <u>Post-Benefit</u> <u>Commencement</u> <u>Date</u>. If the Participant's benefit commences before the Participant's Late Retirement Date, the Participant shall initially receive the amount determined in (i) above as of the date the Participant's benefit commences. On the earlier of the Participant's Late Retirement Date and each date an amount is required to be paid under Section 7.4, the Participant's benefit shall be recalculated in accordance with (i) above and the Participant shall also receive the difference between (A) the amount determined in (i) above as of the date of recalculation reduced by the Actuarially Equivalent monthly value of total benefits previously paid to the Participant and (B) the monthly benefit the Participant was receiving immediately prior to the recalculation, as a separate and identifiable benefit.

5.4    <u>Deferred</u> <u>Vested</u> <u>Retirement</u>.

A Participant who has a Vested Accrued Benefit and whose Termination Date occurs before the Participant's Normal or Early Retirement Date, for reasons other than death, is eligible for a Deferred Vested Benefit.

(a)    <u>Deferred</u> <u>Vested</u> <u>Benefit</u>. "Deferred Vested Benefit" means the Participant's Vested Accrued Benefit.

(b)    <u>Vested</u> <u>Accrued</u> <u>Benefit</u>. "Vested Accrued Benefit" means the Participant's Accrued Benefit determined as of August 31, 2019, or if earlier, as of the Participant's Termination Date multiplied by the Participant's vested percentage determined as of the Participant's Termination Date. The nonvested portion of a Participant's Accrued Benefit is the difference between the Participant's Accrued Benefit and the Participant's Vested Accrued Benefit. If the Participant's Accumulated Contributions have not been withdrawn and the Participant's vested percentage under Section 6.2(b) is zero, the Participant's Vested Accrued Benefit shall be equal to the Participant's Accrued Benefit Derived From Employee Contributions.

(c)    <u>Early</u> <u>Payment</u>. If the Participant is eligible to elect and elects payment of the Deferred Vested Benefit beginning earlier than the month that includes the Participant's Normal Retirement Date, the monthly amount of the Participant's benefit will be reduced in accordance with (i) and (ii) below.

(i)    <u>Accruals</u> <u>Before</u> <u>September</u> <u>1</u>, <u>2005</u>. Benefits earned prior to September 1, 2005, are subject to the reductions specified below.

(A)    <u>5/12% Per Month Reduction</u>. If the Participant has attained age 55 as of the Participant's Termination Date, the reduction is 5/12% per month for

each month that the benefit is payable prior to the first day of the month coinciding with or next following the date the Participant attains age 62.

              (B)    1/3% Per Month Reduction.  For all other Participants, the rate of reduction is 1/3% for each month the benefit is payable prior to the month that includes the Participant's Normal Retirement Date.

           (ii)    Accruals Beginning September 1, 2005.  For benefits earned on and after September 1, 2005, the rate of reduction is 2/3% for each month, up to a total of 60 months, that the benefit is payable prior to the month that includes the Participant's Normal Retirement Date and 1/3% per month for each additional month (in excess of 60 months) that the benefit is payable prior to the month that includes the Participant's Normal Retirement Date.

5.5    Death Benefits.

    A death benefit shall be paid only as provided in this section.

    (a)    Death Before Vesting.  If a Participant whose vested percentage under Section 6.2(b) is zero dies, including death that occurs while performing Qualified Military Service (provided the Participant was entitled to reemployment rights under USERRA immediately before the Participant's death), the Participant's Beneficiary shall receive the Participant's Accumulated Contributions, if any. If the Participant does not have an Accrued Benefit Derived From Employee Contributions, a benefit shall not be payable under this plan.

    (b)    Death Before Annuity Starting Date.  If a Participant whose vested percentage under Section 6.2(b) is 100% dies before the Annuity Starting Date (whether or not the Participant is employed by a Participating Employer at the time of death), benefits will be paid as follows:

           (i)    Surviving Spouse.  If the Participant has a Surviving Spouse, the Surviving Spouse shall receive a QPSA.

              (A)    Spouse Defined.  "Spouse" means the individual to whom the Participant is lawfully married under the laws of the domestic or foreign jurisdiction where the ceremony was performed at the relevant time.

                  (1)    Determination.  The relevant time for determining the Spouse for purposes of the QPSA is the date of the Participant's death.  The relevant time for determining the Spouse for purposes of the QJSA under Article 7 is the Annuity Starting Date.  The individual who is determined to be the Participant's Spouse at the relevant time will be treated as the Spouse for all purposes under this plan at all times thereafter.

(2)    Former Spouse.    A former Spouse shall not be a Spouse or Surviving Spouse except to the extent designated in a QDRO.

(B)    Surviving Spouse Defined.    "Surviving Spouse" means the Spouse to whom the Participant was married at the time of death and who survives the Participant. If the Participant dies before benefit payments begin, "Surviving Spouse" means the Spouse to whom the Participant was married for at least 12 consecutive months at the Participant's death and who survives the Participant.

(C)    QPSA Defined.    "QPSA" means a qualified pre-retirement survivor annuity that is a monthly Single Life Annuity payable to the Surviving Spouse of a Participant as described in (1) or (2) below.

(1)    Generally.    Subject to (2) below, the monthly amount of the QPSA is 50% of the benefit that would have been payable to the Participant if the Participant had retired on the day before the Participant died and had elected to have benefit payments begin on the earliest permitted payment date in the form of an immediate QJSA. The monthly amount is subject to reasonable actuarial adjustments to reflect payment in the QJSA form and if applicable, for payment prior to the Participant's Normal Retirement Date.  If the QPSA begins earlier than the Participant's earliest Early Retirement Date, there shall be no further reduction for payment earlier than that date.

(2)    Special Age 45 Rule.    If the Participant's Surviving Spouse is not more than 10 years younger than the Participant and the Participant dies after attaining age 45 while employed by a Participating Employer, the amount of the QPSA shall be 50% of the Participant's Accrued Benefit determined as of August 31, 2019 or if earlier, the date the Participant dies.  For purposes of this provision only, the monthly amount shall not be subject to the reductions that apply for converting the Single Life Annuity form of payment to the QJSA form and for payment prior to the Participant's Normal Retirement Date or for payment earlier than the Participant's earliest Early Retirement Date, if otherwise applicable.

(ii)    No Surviving Spouse.    If the Participant does not have a Surviving Spouse, the Participant's Beneficiary shall receive the Participant's Accumulated Contributions, if any.  If the Participant does not have an Accrued Benefit Derived From Employee Contributions, a benefit shall not be payable under this plan.

(iii)    Minimum Death Benefit.    If the Participant had an Accrued Benefit Derived From Employee Contributions at the time of the Participant's death and the Surviving Spouse dies before the sum of the pre-retirement survivor annuity payments made to the Surviving Spouse exceeds the Participant's Accumulated Contributions, the Participant's Beneficiary shall receive a single payment equal to the excess of the Participant's Accumulated Contributions over the sum of all pre-retirement survivor annuity payments made to the Surviving Spouse while the Surviving  Spouse was alive.

(c)    Death After Annuity Starting Date.  If a Participant who has a Vested Accrued Benefit dies after the Annuity Starting Date, the Beneficiary shall be paid any remaining benefits payable under the form of payment the Participant was receiving before death.

5.6    Benefit Rules.

(a)    Controlling Provisions.  The eligibility for and amount of a benefit provided under this plan for any Participant, Surviving Spouse or other Beneficiary, if any, shall be based upon the terms of the plan in effect at the Participant's Termination Date and shall not be affected by any amendment with a later effective date unless expressly stated in the amendment; provided, however, that benefit payments to a Participant, Surviving Spouse or other Beneficiary (including an Alternate Payee) shall be paid in the form and at the time specified in Article 7.

(b)    Single Benefit.  A Participant may not receive more than one type of benefit in any month.  The preceding sentence does not apply to the continuing benefit for a Surviving Spouse or other contingent annuitant, or the Minimum Benefit, or to receipt of a benefit as a Participant and a different benefit as the Beneficiary (including Surviving Spouse) of another Participant.

(c)    Previously Paid Benefits.  The amount of a benefit payable under this article will be reduced by the amount of benefits previously paid to or with respect to the Participant, including a lump-sum payment of the Participant's entire Vested Accrued Benefit after the Participant's employment terminates, but not including temporary disability benefits, if any, previously paid under this plan.  All reductions are computed on a uniform basis by calculating and offsetting the Actuarially Equivalent value of the benefit previously paid from the Participant's final benefit.

(d)    Transfer.  A transfer from Covered Employment to other employment with the Employer Group is not termination of employment for purposes of determining the Participant's Annuity Starting Date, but shall be considered a termination of employment for purposes of determining the Participant's Accrued Benefit.

(e)    Minimum Benefit/Accumulated Contribution.  The Participant or, in the case of the Participant's death, the Participant's Surviving Spouse or Beneficiary, shall not receive a benefit less than the Participant's Accumulated Contributions that remain in the plan at the time benefits commence ("Minimum Benefit").  If the Minimum Benefit becomes payable, it shall be paid at the time and in the manner specified in Section 7.1(i).

(f)    Minimum Payment.  Except as specified below, the minimum total dollar amount of benefits payable from this plan to any individual Participant who initially became a Participant in this plan prior to September 1, 2016, whose vested percentage under Section 6.2(b) is 100%, or to the Surviving Spouse or other Beneficiary with respect

to that Participant, including any Surviving Spouse who is also receiving other payments as a Participant, shall be not less than $75 per month.

        (i)     Not Applicable.  The $75 monthly minimum applies only to benefits payable in any monthly annuity form and does not apply to any lump sum payment.  The $75 minimum does not apply if the total dollar amount of the first monthly benefit payable to a Participant exceeds $75.  As the staged payment option under Section 7.3(c)(ii) is a single benefit payable in two stages, the total dollar amount of the monthly benefit payable to a Participant under the two stages shall be combined for the purpose of determining if the $75 minimum benefit is applicable to the Participant.

        (ii)     Applicable.  The $75 monthly minimum applies to any monthly pension payable to or with respect to a Participant even if the Participant elected withdrawal of the Participant's Accumulated Contributions; provided, however, the determination of whether the Participant has a minimum total dollar amount of not less than $75 per month is based upon the benefit determined as if the Participant's Accumulated Contributions had not been withdrawn. The $75 monthly minimum also applies to any monthly pension payable at the Participant's Normal Retirement Date to a Participant whose vested percentage under Section 6.2(b) is zero and who did not elect a withdrawal of the Participant's Accumulated Contributions.  The $75 monthly minimum applies to the monthly amount payable after any applicable reduction due to payment in an optional form or due to permitted commencement of benefit payments prior to the Participant's Normal Retirement Date, except for payment of an immediate annuity in lieu of the lump sum payable under Section 7.1(f)(ii).

5.7    Maximum Annual Benefits.

       The Annual Benefit accrued by or payable to a Participant in a Limitation Year, from all defined benefit plans maintained by the Employer Group, may not exceed the lesser of the Defined Benefit Dollar Limit or the Compensation Limit.  If the benefit that a Participant would otherwise accrue in a Limitation Year would produce an Annual Benefit in excess of the permissible amount under Code Section 415 and Regulations, the benefit shall be limited (or the rate of accrual reduced) to the extent necessary so that the benefit does not exceed the limits.

       (a)     Annual Benefit.  "Annual Benefit" means a benefit payable annually in the form of a Single Life Annuity.  Annual Benefit includes social security supplements described in Code Section 411(a)(9) and benefits transferred from another defined benefit plan (other than transfers of distributable benefits pursuant to Regulations Section 1.411(d)-4, Q&A-3(c)), but does not include benefits attributable to after-tax employee contributions or rollover contributions.  The treatment of benefits that are transferred to this plan is determined pursuant to Regulations Section 1.415(b)-1(b)(3).

       (b)     Defined Benefit Dollar Limit.  "Defined Benefit Dollar Limit" means $275,000, as adjusted, effective January 1 of each year, under Code Section 415(d) in such manner as the Secretary shall prescribe, and payable in the form of a straight life

annuity.  The limit as adjusted under Code Section 415(d) will apply to Limitation Years ending with or within the calendar year for which the adjustment applies, however, a Participant's benefit shall not reflect the adjusted limit prior to January 1 of that calendar year.

(c)    Compensation Limit.  "Compensation Limit" means 100% of the average of the Participant's Section 415 Compensation for the three consecutive years of service (or, if the Participant has less than three consecutive years, the Participant's longest consecutive period of service, including fractions thereof, but not less than one year) that produce the highest average.  The period for determining a year of service under this provision shall be the Limitation Year.

(i)    Termination of Employment.  To the extent directed by the Administrator in a uniform and consistent manner, if a Participant's employment terminates, the Participant's highest average compensation shall be automatically adjusted by the cost-of-living adjustment factor under Code Section 415(d) in the manner prescribed by the Secretary of Treasury.  The adjusted compensation amount shall apply to Limitation Years ending with or within the calendar year of the date of the adjustment, however, a Participant's benefit shall not reflect the adjusted limit prior to January 1 of that calendar year.

(ii)    Reemployment.  If a Participant is subsequently reemployed following a termination of employment, the "Compensation Limit" for the Participant is the greater of (A) 100% of the average of the Participant's Section 415 Compensation for the three consecutive years that produced the highest average determined at the time the Participant's employment terminated (as adjusted under (i) above) or (B) 100% of average of the Participant's Section 415 Compensation for the three consecutive years that produce the highest average determined by excluding all years for which the Participant performed no services for, and received no compensation from, the Employer Group and by treating the years immediately preceding the date of termination and the years following the date of reemployment as consecutive.

(d)    Section 415 Compensation.   Except as modified below, "Section 415 Compensation" means the gross salary or wages paid to a Participant in a Plan Year for personal services performed for the Participating Employer that are required to be reported under Code Sections 6041, 6051, and 6052 (wages, tips and other compensation as reported on Form W-2) for the Participant without regard to any rules that limit remuneration included in wages based on the nature or location of the employment or the services performed.  For any Participant who is providing services to a Participating Employer, but is receiving remuneration from a leasing organization as a payroll agent for that Participating Employer, Section 415 Compensation includes the remuneration paid to the Participant by the leasing organization for services to the Participating Employer.

        (i)    <u>Inclusions</u>.  Section 415 Compensation includes:

        (A)    <u>Elective Contributions</u>.  Amounts that would otherwise be included in Section 415 Compensation but for an election under Code Sections 125, 132(f)(4), 402(g)(3) or 457(b);

        (B)    <u>Deemed Section 125 Compensation</u>.  Elective contributions for payment of group health coverage that are not available to a Participant in cash because the Participant is unable to certify to alternative health coverage but only if the Employer does not request or collect information regarding the Participant's alternative health coverage as part of the enrollment process for the group health plan;

        (C)    <u>Differential Wage Payments</u>.  Differential wage payments as defined under Code Section 3401(h)(2) made with respect to any period the Participant is performing Qualified Military Service;

        (D)    <u>Compensation Paid after Employment Terminates</u>.  The following amounts paid after the Participant's Termination Date provided they are paid by the later of 2 1/2 months after the Termination Date or the end of the Limitation Year that includes the Termination Date:

        (1)    <u>Regular Compensation</u>.  Regular compensation for services performed during the Participant's regular working hours,  or compensation for services performed outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses or other similar payments, provided they would have been made had the Participant continued in employment with the Participating Employer;

        (2)    <u>Leave Cashouts</u>.  Payments made for unused accrued bona fide sick, vacation, or other leave that the Participant would have been able to use if employment had continued; or

        (3)    <u>Deferred Compensation</u>. Payments made pursuant to a nonqualified unfunded deferred compensation plan that would have been paid at the same time had employment continued, but only to the extent the payment is includible in the Participant's gross income;

        (E)    <u>Salary Continuation</u>.  To the extent directed by the Administrator in a uniform and nondiscriminatory manner, salary continuation payments to:

        (1)    <u>Qualified Military Service</u>.  A Participant who does not currently perform services for the Employer due to Qualified Military Service to the extent the payments do not exceed the amounts the Participant would have received if services had continued to be performed rather than entering Qualified Military Service; or

(2)    Disability.  A Participant who is permanently and totally disabled (as defined in Code Section 22(e)(3)) for a fixed or determinable period; and

(F)    Amounts Paid in Next Plan Year.  The Administrator may elect to include amounts earned but not paid during the Limitation Year solely because of the timing of pay periods and pay dates, provided the amounts are paid during the first few weeks of the next Limitation Year, the amounts are included on a uniform and consistent basis with respect to all similarly situated employees, and no amount is included in more than one Limitation Year.

(ii)    Exclusions/Other Termination Payments.    Section 415 Compensation excludes any amounts paid after termination of employment other than those included under (i)(D) above (including, but not limited to, lump sum or installment severance payments) even if paid by the later of 2 1/2 months after the date employment terminates or the end of the Limitation Year that includes the date of termination.

(iii)    Limitation.  Section 415 Compensation shall not exceed the Annual Compensation Limit.  "Annual Compensation Limit" means $330,000 (as adjusted under Code Section 401(a)(17)(B) for calendar years beginning after December 31, 2023).

(iv)    Estimation.    Until Section 415 Compensation is actually determinable, the Participating Employer may use a reasonable estimate of Section 415 Compensation.  As soon as administratively feasible, actual Section 415 Compensation shall be determined.

(e)    Limitation Year.  "Limitation Year" means the Plan Year.  If the Limitation Year is amended to a different 12-month period, the new Limitation Year must begin on a date within the Limitation Year in which the amendment is made.

(f)    Aggregation Rules.

(i)    General Rule.  In accordance with Regulations Section 1.415(f)-1, all defined benefit plans maintained by the Employer Group (as modified by Code Section 415(h)), all benefits under those plans, and Section 415 Compensation from the Employer Group (as modified by Code Section 415(h)) shall be aggregated for purposes of applying this section and the remainder of this article.  In applying the limitations of this article, if this plan is aggregated with another plan, a Participant's benefits shall not be counted more than once in determining the Participant's aggregate Annual Benefit pursuant to Regulations Section 1.415(f)-1(d)(1).

(ii)    Terminated Plan.  The benefits provided under a terminated defined benefit plan maintained by the Employer Group shall be taken into account in applying the limitations of this article in accordance with Regulations Section 1.415(b)-(1)(b)(5).

(iii)    Formerly Affiliated Plan.  A formerly affiliated plan shall be treated as a plan maintained by the Participating Employer but the formerly affiliated plan shall be

treated as if it had terminated immediately prior to the cessation of affiliation with sufficient assets to pay benefit liabilities under the plan and had purchased annuities to provide benefits.   For purposes of this provision, a formerly affiliated plan is a plan that, immediately prior to the cessation of affiliation, was actually maintained by an entity that constitutes the Participating Employer (as determined under Regulations Sections 1.415(a)-1(f)(1) and (2)) and immediately after the cessation of affiliation, is not actually maintained by the entity.  Cessation of affiliation under the preceding sentence means the event that causes an entity to no longer be aggregated with the Participating Employer under the affiliation rules described in Regulations Sections 1.415(a)-1(f)(1) and (2) (such as the sale of a subsidiary to an unrelated corporation) or that causes a plan to not actually be maintained by an entity that constitutes the Participating Employer under the affiliation rules described in Regulations Sections 1.415(a)-1(f)(1) and (2) (such as a transfer of plan sponsorship to an unrelated corporation).

(iv)    Predecessor Employer. If the Employer maintains a defined benefit plan that provides benefits accrued by a Participant while performing services for a former employer (for example, the Participating Employer assumed sponsorship of the former employer's plan or this plan received a transfer of benefits from the former employer's plan), the Participant's benefit under plan maintained by the former employer shall be treated as provided under a plan maintained by the Participating Employer as provided under Regulations Section 1.415(f)-1(c).   A former entity that existed before the Participating Employer will be considered a predecessor employer with respect to a Participant if, under the facts and circumstances, the Participating Employer constitutes a continuation of all or a portion of the trade or business of the former entity.

(v)    Previously Unaggregated Plans.  In accordance with Regulations Section 1.415(f)-1(e), two or more defined benefit plans that were not required to be aggregated as of the first day of a Limitation Year will satisfy the requirements of Code Section 415 with respect to a Participant for the Limitation Year if the plans are aggregated later in that Limitation Year, provided that no plan amendments increasing benefits with respect to the Participant under either plan are made after the occurrence of the event causing the plans to be aggregated.  Two or more defined benefit plans that are required to be aggregated pursuant to Code Section 415(f) during a Limitation Year subsequent to the Limitation Year during which the plans were first aggregated will satisfy the requirements of Code Section 415 with respect to a Participant for the Limitation Year if they are aggregated, provided there have been no increases in the Participant's benefit (including increases as a result of increased compensation or service) under any of the plans at any time during which the plans have been aggregated.

5.8    Adjustments to Maximum Annual Benefits.

The Annual Benefit and limitations described in Section 5.7 shall be adjusted in accordance with this section and applicable Regulations.

    (a)    <u>Annual Benefit Actuarial Adjustment</u>.

        (i)    <u>Actuarial Adjustment</u>.  Except as specified in (ii) below, an Annual Benefit payable in form other than a Single Life Annuity must be adjusted to the actuarially equivalent value of the Single Life Annuity in accordance with the following.

        (A)    <u>Benefits Not Subject To 417(e)</u>.  For any benefit paid in a form to which Code Section 417(e) does not apply, the actuarially equivalent value of the Single Life Annuity shall be the greater of (1) the annual amount of the Single Life Annuity (if any) payable to the Participant under the plan commencing at the same Annuity Starting Date as the form of benefit payable to the Participant, or (2) annual amount of the Single Life Annuity commencing at the Annuity Starting Date that has the same actuarial present value as the form of benefit payable to the Participant, computed using an interest rate assumption of 5% and the 417(e) Mortality Table for that Annuity Starting Date.

        (B)    <u>Benefits Subject To 417(e)</u>. For any benefit paid in a form to which Code Section 417(e) applies, the actuarially equivalent value of the Single Life Annuity shall equal the greatest annual amount of the Single Life Annuity commencing at the same Annuity Starting Date that has the same actuarial present value as the form of benefit payable to the Participant computed by: (i) using the interest rate and mortality table specified in this plan for adjusting benefits in the same form, (ii) using an interest rate assumption of 5.5% and the 417(e) Mortality Table, or (iii) using the 417(e) Interest Rate and the 417(e) Mortality Table and then dividing the result by 1.05.

        (ii)    <u>No Actuarial Adjustment</u>. Actuarial adjustments are not required for:

        (A)    <u>Survivor Benefits</u>. Survivor benefits payable to a Surviving Spouse under a QJSA to the extent such benefits would not be payable if the Participant's benefit were paid in another form;

        (B)    <u>Ancillary Benefits</u>. Benefits that are not directly related to retirement benefits (such as a qualified disability benefit, preretirement incidental death benefits, and post-retirement medical benefits); and

        (C)    <u>Automatic Benefit Increase</u>. The inclusion in the form of benefit of an automatic benefit increase feature, provided the form of benefit is not subject to Code Section 417(e)(3) and would otherwise satisfy the limitations of Code Section 415(b) and Regulations, and in no event would the amount payable to the Participant under the form of benefit in any Limitation Year exceed the limits of Code Section 415(b) and Regulations applicable at the Annuity Starting Date, as increased in subsequent years pursuant to Code Section 415(d) and Regulations Section 1.415(d)-1.  For purposes of the preceding sentence, an automatic benefit increase feature is included in a form of benefit if the benefit provides for automatic, periodic increases to the benefits paid in that form, such as a form of benefit that automatically increases the benefit annually according to a specified percentage or objective index, or a form of benefit that automatically increases the benefit to share favorable investment returns on plan assets.

(iii)    Adjustment For Multiple Annuity Starting Dates.  If a Participant has or will have payments commencing at more than one Annuity Starting Date, the limitations of Code Section 415 must be satisfied as of each of the Annuity Starting Dates, taking into account the benefits that have been or will be provided at all of the Annuity Starting Dates.  In determining the Annual Benefit for such a Participant as of a particular Annuity Starting Date, the plan must actuarially adjust the past and future payments with respect to the benefits that commenced at the other Annuity Starting Dates.  The determination of whether a new Annuity Starting Date has occurred is made pursuant to Regulations Section 1.415(b)-1(b)(1)(iii) and without regard to Regulations Section 1.410(a)(20), Q&A-10(d) (under which the commencement of certain distributions may not give rise to a new Annuity Starting Date).

(b)    Adjustments to Defined Benefit Dollar Limit and Compensation Limit.

(i)    Service Adjustment. If the Annual Benefit begins when the Participant has less than 10 years of participation (as defined below), the Defined Benefit Dollar Limit shall be multiplied by a fraction. The numerator of the fraction is the number of the Participant's years of participation (not less than one) and the denominator is 10. If the Participant has less than 10 years of service (as defined below) when the Annual Benefit begins, the Compensation Limit shall be multiplied by a fraction. The numerator of the fraction is the number of the Participant's years of service (not less than one) and the denominator is 10.

(A)    Year of Participation.  A Participant shall be credited with a year of participation (computed to fractional parts of a year) for each Plan Year during which the Participant is credited with the service required for benefit accrual purposes beginning with the Plan Year in which the Participant first becomes a Participant.

(B)    Year of Service.  A Participant shall be credited with a year of service (computed to fractional parts of a year) for each Plan Year during which the Participant is credited with the service required for benefit accrual purposes taking into account only service with the Employer or a predecessor employer (as defined in Regulations Section 1.415(f)-1(c)).

(C)    General Rules.  A Participant who is permanently and totally disabled within the meaning of Code Section 415(c)(3)(C)(i) for a Plan Year shall be credited with a year of participation and/or service for that Plan Year. A Participant will not be credited with more than one year of participation and/or year of service for each Plan Year. If two or more defined benefit plans are required to be aggregated for a Limitation Year, periods that are counted as years of participation or years of service, as applicable, under any of the plans are counted in computing the reduction for the plans as aggregated.

(ii)  <u>Age Adjustment</u>.

(A)  <u>Before Age 62</u>.  If the Annual Benefit begins before the date the Participant attains age 62 and the plan does not have an immediately commencing Single Life Annuity payable at both age 62 and the age of benefit commencement, the Defined Benefit Dollar Limit at that Annuity Starting Date is the annual amount of a benefit payable as a Single Life Annuity commencing on the Participant's Annuity Starting Date that is the actuarially equivalent of the Defined Benefit Dollar Limit (as reduced under (i) above if necessary) with actuarial equivalence computed using an interest rate assumption of 5% and the 417(e) Mortality Table in effect for that Annuity Starting Date (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date).  If, however, the plan has an immediately commencing Single Life Annuity payable both at age 62 and at the age of benefit commencement, the Defined Benefit Dollar Limit at the Participant's Annuity Starting Date is the lesser of (1) the reduced Defined Benefit Dollar Limit as determined under the preceding sentence or (2) the Defined Benefit Dollar Limit (as reduced under (i) above if necessary) multiplied by the ratio of the annual amount of the immediately commencing Single Life Annuity under the plan at the Participant's Annuity Starting Date to the annual amount of the immediately commencing Single Life Annuity under the plan at age 62, with both annual amounts determined without applying the rules of Code Section 415.

(B)  <u>After Age 65</u>. If the Annual Benefit begins after the Participant attains age 65 and the plan does not have an immediately commencing Single Life Annuity payable at both age 65 and the age of benefit commencement, the Defined Benefit Dollar Limit at that Annuity Starting Date is the annual amount of a benefit payable as a Single Life Annuity commencing on the Participant's Annuity Starting Date that is the actuarially equivalent of the Defined Benefit Dollar Limit (as reduced under (i) above if necessary) with actuarial equivalence computed using an interest rate assumption of 5% and the 417(e) Mortality Table in effect for that Annuity Starting Date (and expressing the Participant's age based on completed calendar months as of the Annuity Starting Date). If, however, the plan has an immediately commencing Single Life Annuity payable both at age 65 and at the age of benefit commencement, the Defined Benefit Dollar Limit at the Participant's Annuity Starting Date is the lesser of (1) the increased Defined Benefit Dollar Limit as determined under the preceding sentence or (2) the Defined Benefit Dollar Limit (as reduced under (i) above if necessary) multiplied by the ratio of the annual amount of the adjusted immediately commencing Single Life Annuity under the plan at the Participant's Annuity Starting Date to the annual amount of the adjusted immediately commencing Single Life Annuity under the plan at age 65, with both annual amounts determined without applying the rules of Code Section 415.  For this purpose, the adjusted immediately commencing Single Life Annuity under the plan at the Participant's Annuity Starting Date is the annual amount of such annuity payable to the Participant computed disregarding the Participant's accruals after age 65 but including actuarial adjustments, even if those actuarial adjustments are applied to offset accruals, and the adjusted immediately commencing Single Life Annuity under the plan at age 65 is the annual amount of such annuity that would be payable under the plan to a hypothetical participant who is age 65 and has the same accrued benefit (with no actuarial increases for

commencement after age 65) as the Participant receiving the payment (determined disregarding the Participant's accruals after age 65).

(iii)    Mortality Adjustment.  In adjusting the Defined Benefit Dollar Limit for the Participant's Annuity Starting Date under (ii) above, no adjustment shall be made to reflect the probability of a Participant's death between the Annuity Starting Date and age 62, or between age 65 and the Annuity Starting Date, if benefits will not be forfeited upon the Participant's death before the Annuity Starting Date.  To the extent that a forfeiture occurs upon the Participant's death before the Annuity Starting Date, an adjustment must be made to reflect the probability of the Participant's death.  A forfeiture shall not be treated as occurring upon the Participant's death If the plan does not charge Participants for providing the QPSA on the Participant's death.

(c)    $10,000 Minimum Benefit.  A benefit shall not be deemed to exceed the Compensation Limit if benefits payable for a Limitation Year under any form of benefit with respect to the Participant under this plan and all other defined benefit plans (regardless of whether terminated) of the Employer Group does not at any time exceed $1,000 multiplied by the Participant's years of service or parts thereof (not to exceed 10) with the Employer Group.  This limitation shall apply only to a Participant who has never participated in a defined contribution plan maintained by the Employer Group.

(d)    Grandfathered Annual Benefit.  The maximum Annual Benefit shall be the greatest of the maximum Annual Benefit as specified in this Article that applies to a Participant at the time of application under Code Section 415, ERISA Section 2004, Section 235(g) of the Tax Equity and Fiscal Responsibility Act of 1982, Section 1106 of the Tax Reform Act of 1986, the Retirement Protection Act of 1994, Section 1449(a) of the Small Business Job Protection Act of 1996, Revenue Ruling 98-1, Section 611 of the Economic Growth and Tax Relief Reconciliation Act of 2001, Section 101 of the Pension Funding Equity Act of 2004, the Pension Protection Act of 2006, and Regulations under the acts and Final Regulations under Code Section 415, including all effective dates, transitional rules and alternate limitations contained in those acts and Regulations.

(e)    Cost of Living Adjustment.  If the Annual Benefit payable to a terminated Participant who has not received a complete distribution of the Participant's Accrued Benefit is limited by either the Defined Benefit Dollar Limit or the Compensation Limit, such benefit, may, as determined by the Administrator in a nondiscriminatory and uniform manner, be increased in accordance with the cost of living adjustments under Code Section 415(d).

# ARTICLE 6

## Determination of Vested Percentage

6.1    Year of Vesting Service.

(a)    Vesting Service.  The Participant's Years of Vesting Service will equal:

(i)    Pre-Effective Date.  The number of the Participant's Years of Vesting Service as determined under the terms of the plan in effect immediately prior to the Effective Date; plus

(ii)    After Effective Date.  The number of the Participant's Years of Vesting Service credited to the Participant for Plan Years beginning on or after the Effective Date.

(b)    Definitions.

(i)    Year of Vesting Service. For Plan Years beginning on or after the Effective Date, a "Year of Vesting Service" is credited for each Vesting Period in which at least 1,000 Hours of Service has been completed.

(ii)    Vesting Period. The "Vesting Period" for determining Years of Vesting Service and the existence of Breaks in Service under this article is the Plan Year.

6.2    Vested Percentage.

(a)    100% Vesting.  A Participant's vested percentage with respect to the Participant's Accumulated Contributions is 100%.

(b)    Vesting Schedule.  Except as specified in (a) above, a Participant's vested percentage is determined as follows:

| Years of Vesting Service | Vested Percentage |
| --- | --- |
| Less than 5 years | -0- |
| 5 years or more | 100% |

(c)    Normal Retirement Date.  The vested percentage of a Participant who is employed by an Employer Group on or after the Participant's Normal Retirement Date shall be 100%.

6.3    Forfeiture/Cashout.

(a)    Zero Vesting.  If the Participant's vested percentage under Section 6.2(b) is zero as of the Participant's Termination Date, and the Actuarially Equivalent present value of the Participant's Accrued Benefit Derived From Employee Contributions is paid in a lump sum, the Participant's Accrued Benefit Derived From Employer Contributions will be forfeited as of such date.

(i)    Repayment.  If the Participant is reemployed by an Employer Group before the Participant has five consecutive Breaks in Service, the Participant may repay the entire amount the Participant received plus interest before the earlier of five years after the date the Participant is reemployed or the date the Participant has five consecutive Breaks in Service following the date of payment.  Interest, compounded annually, shall be paid at the rate determined for purposes of Code Section 411(c)(2)(C) from the date of payment to the date of repayment.

(ii)    Restoration.  The repayment shall restore in full the Participant's Accrued Benefit Derived From Employer Contributions otherwise forfeited by reason of the lump sum payment and the Participant's Accrued Benefit Derived From Employee Contributions deemed paid in full by the lump sum.

(b)    Withdrawal of Accumulated Contributions.  If a Participant withdraws the Participant's Accumulated Contributions and the Participant's vested percentage under Section 6.2(b) is zero, the Participant's Accrued Benefit Derived From Employer Contributions shall be forfeited at the time of the withdrawal.

Upon reemployment, the Participant may repay the full amount of the withdrawal, plus interest, in the time and in the manner described in (a) above.  The repayment shall restore in full the Participant's Accrued Benefit Derived From Employer Contributions otherwise forfeited by reason of the withdrawal and the Participant's Accrued Benefit Derived From Employee Contributions deemed paid in full by the withdrawal.

6.4    Death After Termination/Lost Recipient.

(a)    Death After Termination.  If a Participant whose vested percentage under Section 6.2(b) is not 100% dies after the Participant's Termination Date, the nonvested Accrued Benefit shall be forfeited as of the date of the Participant's death unless previously forfeited.

(b)    Lost Recipient.  If payment has been made but the recipient for any reason does not cash the check(s) within a reasonable period of time or if  payment may be made without consent as permitted under Section 7.5(d) to a Person who cannot be located following a reasonable diligent search, the Participant's Accrued Benefit will be forfeited as of the date the Administrator certifies to the Trustee that the Person cannot be located

and/or payment cannot be made to the Person.  In determining whether a reasonable period has elapsed or the appropriate search methods, the Administrator may follow any applicable guidance provided under the Code, ERISA, Regulations or any other regulatory guidance or official pronouncements.

        (i)    <u>Restoration</u>.  The Participant's Vested Accrued Benefit will be restored to the Participant if the plan has not terminated (or if the plan has terminated, all benefits have not yet been paid) and if the Person entitled to the payment submits a written election of method of payment.  Any such restoration of the Participant's Vested Accrued Benefit shall be made without any adjustment for gains or losses occurring during the period of forfeiture.

        (ii)    <u>No</u> <u>Restoration</u>.  If any Person whose benefit has been forfeited under this provision has not submitted a written election for benefits by the time all plan assets have been distributed due to the plan's termination, the Participant's Vested Accrued Benefit will not be restored.

## ARTICLE <u>7</u>

### Payment <u>of</u> <u>Benefits</u>

**7.1**    <u>Time</u> <u>of</u> <u>Payment</u>.

    A Participant, Surviving Spouse, or Alternate Payee may elect the time to begin to receive benefit payments in accordance with this section and subject to the provisions of this Article.  A Participant may elect to defer benefit payments that otherwise would be paid at the Participant's Normal Retirement Date or Late Retirement Date to any date not later than the Participant's Required Beginning Date as defined in Section 7.4(a). The preceding sentence does not apply to an Alternate Payee or Surviving Spouse.

    (a)    <u>Normal</u> <u>Retirement</u> <u>Benefit</u>.  The Normal Retirement Benefit may begin on the first day of the month coinciding with or next following the Participant's Normal Retirement Date.

    (b)    <u>Early</u> <u>Retirement</u> <u>Benefit</u>.  The Early Retirement Benefit may begin on the first day of the month coinciding with or next following the Participant's Normal Retirement Date.  The Participant may elect earlier payment beginning on the first day of any month coinciding with or next following the Participant's Early Retirement Date.

    (c)    <u>Late</u> <u>Retirement</u> <u>Benefit</u>.  The Late Retirement Benefit may begin on the first day of the month coinciding with or next following the Participant's Late Retirement Date. A Participant whose employment continues after the Participant's Normal Retirement Date may elect to commence payment of a monthly annuity beginning on the first day of any month following the Participant's Normal Retirement Date.

-33-

(d)    <u>Deferred</u> <u>Vested</u> <u>Benefit</u>.  The Deferred Vested Benefit may begin on the first day of the month coinciding with or next following the Participant's Normal Retirement Date.  If the Participant had completed at least five Years of Vesting Service on the Participant's Termination Date, the Participant may elect earlier payment beginning on the first day of any month coinciding with or next following the date the Participant attains age 55.

(e)    <u>Death</u> <u>Benefit</u>.

(i)    <u>Before</u> <u>Annuity</u> <u>Starting</u> <u>Date</u>.

(A)    <u>QPSA</u>.  The QPSA will begin on the first day of the month coinciding with or next following the Participant's Normal Retirement Date or if later, the Participant's date of death.   The Surviving Spouse may elect earlier payment in accordance with (1) or (2) below.

(1)    <u>Employed</u> <u>at</u> <u>Date</u> <u>of</u> <u>Death</u>. If the Participant was an Employee of a Participating Employer at the time of death, the QPSA may begin at any time on or after the Participant's date of death. If the Surviving Spouse's properly completed election is received within 120 days of the date of the Participant's death, the QPSA will commence to the Surviving Spouse on the 30th day of the month that includes the Participant's date of death; however, the first payment to the Surviving Spouse will be made on the 30th day of the month following receipt of the Surviving Spouse's properly completed election and will include a lump sum payment reflecting the monthly payments that would have been made for the period from the date of death to the date of benefit commencement.

(2)    <u>Not</u> <u>Employed</u> <u>at</u> <u>Date</u> <u>of</u> <u>Death</u>.  If the Participant was not an Employee of a Participating Employer at the time of death, the QPSA may begin at any time on or after the Participant's earliest Early Retirement Date or, if later, the date of the Participant's death.

(B)    <u>Accumulated</u> <u>Contributions</u>.  If the Participant's Accumulated Contributions are payable under Section 5.5(b)(ii) or (iii), the death benefit payable to the Participant's Beneficiary will be paid as soon as administratively feasible following the Beneficiary's election after the date of death.

(ii)    <u>After</u> <u>Annuity</u> <u>Starting</u> <u>Date</u>.  If the form of payment to the Participant provides for benefits after the Participant's death, the continuing benefit shall be paid to the Beneficiary as provided.

(f)    <u>Immediate Benefit/Payment of Lump Sum</u>.

(i)    <u>Consent Not Required</u>.

(A)    <u>Termination of Employment</u>. If consent is not required pursuant to Section 7.5(e)(i), the Administrator will direct payment of the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit in a lump sum as soon as administratively feasible following the Participant's Termination Date for any reason other than death or with respect to payment to an Alternate Payee, as soon as administratively feasible following the date the Administrator determines a domestic relations order is a QDRO and any applicable dispute period expires.

(B)    <u>Withdrawal of Accumulated Contributions</u>. If a Participant who has a vested percentage of 100% under Section 6.2(b) elects a withdrawal of the Participant's Accumulated Contributions after the Participant's Termination Date and the Actuarially Equivalent present value of the Participant's remaining Accrued Benefit Derived From Employer Contributions is $7,000 (or such larger amount as may be specified in Code Section 411(a)(11)(A)) or less, the Administrator shall direct payment of the Actuarially Equivalent present value of the remaining Vested Accrued Benefit in a lump sum as soon as administratively feasible following the date the Participant elects the withdrawal.

(ii)    <u>Consent Required</u>.    If the Participant is required to consent to payment, and the Participant is eligible to elect a lump sum payment under Section 7.3(b)(iv)(B), the Administrator shall direct payment of the Participant's Vested Accrued Benefit as soon as administratively feasible following a Participant's election of an immediate benefit in the form of (A) a lump sum payment, or (B) a Single Life Annuity if the Participant is unmarried or QJSA if the Participant is married.  In lieu of the QJSA, a married Participant may elect an immediate 75% joint and survivor annuity with the Participant's Spouse as the joint annuitant.

(g)    <u>QDRO</u>.  Unless otherwise provided below, if the plan receives a domestic relations order that the Administrator determines is a QDRO, benefits payments to the Alternate Payee will begin at the time specified in the QDRO and elected by the Alternate Payee, but not before benefits could have otherwise been payable under this plan.  In no event shall payment to an Alternate Payee be made later than the Participant's Normal Retirement Date or Late Retirement Date, if applicable.

(i)    <u>Lump Sum Payment</u>.  If a lump sum payment is required under Section 7.5(e)(i)(B), the Administrator shall direct payment of the lump sum at the time and in the manner described in (f)(i) above, even though the Participant may not be entitled to a concurrent distribution under the provisions of the plan.

(ii)    <u>Accumulated Contributions</u>. A withdrawal from the portion of the Participant's Accumulated Contributions awarded to an Alternate Payee, if any, may be

-35-

made by the Alternate Payee pursuant to the QDRO at any time after the Participant's Termination Date or if earlier, the date the Participant attains age 50.

(h)     Plan Termination. Benefits will be paid in accordance with Article 12 as soon as administratively feasible following termination of this plan. Notwithstanding the preceding sentence, if a determination letter from the Internal Revenue Service on the termination of the plan is requested by the Administrator, benefit payments on account of the plan's termination may be delayed until the date the favorable determination letter is received.

(i)     Minimum Benefit. The Minimum Benefit, if applicable, will be paid in a single payment to the Participant's Beneficiary as soon as administratively feasible following the death of the survivor of the Participant, Spouse, or any contingent annuitant.

(j)     Withdrawal of Accumulated Contributions. A Participant who has not elected to commence benefit payments may elect to withdraw the Participant's Accumulated Contributions at any time following the Participant's Termination Date. The withdrawal will be paid as soon as administratively feasible following the election, subject to the consent of the Participant's Spouse, if married. If the Participant's vested percentage under Section 6.2(b) is zero, the withdrawal shall be payment in full of the Participant's Accrued Benefit Derived From Employee Contributions. For a Participant with a vested percentage of 100% under Section 6.2(b), the withdrawal shall be payment in full of the Participant's Accrued Benefit Derived From Employee Contributions, but the Accrued Benefit Derived From Employer Contributions will remain payable.

7.2   Determination of Benefits.

The age of the individuals to whom benefits are payable is determined as of the date the benefit is payable. All forms of payment are Actuarially Equivalent to the benefit payable as a Single Life Annuity.

(a)     Actuarially Equivalent. Except as specified in Article 5 or (b) below, "Actuarially Equivalent" means equal to value based on the following actuarial assumptions:

(i)     Interest Rate.

7.5% Preretirement
7.5% Post-Retirement

(ii)     Mortality Table.

417(e) Mortality Table - Preretirement
417(e) Mortality Table - Post-Retirement

(b)   Actuarially Equivalent/Lump Sum.  For purposes of determining the amount of a lump sum benefit, "Actuarially Equivalent" means equal in value based on the actuarial assumptions specified below.

(i)   Interest Rate.  The interest rate is the 417(e) Interest Rate.  "417(e) Interest Rate" means the applicable interest rate(s) determined in accordance with Code Section 417(e).  The 417(e) Interest Rate shall be the interest rate(s) determined under the preceding sentence for the month that is two months preceding the first day of the Plan Year that includes the Annuity Starting Date.

(ii)   Mortality Table.  The mortality table is the 417(e) Mortality Table. "417(e) Mortality Table" means the applicable mortality table prescribed by the Internal Revenue Service to be used for purposes of Code Section 417(e).

7.3   Form of Payment.

(a)   Standard Form of Payment.  Generally, benefits under this plan are paid as follows:

(i)   Married.  If the Participant is married when benefit payments are to begin, the Participant's benefit shall be paid as a QJSA unless the Participant waives the QJSA, with consent of the Spouse, and properly elects another available form of payment. Notwithstanding the preceding sentence, the Participant may, without spousal consent, elect an alternative joint and spousal annuity equal in value to the QJSA.

(A)   Definition.  "QJSA" means an immediate qualified joint and survivor annuity under which a reduced (compared to the amount of the Participant's Vested Accrued Benefit payable as a Single Life Annuity) amount is payable to the Participant for life and 50% of the reduced amount is payable to the Surviving Spouse, if any, for life after the Participant's death.

(B)   Monthly Payments.  The monthly amount payable to the Participant and the monthly amount payable to the Surviving Spouse shall not increase after payments begin.  The monthly payments under the QJSA shall be such that the value of the expected payments to the Participant and the Surviving Spouse is Actuarially Equivalent to the benefit payable as a Single Life Annuity.

(ii)   Not Married.  If the Participant is not married when benefit payments are to begin, the Participant's benefit shall be paid as a Single Life Annuity, unless the Participant waives that form and properly elects another available form of payment.

(b)   Optional Forms of Payment.  Upon waiver of the QJSA (or Single Life Annuity for an unmarried Participant), the Participant may elect one of the following optional forms of benefit payment.  A Beneficiary, including a Surviving Spouse, shall not be permitted to elect an optional form of payment.  Except as specified in Section 7.1(f)(ii)

with respect to the 75% joint and survivor annuity, a lump sum under (iv) below is the only available optional form of benefit payment for payment prior to the Participant's earliest Early Retirement Date.

(i) <u>Single Life Annuity</u>.  A "Single Life Annuity" is a monthly benefit payable in equal installments for the life of the Participant or other individual with no payments to be made for any periods after the recipient's death.

(ii) <u>50%, 75%, or 100% Joint and Contingent Annuity</u>.  A 50%, 75%, or 100% joint and contingent annuity is an Actuarial Equivalent monthly benefit payable to the Participant for life with a continuation of 50%, 75%, or 100% of the Participant's monthly benefit to the Participant's contingent annuitant for the remainder of the contingent annuitant's life after the Participant's death.

(iii) <u>60 or 120 Months Certain and Life Annuity</u>.  A 60 or 120 months certain and life annuity is an Actuarially Equivalent monthly benefit payable to the Participant while the Participant is alive.  If the Participant dies before receiving 60 or 120 monthly payments, the Participant's Beneficiary shall receive the monthly benefit the Participant was receiving until a total of 60 or 120 monthly payments have been paid.

(iv) <u>Lump Sum For Small Amounts</u>.  A lump sum is the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit payable in a single payment, or if necessary, in one or more payments, within one taxable year of the recipient.  The Actuarially Equivalent value of a Participant's Vested Accrued Benefit paid as a lump sum or as an immediate annuity (in lieu of the lump sum) before a Participant's Normal Retirement Date shall be Actuarially Equivalent to the Vested Accrued Benefit payable at Normal Retirement Date (without regard to any early retirement subsidies). The lump sum is available only if:

(A) <u>Consent Not Required</u>. Consent is not required pursuant to Section 7.5(e)(i); or

(B) <u>Remaining Monthly Benefit Less Than $100</u>.  A Participant whose vested percentage under Section 6.2(b) is 100% has elected a withdrawal of the Participant's Accumulated Contributions and the Participant's Accrued Benefit Derived From Employer Contributions after withdrawal of the Accumulated Contributions does not exceed $1,200 ($100 per month).

(c) <u>Modifications to Forms of Payment</u>.  Subject to the consent of the Participant's Spouse, if applicable, a Participant may elect to modify the form of monthly payment elected under (a) or (b) above as specified below. The Participant may choose one or both of the following options to the extent available based on the form of payment elected by the Participant.  A Surviving Spouse who is eligible to receive the QPSA may choose the staged payment option under (ii) below.

(i)     Pop-Up Option.  A Participant may elect to modify the QJSA or other contingent annuity elected under (b)(ii) above to include an Actuarially Equivalent pop-up. The pop-up option increases the amount of the monthly benefit payment to the Participant if the Spouse or other contingent annuitant dies before the Participant. In such event, the monthly payment to the Participant will increase to the monthly amount that would have been payable to the Participant as a Single Life Annuity when benefit payments began plus any applicable increase in past benefits that would have applied. The increased monthly payment payable to the Participant will commence with the monthly payment due for the month following the month in which the Spouse or other contingent annuitant dies and for each month thereafter for the life of the Participant.

(ii)     Staged Payment.  The purpose of this modification is to provide for payments that begin at or after age 62 and are initially based only on the portion of the benefit that is not subject to an early payment reduction and are then increased, at age 65, to include the portion of the benefit that would have been reduced if it had been paid earlier.  When this option is elected, the Participant or Surviving Spouse will receive monthly payments during the initial stage of payment that are attributable only to the Participant's Accrued Benefit as of August 31, 2005. The unreduced payments will begin on the elected date, which must be on or after the earliest date on which they would not be subject to an early payment reduction and before the Participant attains or would have attained age 65.  The monthly payments will increase, to include the value of the entire benefit, commencing with the monthly payment due for the month that includes the Participant's Normal Retirement Date.  The benefit payable under this option is an Actuarially Equivalent single benefit payable in two stages.

(d)     Direct Rollover to Another Plan.  At the election of the distributee, the Trustee shall transfer an eligible rollover distribution to the trustee or custodian of an eligible retirement plan for the benefit of the distributee.

(i)     Eligible Rollover Distribution.  An eligible rollover distribution is a distribution of any portion of the balance to the credit of a distributee, except that an eligible rollover distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent that the distribution is required under Code Section 401(a)(9); and any other distribution that is reasonably expected to total less than $200 during a year.

(ii)     Eligible Retirement Plan.  An eligible retirement plan is an individual retirement account or annuity described in Code Section 408(a), 408A, or 408(b), an annuity plan described in Code Section 403(a), a simple retirement account to the extent permitted under Code Section 408(p)(1)(B), an annuity contract described in Code Section 403(b), or a qualified plan described in Code Section 401(a), that accepts the distributee's eligible rollover distribution.  An eligible retirement plan also includes an eligible plan under Code Section 457(b) which is maintained by a state, political

subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this plan.

(A)  <u>After-Tax</u> <u>Contributions</u>.  For any portion of an eligible rollover distribution consisting of after-tax employee contributions that are not includable in gross income, an eligible retirement plan is an individual retirement account or annuity described in Code Section 408(a), 408A, or 408(b) or a qualified plan described in Code Section 401(a) or an annuity contract described in Code Section 403(b) that agrees to separately account for such portion.

(B)  <u>Non-Spouse</u> <u>Beneficiary</u>.  For any portion of a distribution deemed to be an eligible rollover distribution for a Beneficiary who is not a Spouse, an eligible retirement plan is an individual retirement account or annuity described in Code Section 408(a), 408A, or 408(b) that is established for the purpose of receiving the distribution on behalf of the designated Beneficiary and which is treated as an inherited IRA within the meaning of Code Section 408(d)(3)(C).

(iii)  <u>Distributee</u>.  A distributee includes the Participant, the Participant's Surviving Spouse, the Participant's Spouse or former Spouse who is an Alternate Payee under a QDRO, and a Beneficiary who is not a Spouse.

(e)  <u>Automatic</u> <u>Rollover</u> to <u>IRA</u>/<u>Mandatory</u> <u>Cashout</u>.  If the Participant is not required to consent to a payment pursuant to Section 7.5(e)(i)(A), the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit will be paid in a lump sum.  The Participant may elect to receive the lump sum payment in cash or to have the lump sum payment rolled over to an eligible retirement plan.  If no election is made and the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit exceeds $1,000, the Trustee will roll over the eligible rollover distribution to the trustee or custodian of an individual retirement plan designated by the Administrator.  If no election is made and the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit is $1,000 or less, the Trustee will distribute the lump sum payment directly to the Participant.

7.4    <u>Required</u> <u>Distribution</u> <u>Rules</u>.

Subject to the QJSA and QPSA provisions, this section generally states the requirements of Code Section 401(a)(9) and the Regulations and shall take precedence over any other provision of this plan that permits payment at a later time or in a smaller amount.  All payments shall be determined and made in accordance with the Regulations under Code Section 401(a)(9), including the minimum incidental benefit requirement under Code Section 401(a)(9)(G).

(a)    <u>Time</u> of <u>Distribution</u>.

(i)    <u>Required Beginning Date</u>.  Unless payments begin earlier, the entire interest of the Participant must be distributed or distribution must begin not later than the Participant's Required Beginning Date.  "Required Beginning Date" means the April 1 following the calendar year in which the Participant attains age 70 1/2, or, if later, following the calendar year in which the Participant's Termination Date occurs.

(ii)    <u>Death Before Required Beginning Date</u>.

(A)    <u>Surviving Spouse</u>. If the Participant has a Surviving Spouse and dies before the Required Beginning Date and before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, to the Surviving Spouse by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70 1/2, if later. If the Participant's Surviving Spouse dies after the Participant but before distributions to the Surviving Spouse begin, no benefit shall be payable.

(B)    <u>Commencement</u>. For purposes of this provision and (d) below, distributions are considered to begin on the Participant's Required Beginning Date. If annuity payments irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's Surviving Spouse before the date distributions are required to begin to the Surviving Spouse under the preceding paragraph), the date distributions are considered to begin is the date distributions actually commence.

(iii)    <u>Death After Required Beginning Date</u>. If the Participant dies after the Required Beginning Date, or if earlier, the date payment begins in the form of an irrevocable annuity, payments shall be made at least as rapidly as benefit payments were being paid to the Participant before death.

(b)    <u>General Annuity Requirements</u>.

(i)    <u>Annuity Payments</u>.  If benefit payments under this plan are paid in the form of an annuity, the annuity payments shall comply with the following requirements:

(A)    <u>Payment Intervals</u>.  The annuity payments will be paid in periodic payments made at uniform intervals not longer than one year;

(B)    <u>Payment Period</u>.  The distribution period will be over a life (or lives) or over a period certain not longer than the period described in (c) or (d) below;

(C)    <u>No Recalculation</u>.  Once payments have begun over a period certain, the period certain will not be changed even if the period certain is shorter than the maximum permitted; and

(D)    <u>Nonincreasing</u> <u>or</u> <u>Permissible</u> <u>Increase</u>.  Payments will either be nonincreasing or increase only as permitted under Regulation Section 1.401(a)(9)-6, Q&A-14.

(ii)    <u>Amount</u> <u>Required</u> <u>to</u> <u>be</u> <u>Distributed</u> <u>by</u> <u>Required</u> <u>Beginning</u> <u>Date</u>. The amount that must be distributed on or before the Participant's Required Beginning Date (or, if the Participant dies before distributions begin, the date distributions are required to begin under (a)(ii) above) is the payment that is required for one payment interval. The second payment need not be made until the end of the next payment interval even if that payment interval ends in the next calendar year. Payment intervals are the periods for which payments are received, e.g., bi-monthly, monthly, semi-annually, or annually. All of the Participant's benefit accruals as of the last day of the first distribution calendar year will be included in the calculation of the amount of the annuity payments for payment intervals ending on or after the Participant's Required Beginning Date.

(iii)    <u>Additional</u> <u>Accruals</u> <u>After</u> <u>First</u> <u>Distribution</u> <u>Calendar</u> <u>Year</u>. Any additional benefits accruing to the Participant in a calendar year after the first distribution calendar year will be distributed beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues.

(c)    <u>Requirements</u> <u>For</u> <u>Annuity</u> <u>Distributions</u> <u>That</u> <u>Commence</u> <u>During</u> <u>Participant's</u> <u>Lifetime</u>.

(i)    <u>Joint</u> <u>Life</u> <u>Annuities</u> <u>Where</u> <u>the</u> <u>Beneficiary</u> <u>Is</u> <u>Not</u> <u>the</u> <u>Participant's</u> <u>Spouse</u>. If the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a nonspouse beneficiary, annuity payments to be made on or after the Participant's Required Beginning Date to the designated beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Q&A-2(c)(2) of Regulations Section 1.401(a)(9)-6, in the manner described in Q&A-2(c) of those Regulations, to determine the applicable percentage. If the form of distribution combines a joint and survivor annuity for the joint lives of the participant and a nonspouse beneficiary and a period certain annuity, the requirement in the preceding sentence will apply to annuity payments to be made to the designated beneficiary after the expiration of the period certain.

(ii)    <u>Period</u> <u>Certain</u> <u>Annuities</u>. Unless the Participant's Spouse is the sole designated beneficiary and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the Uniform Lifetime Table set forth in Regulations Section 1.401(a)(9)-9, Q&A-2, for the calendar year that contains the Annuity Starting Date. If the Annuity Starting Date precedes the year in which the Participant reaches age 70, the applicable distribution period for the Participant is the distribution period for age 70 under the Uniform Lifetime Table set forth in Regulations Section 1.401(a)(9)-9, Q&A-2, plus the excess of 70 over the age of the

-42-

Participant as of the Participant's birthday in the year that contains the Annuity Starting Date. If the Participant's Spouse is the Participant's sole designated beneficiary and the form of distribution is a period certain and no life annuity, the period certain may not exceed the longer of the Participant's applicable distribution period, as determined under this section, or the joint life and last survivor expectancy of the Participant and the Participant's Spouse as determined under the Joint and Last Survivor Table set forth in Regulations Section 1.401(a)(9)-9, Q&A-3, using the Participant's and Spouse's attained ages as of the Participant's and Spouse's birthdays in the calendar year that contains the Annuity Starting Date.

(d)    Requirements For Minimum Distributions Where Participant Dies Before Date Distributions Begin.  If the Participant dies before the date distribution begins and there is a Surviving Spouse, the Participant's entire interest will be distributed, beginning no later than the time described in (a)(ii) above, over the life of the Surviving Spouse or over a period certain not exceeding:

(i)    Annuity Starting Date After First Distribution Calendar Year.  If the Annuity Starting Date is after the first distribution calendar year, the life expectancy of the Surviving Spouse determined using the Surviving Spouse's age as of the Surviving Spouse's birthday in the calendar year immediately following the calendar year of the Participant's death; or

(ii)    Annuity Starting Date Before First Distribution Calendar Year.  If the Annuity Starting Date is before the first distribution calendar year, the life expectancy of the Surviving Spouse determined using the Surviving Spouse's age as of the Surviving Spouse's birthday in the calendar year that contains the Annuity Starting Date.

(e)    Definitions.

(i)    Distribution Calendar Year. A distribution calendar year is a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin pursuant to (a) above.

(ii)    Life Expectancy.  Life expectancy is the life expectancy computed by use of the Single Life Table in Regulations Section 1.401(a)(9)-9, Q&A-1.

(f)    Actuarial Increase After 70 1/2.  If benefit payments to a Participant begin on a Required Beginning Date that is later than the April 1 following the calendar year in which the Participant attains age 70 1/2, the benefit shall be actuarially increased to reflect the delay in payment to the date on which benefit payments commence.

(i)    Period for Increase. The period for the actuarial increase shall begin on April 1 following the calendar year in which the Participant attains age 70 1/2 (or

January 1, 1997, in the case of an Employee who attained age 70 1/2 prior to 1996) and shall end on the date on which benefits commence after termination of employment in an amount sufficient to satisfy Code Section 401(a)(9).

       (ii)    <u>Amount</u> <u>of</u> <u>Increase</u>.  The amount of the increase for the period specified in (i) must result in a benefit that is Actuarially Equivalent to the benefit payable on the April 1 following the calendar year in which the Participant attains age 70 1/2 plus the Actuarially Equivalent value of all additional benefits accrued after that date minus the Actuarially Equivalent value of any benefit payments made after that date.

       (iii)    <u>Application</u> <u>of</u> <u>Suspension</u> <u>Rules</u>. The actuarial increase is generally the same as, and not in addition to, the actuarial increase required for that same period under Code Section 411 to reflect a delay in payments after the Participant's Normal Retirement Date, except that the actuarial increase required under Code Section 401(a)(9)(C) must be provided even during the period during which a Participant is in Section 203(a)(3)(B) Service regardless of whether a suspension of benefits notice has been provided in accordance with Section 7.9.

       For purposes of Code Section 411(b)(1)(H), the actuarial increase will be treated as an adjustment attributable to the delay in payment of benefits after the attainment of normal retirement age.  Accordingly, to the extent permitted under Code Section 411(b)(1)(H), the actuarial increase required under Code Section 401(a)(9)(C)(iii) may reduce the benefit accrual otherwise required under Code Section 411(b)(1)(H)(i), except that the rules on suspension of benefits are not applicable.

7.5    <u>Waiver</u> <u>of</u> <u>QJSA</u>; <u>Election</u> <u>of</u> <u>Method</u> <u>and</u> <u>Time</u> <u>of</u> <u>Benefit</u> <u>Payments</u>.

    (a)    <u>Waiver</u> <u>of</u> <u>QJSA</u>.

       (i)    <u>Notice</u> <u>of</u> <u>QJSA</u>. At least 30 days, but not more than 180 days, before the Annuity Starting Date, the Administrator will provide each Participant, in writing, a reasonable explanation of (A) the terms and conditions of the QJSA; (B) the Participant's right to waive, and the effect of the waiver of, the QJSA; (C) the rights of the Spouse; and (D) the right to revoke, and the effect of a revocation of, a previous waiver of the QJSA.

       (ii)    <u>Waiver</u>. During the 180-day period before the Annuity Starting Date, a Participant may waive the QJSA, or the Single Life Annuity if the Participant is not married, and may revoke a prior waiver. A waiver of a QJSA is not effective unless the Spouse consents to the waiver. Notwithstanding the preceding sentence, the Spouse's consent is not required if the Participant elects a form of payment that is an alternative joint and spousal annuity equal in value to the QJSA.  The waiver may be in the form of a written election under (g) below containing the Spouse's consent.

    (b)    <u>Spousal</u> <u>Consent</u>. A consent by a Spouse shall not be effective unless the consent is in writing, signed by the Spouse and witnessed by an individual designated for

this purpose by the Administrator or by a notary public. The consent must acknowledge the effect of the waiver of the QJSA. The consent is effective only with respect to the consenting Spouse and not with respect to a subsequent Spouse. Consent by the Spouse will be irrevocable with respect to the Participant's election, waiver, or designation of a Beneficiary to which the consent relates.

(i)     Specific Beneficiary or Form of Payment. The consent may be limited to payment to a specific alternate Beneficiary, including any class of Beneficiaries or any contingent Beneficiaries, and a specified form of payment. Any waiver after the revocation of a prior waiver or change of Beneficiary will require a new spousal consent.

(ii)    General Consent.   The consent may permit the Participant to designate a Beneficiary, or elect an optional form of benefit payment, or to change either or both without a further consent by the Spouse.  This form of consent is not valid unless the Spouse expressly and voluntarily permits such designations and elections without any further spousal consent.  The consent may be limited to certain Beneficiaries or to certain forms of payment.

(iii)   Additional Rules.

(A)    Revocation of Prior Waiver. A revocation of a prior waiver may be made by a Participant without the consent of the Spouse at any time prior to the Annuity Starting Date.  The number of revocations shall not be limited.

(B)    Unable to Locate Spouse. If it is established to the satisfaction of the Administrator that the Spouse cannot be located or if other circumstances set forth in Regulations issued under Code Section 417 exist, the Spouse's consent is not required.

(c)    Permitted Elections. To the extent permitted under this article and subject to waiver of the QJSA and the required distribution rules of Section 7.4 or the terms of a QDRO, the Participant or other recipient may elect the method and time of payment. To the extent satisfied under subsections (a) or (b), the requirements under (d) and (f) need not be met again.

(d)    Participant Consent. Except as specified in (e) below, if payment is due to termination of employment prior to the Participant's Normal Retirement Date for any reason other than death, plan termination, or pursuant to a QDRO, payment of benefits shall not begin without the Participant's consent. The consent shall be given by an election of benefit payments. An election of payment shall be made within the 180-day period ending on the Annuity Starting Date.

(i)     Notice of Right to Elect. The Participant will be notified of the right to elect benefit payments and when consent is required, the right (if any) to defer payments and the consequences of failing to defer. The written notice shall provide an explanation of the material features and relative values of the available forms of payment. The notice

shall be provided at least 30 days and not more than 180 days before the Annuity Starting Date.

       (ii)     Annuity Starting Date.  "Annuity Starting Date" means the first day of the first period for which an amount is payable in any form. Generally, the Annuity Starting Date is the date on which benefit payments may begin after all conditions and requirements for payment have been met.

          (A)     Suspension of Benefits.

             (1)     Employment Continues.  If benefit payments are suspended pursuant to Section 7.9 for an Employee who continues to be employed without terminating employment and without receiving benefit payments under this plan, the date benefit payments begin after the Participant's Termination Date shall be the Annuity Starting Date for the Participant.

             (2)     Payment Commenced.  If benefit payments that began prior to the Participant's Normal Retirement Date are suspended pursuant to Section 7.9 for an Employee who is reemployed, the date benefit payments start again shall not be a new Annuity Starting Date for the Participant.  The Participant's benefit shall be payable in accordance with the elections made by the Participant as of the initial Annuity Starting Date, adjusted actuarially for a later payment date, if applicable.

          (B)     Administrative Delay.  A payment shall not be considered to occur after the Annuity Starting Date merely because actual payment is reasonably delayed for calculation of the benefit amount if all payments due from the Annuity Starting Date are actually made.

    (e)     Exceptions.

       (i)     Mandatory Cashouts.

          (A)     $7,000 or Less.  Waiver of the QJSA and the Participant's consent are not required with respect to a payment when the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit is $7,000 (or such larger amount as may be specified in Code Section 411(a)(11)(A)) or less unless the distribution is one of a series of scheduled periodic payments and the Participant's consent was required at the time the initial payment was made.

          (B)     QDRO/$7,000 or Less.  If the Actuarially Equivalent present value of the portion of the Participant's Vested Accrued Benefit that is payable to an Alternate Payee under a QDRO is $7,000 (or such larger amount as may be specified in Code Section 411(a)(11)(A)) or less, distribution will be made to the Alternate Payee (without the consent of the Alternate Payee) even though the Participant may not be entitled to a concurrent distribution under the provisions of this plan.

(ii)     <u>Waiver</u> of <u>Notice</u> <u>Period</u>.  Payments may commence less than 30 days after the notices required under (a)(i) and (d)(i) above are given, provided:

(A)     <u>Right</u> to <u>30-day</u> <u>Period</u>.  The Administrator clearly informs the Participant that the Participant has a right to a period of at least 30 days after receiving the notices to consider the decision of whether or not to elect payment or to waive the QJSA and consent to a form of payment other than the QJSA;

(B)     <u>Election</u>.  The Participant, after receiving the notices, affirmatively elects an optional form of payment;

(C)     <u>Right</u> to <u>Revoke</u>.  The Participant is permitted to revoke the affirmative election until the Annuity Starting Date or, if later, at any time prior to the end of the 7-day period that begins the day after the notices are given to the Participant;

(D)     <u>Annuity</u> <u>Starting</u> <u>Date</u>.  The Annuity Starting Date is after the date the notices are provided to the Participant; and

(E)     <u>Benefit</u> <u>Payments</u>.  Benefit payments in accordance with the affirmative election may not commence before the end of the 7-day period described in (C) above, even if the Annuity Starting Date is before the date of the Participant's affirmative election.

(f)     <u>Election</u> <u>Requirements</u>.

(i)     <u>Time</u>.  The election shall be made not later than the date benefit payments begin or, if earlier, the date when benefit payments must begin. An election may be revoked or changed before benefit payments begin. Once benefit payments commence, the form of benefit payment may not be modified for any reason including, but not limited to, the subsequent death of the Participant, Spouse or other contingent annuitant or Beneficiary or divorce of the Participant and Spouse.

(ii)     <u>Form</u>.  An election shall be made in a form acceptable to the Administrator.

(iii)     <u>Other</u> <u>Conditions</u>.

(A)     <u>Void</u> <u>Upon</u> <u>Death</u>.  Subject to (B) below, an election shall become void upon the death of the Participant prior to the date the first monthly payment is required to be paid to the Participant. If a benefit is payable to a Surviving Spouse or other contingent annuitant and conditioned upon the survival of and measured by the life of the contingent annuitant, death of the contingent annuitant prior to the date the first monthly benefit is required to be paid to the Participant shall void the election.

(B)     <u>Terminally</u> <u>Ill</u> <u>Participant</u>.  If a terminally ill Participant has properly completed and filed an application for benefit payment, including any election of

an optional form of payment, so that the applicable initial payment month and date has been determined, and a physician certification or opinion is provided to the Administrator that, as of the date of filing of the application for payment of the benefit and any election of an optional form of payment, the Participant has or had less than three months of life expectancy, then the condition specified in (A) above that requires a Participant to be living on the first monthly payment date does not apply to the Participant.

(g)    Failure to Elect.  A failure to elect shall be deemed an election to defer payment to a later date.

(i)    Participant. If a Participant fails to make an election, the Administrator will direct the Trustee to commence benefit payments as a QJSA if the Participant is married, or as a Single Life Annuity if the Participant is not married, at the time and in the manner determined under Section 7.4. If, following a Participant's Termination Date, the Participant makes or is deemed to make an election to defer payment beyond the Participant's Normal or Late Retirement Date, the amount of the benefit payable to the Participant shall be Actuarially Equivalent to the benefit that would have been payable but for the deferral.

(ii)    Beneficiary/Alternate Payee.  If an Alternate Payee or Surviving Spouse fails to make an election, the Administrator shall direct the Trustee to commence benefit payments at the time and in the manner determined under Section 7.1, but in no event later than the Participant's Normal or Late Retirement Date.

(h)    Additional Information. The Administrator may require additional forms or information when required by law or deemed necessary or appropriate in connection with any benefit payment.

(i)    Time of Payment.

(i)    No Retroactive Payment.  Payment to a Participant will not be made for any period prior to the date the notice under (a)(i) is provided. A written application for benefits on the form provided for such purpose by the Administrator must be properly completed in order to commence benefit payments.  If written application as originally filed with the Administrator is not completed properly, benefit payments will not begin until a properly completed application has been filed.

(ii)    Date of Payment. Benefit payments due for a month occur on the 30th day of the month, or the last day of the month if the applicable month is February, but in fact as a matter of customary administrative practice are normally mailed or deposited directly a few days earlier than the 30th day of the month. Payment shall cease with the payment due on the 30th day of the month in which the Participant (or other Beneficiary) dies.

Docusign Envelope ID: 25023C20-4717-4821-9A45-31AC6EE8DBFD

7.6     Determination of Beneficiary.

A Participant's Beneficiary and successor Beneficiaries are determined under this section.  The determination of a designated beneficiary under Section 7.4 is not only determined under this section but also is subject to and determined under Code Section 401(a)(9) and Regulations.  A Participant may designate or change a Beneficiary by filing a signed designation with the Administrator in a form approved by the Administrator; provided, however, once benefit payments commence, the Beneficiary may not be changed.  The Participant's will is not effective for this purpose.

(a)     Beneficiary.  "Beneficiary" means the Person designated by the Participant, or determined under this section, to receive the Participant's benefits, if any, that are provided by this plan or by the form of payment in effect under this plan after the Participant's death.  The rules of this section apply to a designation by the Participant and in the absence of a valid designation or upon the failure of a designation by the Participant.

(b)     Successor Beneficiaries.  One or more successor Beneficiaries may be designated by the Participant or determined under this section.

(c)     Married Participant; Spousal Consent.  The Beneficiary of a married Participant shall be the Spouse unless the Spouse consents to designation of a Beneficiary other than the Spouse.  If a married Participant designates or changes a Beneficiary other than the Spouse without the Spouse's consent, the designation will be void.  A consent that permits further designations without consent is void unless the consent expressly permits such designations without additional spousal consent.

(i)     Consent.  Consent by the Spouse must be voluntary and must acknowledge and accept the consequences of the designation of a Beneficiary other than the Spouse.  Consent by the Spouse is irrevocable.  The consent and acknowledgment must be witnessed by an individual designated by the Administrator or by a notary public.  If the Spouse cannot be located or if any of the other exceptions set forth in Regulations issued under Code Section 417 apply, a consent is not required.

(ii)     Successors.  Spousal consent is not required for the designation or determination under this section of successor Beneficiaries to the Spouse.

(iii)     Change of Marital Status.  An existing Beneficiary designation by a Participant will be void upon the Participant's subsequent marriage or remarriage unless the new Spouse consents to the designation.

(d)     Default Determination.  If a Participant fails to designate a Beneficiary, or if there is no Beneficiary or successor at the Participant's death or at any later payment date for the reason specified in (e) below or for any other reason, the Beneficiary shall be the surviving Spouse at the time of the Participant's death and the Spouse's estate with respect to any amount remaining undistributed at the subsequent death of the Spouse.

If the Participant is not survived by a Spouse, the Beneficiary shall be the members of the first of the following classes with a living member on the date a benefit payment is due:

(i)    <u>Children</u>.  The Participant's children, including those by adoption, dividing the distribution equally among the Participant's children with the living issue of any deceased child taking their parent's share by right of representation;

(ii)    <u>Parents</u>.  The Participant's parents, dividing the distribution equally if both parents are living; or

(iii)    <u>Brothers and Sisters</u>.  The Participant's brothers and sisters, dividing the distribution equally among the Participant's living brothers and sisters.

(e)    <u>Death of Beneficiary</u>.  If payment to one Beneficiary is pending or has begun and the Beneficiary dies before all payments have been made, the remaining payments shall be paid to the successor Beneficiary designated by the Participant or, if no successor Beneficiary has been designated, to the Beneficiary determined under (d) above.  If payment is pending or has begun to more than one Beneficiary, payments shall continue to the survivor or survivors of them, and any amount remaining upon the death of the last survivor shall be paid to the successor Beneficiary designated by the Participant or, if no successor Beneficiary has been designated, to the Beneficiary determined under (d) above.  Survivors shall include the issue of any deceased child who shall take the deceased child's share by right of representation.

(f)    <u>No Surviving Beneficiary</u>.  If a deceased Participant has no surviving Beneficiary or successor Beneficiaries as designated by the Participant or as determined under (d) above on the date of the Participant's death, or on any subsequent date on which a payment is due, all remaining payments shall be paid to the Participant's estate, if then under the active administration of applicable probate or similar laws, or if not, to those Persons who would then take the Participant's personal property under the laws of the Participant's state of residence then in force, and in the proportions provided by those laws, as though the Participant had died at that time.

(g)    <u>Alternate Payee</u>.  An Alternate Payee awarded an independent benefit under this plan shall be considered a Participant for purposes of determining the Alternate Payee's Beneficiary under this section.

(h)    <u>Beneficiary Treated as Predeceased</u>.  A Beneficiary will be treated as having predeceased the Participant upon the occurrence of an event described in (i), (ii), or (iii) below.

(i)    <u>Disclaimer</u>. A Beneficiary may disclaim all or any portion of the Beneficiary's interest in any payments from this plan by filing a disclaimer with the Administrator. Upon the Administrator's acceptance of the disclaimer, the Beneficiary will be treated as having predeceased the Participant as to the portion disclaimed.

(ii)    <u>Slayer Rule</u>.  Unless otherwise provided under applicable law, if a Beneficiary is convicted of the felonious and intentional killing of the Participant, the Beneficiary will be treated as having predeceased the Participant.

(iii)    <u>Simultaneous Death</u>.   If the Participant and the Participant's Beneficiary die simultaneously or under circumstances such that it is not possible to determine the order of death, and the Participant's beneficiary designation form does not address simultaneous death, the Beneficiary will be presumed to have predeceased the Participant.

(i)    <u>Determination</u>.  The Administrator will apply the rules of this section to determine the proper Persons to whom payment should be made.  In making this determination, the Administrator may request additional documentation from any relevant Person and may conclusively rely on such documentation. The decision of the Administrator will be final and binding on all Persons.

7.7    <u>Facility of Payment</u>.

A payment under this section shall fully discharge CSI, the Administrator, and the Trustees from all future liability with respect to that payment.

(a)    <u>Incapacity</u>. If a recipient entitled to a payment is legally, physically, or mentally incapable of receiving or acknowledging payment, the Administrator may direct the payment to the recipient; or, for the benefit of the recipient, to the recipient's legal representative or any other Person who is legally entitled to receive payments on behalf of the recipient under the laws of the state in which the recipient resides; or to a custodian authorized to receive the benefit on the recipient's behalf under the applicable state's uniform transfers to minors act.

(b)    <u>Legal Representative</u>.  Neither CSI, the Administrator or the Trustees shall be required to commence probate proceedings or to secure the appointment of a legal representative.

(c)    <u>Annuity Contract Purchase</u>.  An annuity contract purchased and distributed by the plan shall comply with the requirements of this plan and shall be nontransferable. Notwithstanding the preceding sentence, if, due to the termination of this plan or for any other reason, an annuity contract is purchased to provide for the continued payment of a benefit that had been payable from this plan prior to the purchase of the annuity contract, the suspension provisions applicable to retirement benefits in pay status specified in Section 7.9 below will not apply.

7.8     Penalties.

        The following penalties apply to payment of, or failure to make payment of, certain amounts under this plan.

        (a)     Payment Before Age 59 1/2.  A Participant who receives a payment of benefits before attaining age 59 1/2 may be liable for an additional 10% federal income tax on any portion of the benefit payments included in gross income.

        (b)     Failure to Receive Minimum Payments.  For a calendar year in which a Participant or Beneficiary fails to receive the minimum payments required under Code Section 401(a)(9), the recipient may be subject to an additional tax up to 50% of the difference between the minimum payments and the amount the recipient actually received.


7.9     Suspension of Benefit Payments.

        (a)     Suspension.  Benefits will be suspended as specified in (i) or (ii) below and in accordance with this section; provided, however, that there will be no suspension for any calendar month during which the Participant does not complete at least 40 Hours of Service in Section 203(a)(3)(B) Service with a Participating Employer.

                (i)     Reemployment Prior to Age 65. Early Retirement Benefits, but not Normal Retirement Benefits or Late Retirement Benefits, in pay status will be suspended for each month during which the Employee is employed on a half-time or more basis with a Participating Employer.

                        (A)     Half-Time Basis.  For purposes of (i) above, an Employee is considered to be employed on a half-time or more basis if the Employee is scheduled as of the first day of the Plan Year to work at least 1,000 Hours of Service in a Plan Year or shifts to a half-time or more position during a Plan Year that would have resulted in the Participant working more than 1,000 Hours of Service during that Plan Year if the Participant had been employed in that position for the entire Plan Year.

                        (B)     Section 203(a)(3)(B) Service.  "Section 203(a)(3)(B) Service" means employment with a Participating Employer for any period beginning on or after the date benefit payments actually begin or the date benefit payments would have begun if the Participant was not employed by the Participating Employer as described in ERISA Section 203(a)(3)(B) and Regulations.

                (ii)    Continuing Employment After Normal Retirement Date.  Unless, or until, benefit payments commence to a Participant whose employment continues after the Participant's Normal Retirement Date, the Normal Retirement Benefit that would have been payable to the Participant if the Participant had elected to commence benefits on the Participant's Normal Retirement Date will be considered suspended under this

provision as if the Participant had been receiving benefits since the Participant's Normal Retirement Date.

    (b)  <u>Notification</u>.  No payment will be withheld under this section unless the Administrator notifies the Participant by personal delivery or first-class mail during the first calendar month or payroll period in which this plan withholds payment that benefit payments are suspended.

    (i)  <u>Content</u>. The notification will contain a description of the specific reasons why benefit payments are being suspended, a description of the plan provision relating to the suspension of payments, a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in Section 2530.203-3 of the Code of Federal Regulations.  In addition, the notice shall inform the Participant of this plan's procedures for affording a review of the suspension of benefits.  A request for review may be considered in accordance with the claims procedure adopted by the plan pursuant to ERISA Section 503 and applicable Regulations.

    (ii)  <u>Additional Information Concerning Offset</u>.  If the plan intends to offset payments pursuant to (e) below, the notice must include specific identification of the periods of employment, the suspendable amounts which are subject to offset, and the manner in which the plan intends to offset such suspendable amounts.  An offset may not be implemented unless or until the notice has been expanded to include this additional information.

    (c)  <u>Resumption of Payment</u>.  If benefit payments have been suspended, payments will resume as specified below.

    (i)  <u>Timing</u>.  Benefit payments will resume no later no later than the first day of third calendar month after the calendar month in which the earliest of the following events occurs:

    (A)  <u>Ceases Employment</u>. The Participant ceases to be employed in Section 203(a)(3)(B) Service;

    (B)  <u>Attains Age 65</u>.  If the Participant's Early Retirement Benefit was suspended under (a)(i) above, the date the Participant attains age 65; or

    (C)  <u>Reemployment After Age 65</u>.  If a Participant was reemployed prior to May 1, 2024, and the Participant's Early, Normal, or Late Retirement Benefit is suspended as of May 1, 2024, under the provisions of this plan in effect on April 30, 2024, the later of (i) the date the Participant attains age 65 or (ii) May 1, 2024.

    (ii)  <u>Amount</u>.  The initial payment upon resumption will include the payment scheduled to occur in the calendar month when payments resume and any amounts withheld during the period between the cessation of Section 203(a)(3)(B) Service and the resumption of payments. Benefits payable upon resumption of benefit

payments will not be less than the amount of the suspended benefit plus any additional benefit accrued during the period of reemployment.

(iii)    Actuarial Increase.  An Accrued Benefit Derived From Employer Contributions will not be actuarially increased by reason of a period of suspension; however, an actuarial increase will be applied to the portion of the suspended Accrued Benefit Derived From Employee Contributions only if, and to the extent necessary, to prevent a permanent forfeiture of any portion of the Accrued Benefit Derived From Employee Contributions.

(d)    Amount Suspended.  The entire amount payable shall be withheld for any calendar month for which there is a suspension, but the amount that is permanently suspended and forfeited shall be limited to the following portions of the Employer-derived portion of the suspended benefit payment, as applicable:

(i)    Life Annuity.  With respect to benefits payable periodically on a monthly basis for as long as a life (or lives) continue, such as a Single Life Annuity or a QJSA, an amount equal to the portion of a monthly benefit payment derived from Employer Contributions.

(ii)    Other Benefit Forms.  With respect to benefits payable in a form other than the forms described in (i) above, an amount of the portion of benefit payments derived from Employer Contributions for a Plan Year in which the Participant is employed in Section 203(a)(3)(B) Service, equal to the lesser of (A) the amount of benefit that would have been payable to the Participant during the Plan Year if the Participant had been receiving monthly benefits under this plan since actual retirement based on a Single Life Annuity beginning at actual retirement age or (B) the actual amount paid or scheduled to be paid to the Participant for such Plan Year.  Payments scheduled to be paid less frequently than monthly may be converted to monthly payments for purposes of the preceding sentence.

(e)    Offset.  If benefits that should be suspended under this provision are paid to a Participant, those benefit payments may offset future benefit payments in accordance with Regulations under ERISA Section 203(a)(3)(B), provided, that such deduction or offset does not exceed in any one month 25 percent of that month's total benefit payment which would have been due but for the offset (excluding the initial payment described in (b) above, which may be subject to offset without limitation).

(f)    Not Applicable.  This section does not apply to the Minimum Accrued Benefit to which the Participant is entitled, if any, or to any individual who is receiving a benefit from this plan and earnings from employment (other than from employment with a Participating Employer) or self-employment.

ARTICLE 8

Administration of the Plan

8.1    Responsibilities of CSI.

CSI shall be responsible for:

(a)    Employer Contributions.    Determining the amount of Employer
Contributions;

(b)    Trustee.  Appointing the Trustees;

(c)    Amendment.  Amending this plan;

(d)    Plan Termination.  Terminating this plan in its entirety; and

(e)    Merger.  Merging this plan with another qualified retirement plan.

8.2    Action by CSI.

An action required to be taken by CSI may be taken by its Board of Directors, a
committee of the Board of Directors, or by an individual authorized to act on behalf of CSI.

8.3    Plan Administrator; Named Fiduciary.

"Administrator" means the Trustees appointed by CSI to administer this plan in
accordance with the provisions of this Article.  The Administrator is a named fiduciary for
operation and management of this plan and shall have the responsibilities conferred by
ERISA upon the "Administrator" as defined in ERISA Section 3(16).

8.4    Administrator Operation and Organization.

(a)    Bylaws. The Trustees have adopted bylaws governing their organization
and the bylaws are attached to this plan as Appendix A.  The bylaws provide for the hiring
of certain administrative officers who will have charge of the day-to-day operation of this
plan.  The bylaws, including any amendments to the bylaws, are subject to approval by
the Board of Directors of CSI.

(b)    Membership. The Trustees shall be appointed and removed in accordance
with the terms of the Trust Agreement. If, at any time there are no current Trustees, CSI
shall perform the functions of the Administrator.

(c)    Actions.  The bylaws cover the details of meetings of the Board of Trustees and the specific procedures by which the Trustees take action with respect to this plan and the Trust Fund.

(d)    Agent.  The Executive Secretary-Treasurer of the Board of Trustees will serve as the agent for service of process.

(e)    Compensation.  Any Trustee who is an Employee shall serve without compensation for service as a Trustee.

(f)    Conflict of Interest.  Any Trustee who is a Participant shall not vote or act on a matter that relates solely to that Participant.

8.5    Duties, Powers, and Responsibilities of the Administrator.

The Administrator has the following duties, powers, and responsibilities and will:

(a)    Plan Interpretation and Administration. Have discretionary authority to:

(i)    Interpret. Interpret and construe all provisions of this instrument (including resolving an inconsistency or ambiguity or correcting an error or an omission);

(ii)    Administer. Administer the plan in accordance with its terms and provisions;

(iii)    Decisions. Make final, conclusive, and binding decisions based on its interpretations, and any such determinations shall be given deference in the event it is subject to judicial review;

(b)    Investment Manager.  If appropriate, appoint one or more Investment Managers, who shall have the power to acquire, manage, or dispose of any or all plan assets subject to:

(i)    Functions.  The functions of the Investment Manager shall be limited to those specified services and duties for which the Investment Manager is engaged;

(ii)    Qualification.  "Investment Manager" means a Person, as defined under ERISA 3(38), who is either (1) registered as an investment adviser under the Investment Advisers Act of 1940; (2) not registered as an investment adviser under the Investment Advisers Act of 1940 by reason of paragraph (1) of section 203A(a) of such Act, but is registered under the state in which it maintains its principal office and place of business and has filed a copy of its state registration form with the Department of Labor; (3) a bank (as defined in the Investment Advisers Act of 1940); or (4) an insurance

company licensed to manage, acquire, and dispose of assets of qualified retirement plans under the laws of more than one state; and

(iii)     Acknowledgment.  The Investment Manager must acknowledge in writing that it is a fiduciary to this instrument;

(c)     Investment Adviser.  If appropriate, appoint one or more investment advisers to render advice or make recommendations with respect to any or all plan assets subject to:

(i)     Functions.  The function of an investment adviser shall be limited to those specified services and duties for which the investment adviser is engaged; and

(ii)     Acknowledgement.  When appropriate, the investment adviser must acknowledge in writing that it is a fiduciary with respect to this instrument; and

(d)     Custodian.  If appropriate, appoint one or more agents to act as custodian of plan assets transferred to the custodian;

(e)     Participant Rights.   Subject to Section 8.10, determine the rights of Participants and Beneficiaries under the terms of this plan;

(f)     Limits; Tests.  Be responsible for determining that this plan complies with all limitations and tests under the Code and Regulations and maintain records necessary to demonstrate compliance with such limits and tests;

(g)     Benefits and Vesting.  Determine the Accrued Benefit of each eligible Participant and the Participant's vested percentage;

(h)     Errors.  Correct an error, including (but not limited to) errors in calculation of benefits or in determination of vesting or payment of a Participant's benefits;

(i)     Claims and Elections.  Establish or approve the manner of making and reviewing Claims, elections, and applications;

(j)     Benefit Payments.  Determine the time payments are to be made or to begin, the recipient of the payment, and the elected form of payment;

(k)     QDRO Determination.  Establish procedures to determine whether or not a domestic relations order is a QDRO, notify the Participant and any Alternate Payee of this determination, and assign benefits to the Alternate Payee pursuant to a QDRO;

(l)     Administration Information.  Obtain to the extent reasonably possible all information necessary for the proper administration of this plan;

(m)    <u>Recordkeeping</u>.  Establish procedures for and supervise the establishment and maintenance of all records necessary and appropriate for the proper administration of this plan;

(n)    <u>Reporting</u> <u>and</u> <u>Disclosure</u>.  Prepare and (i) file annual and periodic reports required under ERISA and Regulations; and (ii) distribute applicable disclosure documents including (but not limited to) the summary plan description, an explanation to recipients of payments eligible for rollover treatment, the annual funding notice, requested and required benefit statements, and notices, if any, required by Code Section 433 and Regulations with respect to benefit restrictions;

(o)    <u>Advisers</u>.  Employ and rely on the advice and information provided by attorneys, "Actuaries" (an individual or firm employed to provide actuarial services for this plan), accountants, clerical employees, agents, or other Persons who are necessary for operation, administration, and management of this plan;

(p)    <u>Expenses</u>, <u>Fees</u>, <u>and</u> <u>Charges</u>.  To pay or reimburse from the Trust Fund all reasonable and necessary expenses, fees and charges, including fees for attorneys, Actuaries, accountants, clerical employees, agents, or other Persons, incurred in connection with the administration, management, or operation of this plan;

(q)    <u>Nondiscrimination</u>.  Apply all rules, policies, procedures, and other acts without discrimination among Participants;

(r)    <u>Delegation</u>.  To delegate any of its authority and allocate any of its responsibilities for the administration and operation of this plan to any one or more Employees of a Participating Employer by written instruction to that effect;

(s)    <u>Bonding</u>.  Review compliance with the bonding requirements of ERISA; and

(t)    <u>Other</u> <u>Powers</u> <u>and</u> <u>Duties</u>.  Exercise all other powers and duties necessary or appropriate under this plan, except those powers and duties allocated to another named fiduciary.

8.6    <u>Delegation</u> <u>of</u> <u>Duties</u>.

(a)    <u>General</u>.  The powers and duties set forth in Sections 8.1 and 8.5 may be delegated by CSI or the Administrator (subject to any applicable limits on its authority to delegate) to another Person.

(b)    <u>Fiduciary</u> <u>Duties</u>.  Delegation of fiduciary duties must be:

(i)    <u>In</u> <u>Writing</u>.  In writing and specify (i) the effective date of the delegation; (ii) the responsibility delegated; and (iii) the name, office, or other reference of each Person to whom the responsibility is delegated; and

(ii)   <u>Acceptance of Responsibility</u>.   Communicated to the fiduciary to whom the responsibility is assigned, and written acceptance of the responsibility must be made by the fiduciary.  The fiduciary will retain the responsibility until the fiduciary resigns or rejects the responsibility in writing, or CSI or the Administrator takes a superseding action.

(c)   <u>Conflict</u>.   If a delegate's powers conflict with those of CSI or the Administrator, the powers of CSI or the Administrator will control.  Action taken by a delegate that is in conflict with any action taken by CSI or the Administrator will be void.

8.7   <u>Interrelationship of Fiduciaries; Discretionary Authority</u>.

A Person may serve in more than one fiduciary capacity with respect to this plan and the Trust Fund.

(a)   <u>Performance of Duties</u>.   Each fiduciary will act in accordance with this plan and the Trust Fund.  Each fiduciary will be responsible for the proper exercise of its responsibilities.

(b)   <u>Reliance on Others</u>.   Except as required by ERISA Section 405(b), each fiduciary may rely upon the action of another fiduciary and is not required to inquire into the propriety of any action.

(c)   <u>Discretionary Authority of Fiduciaries</u>.   Each fiduciary will have full discretionary authority in the exercise of the powers, duties, and responsibilities allocated or delegated to that fiduciary under this instrument.  Decisions made by a fiduciary will be final and binding on all affected and interested parties.

8.8   <u>Indemnification</u>.

CSI shall indemnify, defend, and hold harmless, to the fullest extent permitted by ERISA, each member of the Board of Directors, each member of the Board of Trustees, and each Employee to whom fiduciary duties or other responsibilities for the operation and administration of this instrument have been assigned or delegated, from any and all claims, losses, damages, expenses, and liabilities arising from any action or failure to act with respect to any matter related to this instrument.

(a)   <u>Expenses</u>.   Indemnification under this plan shall include payment of all expenses actually and reasonably incurred by an individual in defense of any action, suit, proceeding, claim, issue, or matter (including attorneys' fees).

(i)   <u>Advance</u>. CSI may pay expenses incurred in advance of a final disposition as authorized by the Board of Directors, but only upon receipt of a commitment

by or on behalf of the individual to repay such amount if the indemnity is not permitted by ERISA.  Such expenses shall be paid from the general assets of CSI and shall not be paid from the Trust Fund.

(ii)    Repayment. The individual shall repay any expenses paid by CSI as soon as administratively feasible after a final disposition that finds such indemnity is not permitted by ERISA.

(b)    Insurance.  Liability insurance may be purchased and maintained to guard against claims, losses, damages, expenses, and liabilities arising from the performance or failure to perform any power, duty, or responsibility with respect to this instrument.


8.9    Fiduciary Standards.

Each fiduciary shall act solely in the interest of Participants and Beneficiaries:

(a)    Prudence.    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent Person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(b)    Exclusive Purpose.  For the exclusive purpose of providing benefits and paying expenses of administration; and

(c)    Prohibited Transaction.  To avoid engaging in a prohibited transaction under the Code or ERISA unless an exemption for the transaction is available or obtained.


8.10   Claims; Appeal Procedures.

(a)    Claims.  A "Claim" is a written request or allegation made by a Participant, Beneficiary, or Alternate Payee ("Claimant") with respect to any aspect of the operation or administration of the plan.  A Claim may include, but is not limited to, a request for benefits or an allegation that the Administrator, Employer, or other fiduciary has violated the Code or ERISA.

(i)    Deadline for Submission.

(A)    General. A Claim other than a claim involving a breach of fiduciary duty must be submitted to the Administrator within six months of the date of the event giving rise to the Claim.

(B)    Breach of Fiduciary Duty. A Claim involving an alleged breach of fiduciary duty must be submitted within one year from the date on which the Claimant

had actual knowledge of the alleged breach, but no later than three years from the date
of the alleged breach.

(ii)    Deadline for Response.    The Administrator will provide written
notification of the determination to the Claimant not later than 90 days after receipt of the
Claim unless the Administrator determines that special circumstances require an
extension of time for processing the Claim.

(b)    Notification of Adverse Determination.    Notification of an adverse
determination shall be written in a manner that can be understood by the Claimant and
will include: (i) the specific reasons for the denial; (ii) specific reference to pertinent plan
provisions on which the denial is based; (iii) a statement outlining additional material or
information necessary to enable approval of the Claim and the reasons why such material
is necessary; and (iv) an explanation of the appeal procedures, including a statement of
the Claimant's right to initiate a lawsuit in the event of a denial on appeal.

(c)    Appeal to Administrator. Any Claimant asserting entitlement to a benefit
different from the benefit approved by the Administrator in response to the application for
payment, or who has received an adverse determination from the Administrator, may,
within 120 days after notice of the determination, file a written appeal for a full and fair
review by the Administrator.

(d)    Administrator Decision. The Administrator shall approve or deny the
appeal.  Written notification will be provided to the Claimant within 60 days after receipt
of the appeal, unless the Administrator determines that circumstances require an
extension of time for processing the appeal.

(e)    Appeal to CSI.  A Claimant who is notified of an adverse determination with
respect to the appeal made to the Administrator may, but shall not be required to, submit
a written appeal for a full and fair review by the Board of Directors of CSI within 60 days
after notice of the determination by the Administrator.

(f)    CSI Decision.  If an appeal is made to the Board of Directors of CSI, the
Board of Directors will render a final determination and provide written notification to the
Claimant within 120 days after receipt of the appeal, unless the Board of Directors
determines that circumstances require an extension of time for processing the appeal.

(g)    Notification of Adverse Determination on Appeal.  Notification of an adverse
determination on appeal will be written in a manner that can be understood by the
Claimant and will include: (i) the specific reasons for the denial; (ii) specific reference to
pertinent plan provisions on which the denial is based; (iii) a statement of the Claimant's
right to reasonable access to, and copies of, all documents, records and information
relevant to the Claim at no cost; and (iv) an explanation of the additional appeal
procedures, if any are available, including a statement of the Claimant's right to initiate a
lawsuit.

(h)    Extensions.  If the response time in (a), (d), or (e) is extended, written notice of the extension must be provided within the original response period and the extension cannot be longer than the original response period – i.e., 90 or 60 days.  Notice of the extension must specify the circumstances requiring the extension and the date by which the determination is expected to be completed.

The initial and extended response times in (d) and (e) are automatically extended, to the extent permitted under Regulations Section 2560.503-1(i), based on the scheduled meeting dates of the Trustees and the Board of Directors of CSI.  The Trustees and the Board of Directors of CSI respectively shall appoint an appeals committee, or delegate the responsibility for appeals to an existing committee, for all claims for which response times related to their respective scheduled meeting dates are not allowed under the Regulations.  In those cases, the committee shall be the appropriate named fiduciary and shall act for the Trustees or the Board of Directors for purposes of the appeals, with full and absolute authority and discretion to make the required decisions.

(i)    Full and Fair Review.  A full and fair review provides the Claimant with (i) reasonable access to, and copies of, all documents, records, and information relevant to the Claim at no cost, (ii) the opportunity to submit written comments, documents or information relating to the Claim, and (iii) the right to have such comments, documents or information taken into account, even if not submitted or considered in the preceding determination.

(j)    Authorized Representative; Hearings.  A Claimant may designate an authorized representative to act on behalf of, or with, the Claimant at all stages of a Claim or other action against the plan. If the Claimant designates a representative, all communications will be with that representative and not with the Claimant.  There shall be no right to a hearing or other presentation before the Administrator, the Board of Directors of CSI, or their respective committees.  The Administrator, the Board of Directors of CSI, or their respective committees may, in its sole discretion, require a hearing or other presentation if deemed necessary for full and fair review and adjudication of the Claim.

8.11   Seeking Review of a Claim in Court.

(a)    Exhaustion of Appeal Procedures Required.  A Claimant may not file any action regarding a Claim against the plan, the Employer, the Administrator, or other fiduciary in court before first exhausting the administrative remedies set forth in Section 8.10.

(b)    Filing Deadline.  If a Claimant exhausts the administrative remedies as set forth in Section 8.10 and then elects to bring an action in court, such action must be filed no later than six months from the date of the Administrator's written determination on the appeal of the Claim.  If a Claimant does not bring an action in court within this timeline, the Claim will be considered waived.

(c)    Forum Selection.  Any suit, action, or other legal proceeding arising out of or relating to this plan or a fiduciary must be brought exclusively in a court of competent jurisdiction in the State of Michigan.

(d)    Administrator's Failure to Follow Appeal Procedures.  If the Administrator does not follow the procedures set forth in Section 8.10 with respect to a Claim, the Claimant may seek review of such Claim in court if the action is brought no later than six months from the date on which the determination from the Administrator was due.

8.12    Participating Employer Responsibilities.

A Participating Employer shall be responsible for:

(a)    Employee Information.  Supplying all necessary information with respect to each Employee who is a Participant under the plan;

(b)    Payment of Employer Contribution.  Paying Employer Contributions, including any applicable interest, which are plan assets when due;

(c)    Payment of Assessments Due to Incorrect Information. Paying any amounts due that are incurred in the operation, administration, and management of this plan assessed by the Trustees to the Participating Employer that are directly attributable to the Participating Employer as a result of incorrect or fraudulent information provided by the Participating Employer to the Administrator;

(d)    Penalties; Excise Taxes.  Paying any penalty tax or excise taxes incurred by this plan in the amount allocated to the Participating Employer;

(e)    Records. Maintaining and providing records required by the Administrator or CSI;

(f)    Financial Information.  Providing financial information requested by the Trustees or CSI;

(g)    Payment of Withdrawal Liability.  Paying withdrawal liability, including any required interest, upon the Participating Employer's voluntary or involuntary termination as a Participating Employer, which are plan assets when due;

(h)    Additional Information.  Providing any additional information the Administrator deems necessary to administer the plan; and

(i)    Other Acts.  Performing such other acts as may be necessary to such Participating Employer's participation in this plan.

8.13   Participant's Responsibilities.

(a)   Requests. All requests for action of any kind by a Participant, Surviving Spouse, or Beneficiary, including an Alternate Payee, under this plan shall be in writing, executed by the applicable party, and shall be subject to any other plan rules applicable to any specific type of request.

(b)   Furnish Information. Each Participant, Surviving Spouse, or Beneficiary, including an Alternate Payee, will furnish the Administrator information reasonably necessary for the proper administration of this plan, including, without limitation, proof of identity, proof of age, current mailing address, and employment status.  In the absence of necessary information, the Administrator may use and rely on information they deem reliable regardless of the source of the information or if no reliable information exists, benefit payments due may be withheld until such information is obtained by the Administrator.

8.14   Electronic Administration.

Notwithstanding the requirement set forth in this plan that certain transactions, notices, elections, consents and disclosures be evidenced in the form of written documentation, documentation for such transactions, notices, elections, consents or disclosures may be provided or obtained through electronic media to the extent consistent with Regulations and other guidance.

8.15   Qualified Domestic Relations Orders.

The determination of whether or not any domestic relations order received by this plan is a qualified domestic relations order ("QDRO") will be made by the Administrator in accordance with the procedures established for this plan. If not provided at an earlier time, a copy of such procedures will be furnished to the parties named in the domestic relations order at the time the order is received by the Administrator. The Administrator will determine whether the domestic relations order is a QDRO within a reasonable period of time after receiving the order.

(a)   QDRO. As described in Code Section 414(p), a QDRO is a qualified domestic relations order issued by a competent state court that:

(i)   Benefits.  Creates or recognizes the existence of an Alternate Payee's right to receive, or assigns to an Alternate Payee the right to receive, all or a portion of the benefits payable with respect to a Participant;

(ii)   Reason.  Relates to alimony, support of a child or other dependent, or a division of marital property;

(iii)    <u>Contents</u>.  Contains the name and address of the Participant and the Alternate Payee, the amount of benefits or percentage of the Participant's Vested Accrued Benefit to be paid, the date as of which the amount or percentage is to be determined, and instructions concerning the timing and method of payment; and

(iv)    <u>Restrictions</u>.   Does not (1) require this plan to pay more to the Participant and all Alternate Payees than the Actuarially Equivalent present value of the Participant's Vested Accrued Benefit; (2) specify a method, benefit commencement date, or duration of payment not otherwise permitted under this plan; or (3) cancel the prior rights of another Alternate Payee.

(b)    <u>Alternate Payee</u>.  "Alternate Payee" means any Spouse, former Spouse, child, or other dependent of a Participant who is recognized by a QDRO as having a right to receive all or a portion of a Participant's benefits payable under this plan.

(i)    <u>Rights</u>.   An Alternate Payee shall have no rights to a Participant's benefit and no rights under this plan other than the rights specifically granted to the Alternate Payee pursuant to a QDRO that are consistent with this plan.

(ii)    <u>Anti-Alienation</u>.  Any reference to Beneficiary in Section 12.1 shall also apply to an Alternate Payee who is awarded an independent benefit under this plan.

(iii)    <u>Written Requests</u>.  All requests for action by an Alternate Payee under this plan shall be in writing, executed by the Alternate Payee, and subject to all other plan provisions applicable to such requests for action.

ARTICLE <u>9</u>

<u>Funding</u>

The Trust Fund has been established by CSI as the funding vehicle for this plan. Under the provisions of the Trust Agreement, the Trustees will receive contributions from the Participating Employers and will hold, invest, and distribute the assets of the Trust Fund in accordance with the terms and conditions of this plan and the Trust Agreement. Neither the Board of Directors, nor any Participating Employer, nor the Trustees shall be liable in any manner if the assets of the Trust Fund are insufficient to provide for the payment of all benefits specified in this plan.  Except as provided under Title IV of ERISA, the benefits of the plan are payable only from the Trust Fund and only to the extent the Trust Fund is sufficient for that purpose.

## ARTICLE 10

## Amendment, Mergers, Successor Employer

**10.1    Amendment by CSI.**

CSI reserves the right at any time or times to alter, amend or modify the plan or the Trust Agreement, or both, provided that no amendment or modification may be made that enlarges the rights of any Participating Employer except as required by applicable law.  Any amendment adopted by CSI shall be binding on each Participating Employer.

(a)    Prohibitions. An amendment, other than a Material Amendment, may be made without the consent of any other Person, except that an amendment shall not:

(i)    Decrease Benefit.  Decrease a Participant's Vested Accrued Benefit, determined as of the later of the date the amendment is adopted or becomes effective, except as permitted by ERISA Section 302(c)(8) and 412(d)(2);

(ii)    Reduce Vested Percentage.    Reduce a Participant's vested percentage as of the later of the adoption of the amendment or the effective date of the amendment;

(iii)    Modify the Vesting Schedule.    Modify the vesting schedule for a Participant who was a Participant on the later of the effective date or the date of adoption of the amendment, except to increase the Participant's vested percentage (for each Year of Vesting Service); and

(iv)    Elimination of Protected Benefits.    Eliminate any early retirement benefits and retirement-type subsidy under Code Section 411(d)(6)(B)(i) or any optional forms of distribution with respect to benefits attributable to service earned before the amendment, except as may be permitted under Code Sections 401(a)(4) and 411.

(b)    Notice.  An amendment which provides for a significant reduction in future benefit accruals shall require at least 45 days' prior notice to affected Participants and Alternate Payees before becoming effective.

(c)    Material Amendment.  An amendment that is a Material Amendment may not be made without the consent of the Participating Employers in accordance with Section 10.3(c).

**10.2    Amendment by Warner Norcross + Judd LLP.**

(a)    Pre-Approved Plan Sponsor.  Warner Norcross + Judd LLP, in its capacity as a pre-approved plan sponsor, has established this pre-approved defined benefit

pension plan as defined in Section 4.06 of Revenue Procedure 2017-41 or in any successor guidance issued by the Department of Treasury.  Warner Norcross + Judd LLP has been issued an advisory letter by the IRS as to the acceptability of the form of this pre-approved plan under Code Section 401(a).  Warner Norcross + Judd LLP is located at 150 Ottawa Avenue, NW, Suite 1500, Grand Rapids, Michigan 49503-2832, (616) 752-2000.

(b)    Authorized Amendments.  Warner Norcross + Judd LLP is permitted to amend this plan on behalf of CSI for changes in the Code, Regulations, revenue rulings, other statements published by the Internal Revenue Service (including model, sample, or other required good faith amendments, but only if their adoption will not cause the plan to be individually designed), and for corrections of prior approved plans. Warner Norcross + Judd LLP will inform CSI of amendments made to the plan, including, but not limited to, any amendment to discontinue the plan.

(c)    Termination of Authority.  Warner Norcross + Judd LLP will no longer have the authority to amend the plan on behalf of CSI as of the date the first of the following causes the plan to become individually designed:

(i)    Type of Plan. The date CSI amends the plan to incorporate a type of plan not permitted under the pre-approved plan program, as described in Revenue Procedure 2017-41 or any superseding guidance;

(ii)    Individually Designed.  The date the Internal Revenue Service notifies CSI that the plan is an individually designed plan due to the nature and extent of amendments by CSI; or

(iii)    Revocation.  The date CSI revokes, or is deemed to revoke, this authorization to amend on behalf of CSI by notification to Warner Norcross + Judd LLP that they will no longer represent CSI with respect to the plan.

10.3    Amendment by Participating Employer.

A Participating Employer has no right to amend this plan or any provision of this plan affecting the Participating Employer except as specified below.

(a)    Participating Employer Termination. A Participating Employer may terminate its participation in this plan in accordance with Section 11.2.

(b)    Material Changes. A Material Amendment to this plan must be approved by the Participating Employers in accordance with the procedures in (c) below. A Material Amendment ("Material Amendment") is an amendment to this plan that is not required by law and either materially increases benefits to Participants under this plan, materially expands the Employees that are eligible to participate in this plan, or terminates this plan in its entirety. Material Amendments include (and are limited to):

(i)    New Adopting Employer. Except as specified in Section 11.3 with respect to a successor to a Participating Employer assuming the original Participating Employer's obligations under the plan, permitting an employer to adopt this plan and become a Participating Employer on or after July 1, 2018;

(ii)    Unfreeze Participation. Permitting new or rehired Employees employed (or reemployed) on or after September 1, 2019, to become Participants in this plan;

(iii)    Resume Accruals. Resuming benefit accruals on or after September 1, 2019;

(iv)    Normal Retirement Date. Changing the definition of Normal Retirement Date to a lower retirement age;

(v)    Early Reduction Factors. Modifying the reduction factors under Sections 5.2(c) or 5.4(c) applicable to payment of the Early Retirement Benefit or Deferred Vested Benefit prior to Normal Retirement Date to increase the subsidy;

(vi)    Vesting.  Modifying the vesting schedule under Section 6.2(b); and

(v)    Plan Termination. Terminating this plan in its entirety.

(c)    Procedures.  The following provisions apply if a Material Amendment is proposed.

(i)    Notification.  CSI, with the advice and assistance of the Trustees, shall notify the Participating Employers when it has approved a Material Amendment and determine and tabulate the directions received from Participating Employers regarding the Material Amendment. Each Participating Employer shall be furnished information with respect to the Material Amendment designed to enable the Participating Employer to determine the material effect of the amendment's changes.

(ii)    Participating Employer Direction.  Each Participating Employer may direct the implementation or rejection of the terms of the Material Amendment. The direction shall be filed in the form and at the time specified when the Material Amendment is circulated for direction.  A Participating Employer must approve or reject the terms of the Material Amendment in its entirety.

(iii)    Invalid Directions or No Directions.  Invalid directions from a Participating Employer or failure to provide directions within 30 days of the date Participating Employers are notified of the Material Amendment, shall be deemed a direction by the Participating Employer to implement the Material Amendment as proposed.

(v)　　Majority. If a majority of the directions are to implement the proposed Material Amendment, CSI shall execute the amendment without modification.

(vi)　　Confidentiality.  CSI and the Trustees may not divulge information with respect to any Participating Employer's directions to any other Person.

10.4　Merger.

(a)　　CSI.  CSI may determine to merge or consolidate this plan, in its entirety, with, or transfer all of its assets and liabilities to, another qualified retirement plan if:

(i)　　Preservation of Accrued Benefits.  Each Participant's Accrued Benefit would be equal to or greater than the Participant's Accrued Benefit as of the date immediately before the merger, consolidation, or transfer, assuming that this plan had terminated at that time.

(ii)　　Actuarial Statement.  If required, at least 30 days before the merger, consolidation, or transfer, the Administrator shall file an actuarial statement of valuation, in accordance with Code Section 6058, that the requirements of (a) will be met upon consummation of the merger, consolidation, or transfer.

(iii)　　Authorization.  CSI and any new or successor employer shall authorize the merger, consolidation, or transfer.

(b)　　Participating Employer.  A Participating Employer may not transfer the assets and liabilities attributable to its Participants and Beneficiaries under this plan to another plan maintained by the Participating Employer or any other plan through merger, consolidation, or spinoff.

10.5　Successor Employer.

If a Participating Employer is dissolved, merged, consolidated, restructured, or reorganized, or if the assets of the Participating Employer are transferred, the successor may assume and continue the original Participating Employer's obligations under this plan, and in that event, the successor will be substituted for the original Participating Employer.

ARTICLE 11

Termination

11.1   Right to Terminate Plan.

(a)   CSI. CSI reserves the right to terminate this plan and the Trust Fund.  The right to terminate is subject to, and conditioned upon, proper and timely notice to the Participants before the effective date of plan termination, including, if applicable, advance notice of the effective date of an amendment which ceases the accrual of benefits under this plan.

(b)   Pension Benefit Guaranty Corporation.  Unless this plan meets the exception described in ERISA Section 4021(b)(13), termination of this plan is also subject to the requirements of the Pension Benefit Guaranty Corporation ("PBGC").  These requirements include:

(i)   Intent to Terminate.  A notice of the intention to terminate this plan to the affected parties at least 60 days and not more than 90 days before the proposed termination date;

(ii)   PBGC Certification.  An actuarial certification to the PBGC stating the projected amount of plan assets, the Actuarially Equivalent present value of Benefit Commitments, and either that this plan is projected to be sufficient for all Benefit Commitments or that this plan meets the criteria for a distress termination together with a certification by the Administrator of the accuracy of the information underlying the actuarial certification; and

(iii)   Benefit Commitments.  As soon as possible after issuance of the notice of intent to terminate, a notice to each Participant and Beneficiary of the amount of Benefit Commitments or benefits payable, the amount and availability of alternative benefits or forms of payment, and the specific personal data (retirement age, spouse's age, and service) used to calculate the benefit.  "Benefit Commitments" consist of all amounts set forth in subparagraphs (i)-(v) of Section 12.3(c).

11.2   Termination of Participating Employer Status.

Each Participating Employer reserves the right, by action of its Board of Directors or other governing body, to terminate its participation in this plan as of a date approved and specified in writing by the Participating Employer and the Trustees.  Termination of participation is considered a partial termination of this plan with respect to the Participants of the withdrawing Participating Employer who are employed by the Employer Group on the date of the withdrawal.

(a)    <u>Voluntary Termination</u>.  A Participating Employer who has elected to terminate its participation in this plan ("Terminating Employer") shall be liable for withdrawal liability to this plan in accordance with the following provisions.

(i)    <u>Amount of Withdrawal Liability</u>. The amount of the Terminating Employer's liability shall be calculated by multiplying the unfunded benefit liability of this plan by a fraction. The numerator of the fraction shall be the Terminating Employer's Total Required Contributions to this plan for the five Plan Years preceding the withdrawal and the denominator shall be the Total Required Contributions of all Participating Employers for the five Plan Years preceding the withdrawal. The amount of the Terminating Employer's withdrawal liability shall be determined as of the end of the Plan Year preceding the effective date of the Terminating Employer's withdrawal from this plan.

(ii)    <u>Unfunded Benefit Liability</u>. This plan's unfunded benefit liability shall be the amount determined by this plan's Actuary for purposes of ERISA Section 4010, regardless of whether the reporting requirements of ERISA Section 4010 are applicable. The unfunded benefit liability amount determined by the Actuary in accordance with ERISA Section 4010 and Regulations shall be considered final and binding.

(iii)    <u>Total Required Contributions</u>.  A Participating Employer's "Total Required Contributions" shall equal the sum of (A) and (B) below.

(A)    <u>Before September 1, 2019</u>.  For each Plan Year beginning before September 1, 2019, that is included in the five-year period under (i) above, the Participating Employer's contribution for such Plan Year shall be the amount of the Participating Employer's contribution, if the Participating Employer had selected the regular contribution alternative for that Plan Year, or one-half of the Participating Employer's contribution, if the Participating Employer had selected the employer contribution plan alternative for that Plan Year.  Employee Contributions (under the regular contribution alternative or those deemed to be made under the employer contribution plan alternative) and, with respect to the Plan Years beginning September 1, 2017, and September 1, 2018, additional contributions required to be contributed by the Participating Employer shall not be included in determining the amount of the Participating Employer's contribution for a Plan Year.

(B)    <u>After August 31, 2019</u>.  For each Plan Year beginning on or after September 1, 2019, that is included in the five-year period under (i) above, the Participating Employer's contribution for such Plan Year shall be the Participating Employer's share of the Annual Contribution for that Plan Year before application of any cap under Section 4.2(b) and regardless of the amount of actually contributed by the Participating Employer for such year.

(iv)    <u>Payment</u>. Withdrawal liability is assessed to the Terminating Employer on the termination date and is immediately due in its entirety. The Trustees shall notify the Terminating Employer of the amount of the withdrawal liability upon receipt

of the Participating Employer's written notice of termination or as soon as administratively feasible thereafter. The Terminating Employer must continue to make its monthly contributions until the date the Participating Employer is notified of the amount of the withdrawal liability and the withdrawal liability is paid in full; however, any contributions made to this plan by the Terminating Employer after the effective date of the Terminating Employer's withdrawal shall offset the amount of withdrawal liability due from the Terminating Employer. Unless other payment terms are agreed to between the Trustees and the Terminating Employer, the remaining amount of withdrawal liability (after any offset for contributions made after the termination date) must be paid to the Trust Fund no later than six months after the date the Trustees have notified the Terminating Employer of the full withdrawal liability amount. Even though additional time is provided for payment, the full amount of withdrawal liability is due on the termination date and is considered an asset of the Trust Fund as of that date. If all or any portion of the withdrawal liability is not paid by the date due, interest shall be assessed on the unpaid amount in accordance with Code Section 6601.

(v)    Joint and Several Liability. For purposes of this provision, if the Terminating Employer ceases to exist as a result of a corporate transaction, reorganization, or other event described in Section 11.3, the parent or successor shall be treated as the entity in accordance with the provisions of ERISA Section 4069.

(vi)    Dispute Period. A Terminating Employer may request the Trustees to review any specific matter relating to the determination of the Terminating Employer's withdrawal liability (other than the Actuary's determination of the unfunded benefit liability) within sixty days of the date the Trustees notify the Terminating Employer of the withdrawal liability amount. In doing so, the Terminating Employer may identify inaccuracies in the determination of the amount and furnish the Trustees with any additional relevant information. If a review is not requested within sixty days, the determination of the withdrawal liability amount will be considered final and binding. The Trustees will review any matter raised by the Terminating Employer and notify the Terminating Employer of its final decision, including the basis for its decision, within ninety days after all relevant information has been filed by the Terminating Employer with respect to its request.

(b)    Involuntary Termination.  Termination of participation in this plan by a Participating Employer also may occur automatically, as provided in Sections 1.1(b)(ii) and 11.3, or result from delinquency in payment of contributions to the Trust Fund, as provided in Section 4.5. In such cases, the provisions of (a) above shall apply to the Participating Employer. Notwithstanding anything in this plan to the contrary, the Trustees retain the sole discretion in these situations to determine the date as of which the Participating Employer's participation is terminated.

11.3    Automatic Termination of Participating Employer Status.

        Termination of participation in this plan by a Participating Employer shall result upon the legal dissolution of the Participating Employer, or upon a cessation of business operations, or upon its adjudication as bankrupt or insolvent, or upon a general assignment by the Participating Employer for the benefit of creditors, or upon the appointment of a receiver for its assets, or when required by ERISA or the Code.

        Notwithstanding the preceding paragraph, if the successor to a Participating Employer that dissolves, merges, consolidates, restructures, or reorganizes, or transfer its assets, is a Participating Employer in this plan, the change in the original employer's identity shall not be considered a termination of participation by the original Participating Employer if the successor Participating Employer assumes all of the original Participating Employer's obligations under this plan. The successor Participating Employer's obligations with respect to the original Participating Employer shall include the original Participating Employer's contribution obligations.

11.4    Termination of Plan.

        (a)    Termination.  Upon termination of this plan in its entirety by CSI, the assets of the Trust Fund shall be liquidated over a reasonable period determined by the Trustee after consultation with the Administrator and, if covered by ERISA Section 4021(a), upon expiration of the statutory 60-day period after filing of the PBGC certification or extension of that period (for a standard termination), or upon the consent and approval of the PBGC (for a distress termination). The net assets (after provision is made for administrative expenses and expenses of liquidation) shall be applied and paid as provided in this section.

        (b)    Priorities.  Assets remaining after reserving sufficient assets to pay the expenses of administration and termination shall be applied as required under ERISA Section 4044 in the following order of priority:

                (i)    Mandatory Contribution Benefits.  First, to the portion of the Participants' Accrued Benefit derived from Participants' mandatory after-tax employee contributions.  The amount of mandatory after-tax employee contributions shall be reduced by amounts withdrawn by the Participant before the termination of this plan.

                (ii)    Benefits Payable.  Second, to benefits payable to a Participant or Beneficiary who at the date which is three years before termination either had begun to receive benefit payments or would have begun receiving benefit payments had the Participant elected to retire and begin receiving benefits as of that date.

                        (A)    Benefit.  For this purpose, the benefit shall be the smaller of the benefit that was being received or the benefit that would have been received had the

Participant retired based on the least benefit in effect during the five-year period ending at termination.

(B)    Benefit Decrease.    If benefits under this plan had been reduced during the three-year period ending at termination by amendment or due to the form of payment, the lowest payment received during that period shall be considered as the benefit that was being received three years before termination.

(iii)    Benefits Guaranteed.    Third, to benefits to a Participant (or Beneficiary) if, on the effective date of plan termination, the Participant's employment had terminated with a pension payable or the Participant would have had a pension payable had the Participant's employment terminated other than by death on that date.

(A)    Benefit.    The benefit shall be the benefit not covered in the previous priority category which was provided by this plan at the date five years prior to the effective date of plan termination and a prorated portion of any benefit increase from that period to the effective date of termination.  The prorated portion of a benefit increase shall be determined by multiplying the amount of the increase by 20% for each Plan Year that the increase was in effect.

(B)    Limitation.    A benefit payable under this subsection shall not be greater than the actuarial value of a monthly single life annuity benefit equal to the maximum monthly amount guaranteed by the PBGC as of the date of plan termination.

(iv)    Other Vested Benefits.    Fourth, to benefits to a Participant (or Beneficiary) if, on the effective date of plan termination, the Participant's employment had terminated with a benefit payable or the Participant would have had a benefit payable had such Participant's employment terminated other than by death on that date.  The benefit shall be the benefit provided by this plan as in effect on the date of termination.

(v)    Other Nonvested Benefits.    Fifth, to benefits to a nonvested Participant whose employment had not terminated as of the effective date of plan termination.  The benefit shall be the Actuarially Equivalent present value of the Participant's Accrued Benefit determined without regard to the vesting schedule under this plan.

(c)    Rules For Application.  The liability established by each priority shall be fully satisfied before provision for payment may be made under the next priority.

(i)    Distress Termination.  If plan assets are insufficient to satisfy the benefits payable under priorities (b)(i) through (v), this plan shall be subject to the distress termination provisions of ERISA.

(ii)    Insufficiency Within Priority.  If plan assets are insufficient within a priority to provide full benefits for all persons included within priorities (b)(i), (ii), (iii), and (v), the benefits shall be proportionately reduced based upon the present value of the full

benefit payable.  If the insufficiency occurs in priority (b)(iv), benefits in effect for the entire five-year period shall first be satisfied.  Then benefit increases shall be satisfied in the chronological order of their effective dates.

11.5    Effect of Termination.

(a)    Nonforfeitability.  Upon termination, including a partial termination of this plan, the rights of all affected Participants to Accrued Benefits as of the date of termination shall be nonforfeitable, except to the extent that they are subject to limitations with respect to maximum benefits.

(b)    Distribution.

(i)    Payment Options.  If this plan is terminated in its entirety and the procedural termination requirements have been satisfied:

(A)    Active Participants.  Each Participant, Surviving Spouse, or Beneficiary, including an Alternate Payee, whose benefits have not commenced shall be permitted to elect (regardless of whether the Participant's employment has terminated) payment in accordance with the provisions of Article 7, including a lump sum distribution without limitation; and

(B)    Retirees.  Each terminated Participant, Surviving Spouse, Beneficiary, including an Alternate Payee, or contingent annuitant receiving benefit payments as of the date of the plan termination shall continue to receive the same form of benefit payment through the purchase of an irrevocable annuity contract in accordance with (iii) below.

(ii)    Lump Sum.  Distribution in a lump sum under (i)(A) above shall be in complete satisfaction of the individual's right to benefits under this plan, and no other benefits shall be payable to or on behalf of such individual from the plan.

(iii)    Annuity Contract/PBGC.  The Administrator shall direct payment of benefits for all Participants, Surviving Spouses, Alternate Payees, and Beneficiaries not receiving a lump sum benefit on plan termination through the purchase of annuity contracts providing for immediate or deferred payment or by transferring the value of the individual's benefit to the PBGC in accordance with the missing participant program established under the termination provisions of ERISA and applicable Regulations. A Person is considered missing if, following the Administrator's completion of the search methods described in applicable Treasury or Department of Labor guidance, the Person cannot be located or efforts to communicate with the Person fail to secure an election.

(c)    Recourse Only Against Trust Assets.  Except as required under ERISA, there is no recourse for the payment of Accrued Benefits as of the date of plan termination other than from the assets of this plan and the Employer shall have no further liability for

contributions to this plan or for payment of benefits for affected Participants upon plan termination.

11.6    Reversion of Assets.

A Participating Employer shall not receive an amount from assets of the plan due to plan termination, except that, Participating Employers then participating in this plan may receive all amounts, if any, remaining after payment of the present value of (or application to purchase annuities to pay) the Benefit Commitments under this plan to Participants and Beneficiaries.  Any excess remaining after payment or application of these amounts shall be considered to result from a variation between actual experience and expected actuarial experience.

11.7    Highest Paid Restriction.

(a)    Restrictions on Termination.  If this plan terminates, the benefit of any present or former Highly Compensated Employee shall be limited to a benefit that is nondiscriminatory under Code Section 401(a)(4).

(b)    Restrictions on Distributions.  The benefits payable to any of the 25 present and former Highly Compensated Employees paid the most compensation in the current or any prior Plan Year shall be restricted to annual payments no greater than (1) the annual payment that would be made to or with respect to the Participant under a life annuity that is Actuarially Equivalent to the sum of the Participant's Vested Accrued Benefit and the Participant's other benefits under this plan (other than a social security supplement) plus (2) the amount the Participant is entitled to receive under a social security supplement.

(i)    Exceptions.  The restriction shall not apply if: after payment of the benefit the value of the plan assets equals or exceeds 110% of the plan's funding target (as defined in Code Section 430(d)(1); the value of the benefits for the Participant is less than 1% of the plan's funding target before distribution; the value of the benefit payable does not exceed the amount described in Code Section 411(a)(11)(A); or the plan terminates and the benefit is nondiscriminatory under Code Section 401(a)(4).

(ii)    Benefit.  For purposes of the restriction, the Participant's benefit includes loans in excess of the amount set forth in Code Section 72(p)(2)(A), any periodic income, any withdrawal values paid to a Participant, and any death benefits not provided for by insurance on the Participant's life.

(c)    Payment of Restricted Benefit in Full.  A Participant's otherwise restricted benefit may be paid in full if the Participant enters into a written agreement with the Administrator to secure repayment of the restricted amount.  The restricted amount is the excess of the amount paid to the Participant (accumulated with reasonable interest) over

the amount that could have been paid under the restriction (accumulated with reasonable interest).  The Participant may secure repayment of the restricted amount by one of the following methods.

(i)    <u>Deposit in Escrow</u>.  The Participant may deposit in escrow, with an acceptable depository, property having a fair market value equal to at least 125% of the restricted amount.  The escrow arrangement may permit the Participant to withdraw amounts in excess of 125% of the restricted amount.  If the market value of the property falls below 110% of the remaining restricted amount, the Participant must deposit additional property to bring the value of the property held by the depository up to 125% of the restricted amount.  The escrow arrangement may provide that the Participant may have the right to receive any income from the property placed in escrow, subject to the Participant's obligation to deposit additional property.

(ii)    <u>Letter of Credit</u>.  The Participant may provide a bank letter of credit in an amount equal to at least 100% of the restricted amount.

(iii)    <u>Bond</u>.  The Participant may post a bond equal to at least 100% of the restricted amount.  If a bond is posted, the bond must be furnished by an insurance company, bonding company or other surety for federal bonds.

A surety or bank may release any liability on a bond or letter of credit in excess of 100% of the restricted amount.  If the Administrator certifies to the depository, surety, or bank that the Participant (or the Participant's estate) is no longer obligated to repay any restricted amount, a depository may redeliver any property held under the escrow arrangement, and a surety or bank may release any liability on the Participant's bond or letter of credit.  The Administrator shall make such a certification only upon an occurrence described in (b)(i) above.

(d)    <u>Payments Prior to January 1, 1994</u>.  Payments that were made or began before January 1, 1994, and that were restricted under Regulations Section 1.401-4(c) will not continue to be restricted unless the payments also would be subject to restriction under the rules of this section.  Any payment that remains restricted will be restricted in accordance with Regulations Section 1.401-4(c), but the Participant may receive payment of an amount in escrow or release of any bond or letter of credit if the amount could be released under either Regulations Section 1.401-4(c) or 1.401(a)(4)-5(b).

## ARTICLE 12

## General Provisions

### 12.1    Spendthrift Provision.

An interest in the assets of the plan shall not be subject to assignment, conveyance, transfer, anticipation, pledge, alienation, sale, encumbrance, or charge, whether voluntary or involuntary, by a Participant or Beneficiary except under a QDRO or as permitted in subsection (a) or (b).

(a)    Not Security.  An interest shall not provide collateral or security for a debt of a Participant or Beneficiary or be subject to garnishment, execution, assignment, levy, or to another form of judicial or administrative process or to the claim of a creditor of a Participant or Beneficiary, through legal process or otherwise, except under a voluntary revocable assignment permitted by Regulation Section 1.401(a)-13.

(b)    Crimes and ERISA Violations.  A Participant's interest in assets of the plan may be offset to pay an amount that the Participant is required to pay to the Internal Revenue Service or to the plan for certain crimes and ERISA violations in accordance with the following rules:

(i)    Express Provision.  An offset may be made if it is expressly provided for by:

(A)    Judgment of Conviction.  A judgment of conviction for a crime involving this plan;

(B)    Civil Judgment.  A civil judgment (including a consent order or decree) entered by a court in an action brought in connection with a violation (or alleged violation) of the fiduciary responsibility provisions under ERISA;

(C)    Agency Settlement.  A settlement agreement between the Participant and the Department of Labor or Pension Benefit Guaranty Corporation in connection with a violation (or alleged violation) of the fiduciary responsibility provisions under ERISA by a fiduciary or any other person; or

(D)    IRS Levy.  A levy issued by the Internal Revenue Service or a judgment involving a collection by the United States Government resulting from an unpaid tax assessment against the Participant or Beneficiary.

(ii)    Spousal Consent.  A Participant's interest in the assets of this plan shall not be offset if the Participant has a Spouse on the date of the offset unless the QJSA have been waived or the Spouse consents in writing to the offset.  The consent must be witnessed by an individual named by the Administrator or by a notary public.  If

-78-

the Spouse cannot be located or if other circumstances set forth in Regulations issued under Code Section 417 exist, the consent is not required.

        (iii)    Waiver of Consent Requirement.  The consent of the Spouse is not required if the judgment or settlement agreement in (i) above:

        (A)    Payment Ordered.  Orders or requires the Spouse to pay an amount to this plan in connection with a violation of the fiduciary responsibility provisions under ERISA; or

        (B)    Rights Retained.  Retains the Spouse's right to the QJSA or QPSA determined in accordance with Code Section 401(a)(13)(D).

    (c)    Attempts Void. Any other attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, or otherwise dispose of benefits payable, before actual receipt of the benefits, or a right to receive benefits, shall be void.  The Trust Fund shall not be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of a Person entitled to benefits.  The benefits and assets held under this plan shall not be considered an asset of a Participant or Beneficiary in the event of insolvency or bankruptcy.

## 12.2  Effect Upon Employment Relationship.

Establishment and operation of this plan is strictly a voluntary undertaking by CSI. Adoption of this plan by a Participating Employer shall not create a contract of employment between a Participating Employer and an Employee, confer upon an Employee a legal right to continuation of employment, limit or qualify the right of the Participating Employer to discharge or retire an Employee, or affect the right of an Employee to remain in service after the Normal Retirement Date.

## 12.3  No Interest in Employer Assets.

Nothing in this plan or the Trust Agreement shall be construed to give an Employee, Participant, Beneficiary, or Alternate Payee an interest in the assets or the business affairs of a Participating Employer or the right to examine the books and records of a Participating Employer.  An individual's rights are solely those granted by this instrument.

## 12.4  Construction.

The singular includes the plural, and the plural includes the singular, unless the context clearly indicates the contrary.  Capitalized terms have the meaning specified in

this plan.  If a term is not defined, the term shall have the general, accepted meaning of the term.

Any period of time described in this plan shall consist of consecutive days, months, or years, as appropriate.

12.5    Severability.

If any provision of this plan is invalid, unenforceable, or disqualified under the Code, ERISA, or Regulations, for any period of time, the affected provision shall be ineffective, but the remaining provisions shall be unaffected.

12.6    Governing Law.

This plan shall be interpreted, administered, and managed in compliance with the Code, ERISA, and Regulations.  To the extent not preempted by federal law, this plan shall be interpreted, administered, and managed in compliance with the laws of the State of Michigan.

12.7    Nondiversion.

Except for reversion of assets permitted upon plan termination, all of the plan assets shall be retained for the exclusive benefit of Participants and their Beneficiaries, shall be used to pay benefits to such Persons and to pay administrative expenses to the extent not paid by the Trust Fund or a Participating Employer and shall not revert to or inure to the benefit of any Participating Employer.

12.8    Correction of Errors and Recoupment.

If any error or change in records results in any Participant, Beneficiary, Surviving Spouse, or Alternate Payee receiving from the plan more or less than the amount that would have been payable had the records been correct or had the error not been made, the Administrator shall correct the error by adjusting, as far as practicable, the future payments in such a manner that the benefits to which the Person was correctly entitled shall be paid.  The Administrator shall be entitled to recoup amounts which are overpaid to a Participant, Beneficiary, Surviving Spouse, or Alternate Payee and may choose to recoup by requesting repayment from such Person either in addition to or instead of adjusting future benefit payments to such Person.

12.9    Limitations Applicable to CSEC Plan in Funding Restoration Status.

This section generally states the requirements of Code Section 433(j) and its limitations, effective for Plan Years beginning on or after January 1, 2014.  The provisions of this section shall be determined and applied in accordance with the provisions of Code Section 433, including any future guidance issued by the Department of Treasury and any Regulations promulgated thereunder.

(a)    Funding Restoration Status. If the plan's funded percentage, as defined under Code Section 433(j)(5)(B), is less than 80% as of the beginning of a Plan Year, the plan shall be treated as in "Funding Restoration Status" for the Plan Year, and the minimum contribution requirements of Code Section 433(j)(1) shall apply.

(b)    Funding Restoration Plan. A written funding restoration plan shall be established or updated within 180 days of receiving notification from the Actuary that the plan is, or remains, in Funding Restoration Status for a Plan Year.  The funding restoration plan shall consist of actions that are calculated, based on reasonable assumptions, to increase the funding percentage of the plan to 100% over a period that is not longer than the greater of 7 years or the shortest amount of time practicable.

(c)    Limitation on Plan Amendments.  In accordance with Code Section 433(j) and except as otherwise provided therein, no amendment to the plan that has the effect of increasing liabilities of the plan by reason of increases in benefits, establishment of new benefits, changing the rate of benefit accrual, or changing the rate at which benefits become nonforfeitable will take effect in a Plan Year if the plan is in Funding Restoration Status for the Plan Year.

(d)    Automatic Restoration.  If an amendment to the plan does not take effect as of the effective date of the amendment in accordance with (c) above, but is permitted to take effect later in the Plan Year as a result of additional contributions for the Plan Year, the amendment will automatically take effect as of the first day of the Plan Year (or, if later, the original effective date of the amendment).  If the amendment cannot take effect during the Plan Year, it will be treated as if it were never adopted, unless the amendment provides otherwise.

12.10    Authorization of PTE 80-26 Loan.

Pursuant to Department of Labor Prohibited Transaction Exemption 80-26, 71 Fed. Reg. 17917, 17919-20 (Apr. 7, 2006) (PTE 80-26), any party in interest or disqualified person ("80-26 Lender") may pay ordinary operating expenses of this plan or other expenses incidental to the operation of this plan, including, but not limited to, the payment of benefits in accordance with the terms of the plan, which will constitute unsecured, interest-free loans or extensions of credit from the 80-26 Lender to the plan.

(a)    Right to Collect.  The 80-26 Lender is entitled, at its option, either to forgive or to collect any such loan upon demand.

(b)    PTE 80-26 Loan Requirements. In addition to other requirements set forth in the Code, Regulations and PTE 80-26, the loan or extension of credit will:

(i)    No Discount.  Not waive any discount for payment in cash;

(ii)    No Interest or Fees.  Not charge any interest or fee to the plan;

(iii)    Unsecured.  Be unsecured; and

(iv)    Not Made by Plan.  Not be directly or indirectly made by the plan.

(c)    Written Loan Agreement. To the extent necessary, the terms of this provision constitute a written loan agreement between the 80-26 Lender and the plan.


ARTICLE 13

Top-Heavy Plan Provisions


13.1    Top-Heavy Plan.

If this plan is or becomes a Top-Heavy Plan in a Plan Year with respect to a Participating Employer, the provisions of this article shall supersede all conflicting plan provisions for that Participating Employer.  "Top-Heavy Plan" means this plan for a Plan Year if:

(a)    Not Required or Permissive Aggregation Group.  This plan is not part of a Required Aggregation Group or a Permissive Aggregation Group, and the Top-Heavy Ratio exceeds 60%;

(b)    Required Aggregation Group.  This plan is part of a Required Aggregation Group (but not part of a Permissive Aggregation Group), and the Top-Heavy Ratio for the Required Aggregation Group exceeds 60%; or

(c)    Permissive Aggregation Group. This plan is part of a Permissive Aggregation Group, and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds 60%.

13.2    Top-Heavy Determination.

The determination of the Top-Heavy Ratio and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Code Section 416 and Regulations and shall be applied separately with respect to each Employer Group.

(a)    Top-Heavy Ratio.  "Top-Heavy Ratio" means the ratio, as of this plan's Determination Date, calculated by dividing the aggregate Present Value of Accrued Benefits of all Key Employees of each plan in the Required Aggregation Group (and each other plan in the Permissive Aggregation Group, if necessary or desirable) by the aggregate Present Value of Accrued Benefits of all Participants under all plans in the Required (or Permissive) Aggregation Group.

(i)    Disregard Certain Employees.  In calculating the Top-Heavy Ratio, the account balance or Accrued Benefit of a Participant who was a Key Employee in a prior year but is no longer a Key Employee or has not performed services for a Participating Employer participating in this plan at any time during the one-year period ending on the Determination Date(s) will be disregarded.

(ii)    Ownership. Ownership shall be determined under Code Section 318 as modified by Code Section 416(i)(1)(B)(iii) without regard to the aggregation rules under Code Section 414.

(b)    Present Value of Accrued Benefits.

(i)    This Plan.  "Present Value of Accrued Benefits" under this plan means the Actuarially Equivalent present value of the Accrued Benefits of all Participants and Beneficiaries determined as of the most recent Top-Heavy Valuation Date within the 12-month period ending on the Determination Date.  The Present Value of Accrued Benefits includes:

(A)    One-Year Period.  The amount of benefit payments made from this plan due to severance from employment, death or disability during the one-year period ending on the Determination Date; and

(B)    Five-Year Period.  The amount of benefit payments made from this plan for any other reason during the five-year period ending on the Determination Date.

(ii)    Accrual Method.  The Accrued Benefit of any Participant who is not a Key Employee shall be determined (i) under the method, if any, that applies uniformly with respect to all defined benefit plans in the aggregation group, or (ii) if there is no uniform method, as if the benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Code Section 411(b)(1)(C).

(iii)    <u>Multiple Plans</u>.  The Present Value of Accrued Benefits shall be determined with respect to, and pursuant to the provisions of, all qualified retirement plans (including a simplified employee pension plan) in the aggregation group.  When aggregating plans, the Present Value of Accrued Benefits will be calculated with reference to the Determination Dates that fall within the same calendar year.

(iv)    <u>Unpaid Contribution</u>.  A contribution not paid as of a Determination Date for any plan in the aggregation group shall be included in the determination of the Present Value of Accrued Benefits as required in Code Section 416 and Regulations.

(v)    <u>Actuarial Assumptions</u>.  If this plan is part of a Permissive Aggregation Group or a Required Aggregation Group and at least one of the qualified retirement plans aggregated with this plan is a defined benefit plan, the Present Value of Accrued Benefits under any such defined benefit plan shall be determined based on the actuarial assumptions specified in Section 7.2 and in accordance with Regulations Section 1.416-1, T-25 through T-28.

(vi)    <u>Rollovers and Transfers</u>.  A distribution rolled over or an amount transferred from this plan to another qualified retirement plan in the Employer Group shall not be included in the Present Value of Accrued Benefits under this plan.  If a rollover or transfer to a qualified retirement plan of an unrelated employer was initiated by the former Participant, it shall be deemed a distribution from this plan.

(c)    <u>Required Aggregation Group</u>.  "Required Aggregation Group" means all qualified retirement plans, including terminated plans, of the Employer Group in which at least one Key Employee is a participant at any time during the Plan Year containing the Determination Date or any of the four preceding Plan Years (regardless of whether the plan has terminated), plus all other qualified retirement plans of the Employer Group, that enable one or more of the plans covering at least one Key Employee to meet the requirements of Code Sections 401(a)(4) or 410.

(d)    <u>Permissive Aggregation Group</u>.  "Permissive Aggregation Group" means all qualified retirement plans, including terminated plans, if any, of the Employer Group that are part of a Required Aggregation Group that includes this plan, plus any other qualified retirement plan (designated by the Participating Employer) of the Employer Group that is not part of the Required Aggregation Group but that, when considered part of the Permissive Aggregation Group, does not prevent the group from meeting the requirements of Code Sections 401(a)(4) and 410.

(e)    <u>Determination Date</u>.  For any Plan Year after the initial Plan Year, "Determination Date" means the last day of the preceding Plan Year.  For the initial Plan Year, "Determination Date" means the last day of the initial Plan Year.

(f)    <u>Key Employee</u>.  "Key Employee" means an Employee or former Employee (including any deceased Employee or the Beneficiary of any deceased Employee) who,

under Code Section 416(i), is or was, during the Plan Year that includes the Determination Date, one of the following:

(i)    <u>Officer</u>.  An officer of an entity in the Employer Group if the officer's Section 415 Compensation exceeds $215,000 (as adjusted under Code Section 416(i)(1) for Plan Years beginning after December 31, 2023);

(ii)    <u>5% Owner</u>.  A 5% owner of an entity in the Employer Group; or

(iii)    <u>1% Owner; $150,000 Compensation</u>.  A 1% owner of an entity in the Employer Group whose Section 415 Compensation exceeds $150,000.

Compensation for (i) and (iii) above for a Plan Year is determined without regard to the Annual Compensation Limit.

(g)    <u>Top-Heavy Valuation Date</u>.  "Top-Heavy Valuation Date" means, for a defined contribution plan (including a simplified employee pension plan), the date for revaluation of the assets to market value coinciding with or occurring most recently within the 12-month period ending on, the Determination Date.  For a defined benefit plan, the term means the most recent date used for computing the plan costs for minimum funding purposes (whether or not an actuarial valuation is performed during that Plan Year) occurring within the 12-month period ending on the Determination Date.

13.3    <u>Minimum Benefits</u>.

For each Plan Year in which this plan is or becomes a Top-Heavy Plan and benefit accruals are not frozen, each Participant who is not a Key Employee and who completes at least 1,000 Hours of Service shall accrue a Minimum Accrued Benefit.

(a)    <u>Top-Heavy Minimum Accrued Benefit</u>.  The "Top-Heavy Minimum Accrued Benefit" for a Participant who is not a Key Employee means the monthly amount of a pension benefit payable as a Single Life Annuity beginning on the first day of the first month following the Participant's Normal Retirement Date.  The monthly amount shall be 2% of Minimum Average Monthly Compensation multiplied by Years of Vesting Service (maximum of 10 years) earned for Plan Years beginning on or after September 1, 1984, during which this plan is a Top-Heavy Plan.

(b)    <u>Top-Heavy Minimum Average Monthly Compensation</u>.  "Top-Heavy Minimum Average Monthly Compensation" means the average of the Participant's Section 415 Compensation for the five consecutive Plan Years during the Participant's period of employment that yield the highest amount.  The five consecutive Plan Years shall not include Plan Years beginning before September 1, 1984, and any Plan Year after the last Plan Year in which this plan is a Top-Heavy Plan, and shall not include or be deemed interrupted by, Plan Years during which the Participant does not earn a Year of Vesting Service.

13.4    <u>Vesting</u> <u>Schedule</u>.

The vesting schedule for each Participant who has an Hour of Service during a Plan Year in which this plan is or becomes a Top-Heavy Plan shall be replaced with the following schedule:

| Years of Vesting Service | Vested Percentage |
|---|---|
| Less than 2 years | -0- |
| 2 years | 20% |
| 3 years | 40% |
| 4 years | 60% |
| 5 years or more | 100% |

(a)    <u>Cessation</u>.  If this plan ceases to be a Top-Heavy Plan, vested percentages shall continue to be determined under this schedule.

(b)    <u>Vesting</u> <u>Schedule</u> <u>Change</u>.  Any change in the vesting schedule due to this plan becoming, or ceasing to be, a Top-Heavy Plan shall be treated as an amendment to this plan, and all rules applying to the amendment of a vesting schedule shall apply.

CSI may rely on the opinion letter issued by the Internal Revenue Service to Warner Norcross + Judd LLP as evidence that this plan is qualified under Code Section 401(a) except to the extent provided in Revenue Procedure 2017-41 or as specified in the opinion letter. CSI hereby executes this instrument on ___9/11/2024_____.

CHRISTIAN SCHOOLS INTERNATIONAL

By _____
James C. Bruinsma

Its ___Board Chair_____

<u>Employer</u>

30474016

APPENDIX A

**CHRISTIAN SCHOOL PENSION PLAN AND TRUST FUND**

**CHRISTIAN SCHOOLS INTERNATIONAL INSURANCE TRUST**
**BOARD OF TRUSTEES**

**BYLAWS**

The Christian School Pension Plan and Trust Fund Board of Trustees ("Pension Trustees") and the Christian School International Insurance Trust Board of Trustees ("Insurance Trustees") (collectively, "Trustees," and individually "Trustee") for the trusts collectively, "Trusts" or individually "Trust") related to the Christian School Pension Plan and Christian Schools International Insurance Plan (collectively, "Plans" or individually "Plan") have adopted bylaws governing their organization (the "Bylaws"), with the approval of the Christian Schools International ("CSI") Board of Directors (the "Board of Directors"), as set forth below.

**I. ORGANIZATION**

**A.    Officers.**

The Board of Trustees shall appoint an Executive Secretary-Treasurer who will serve as an advisory member of the Board of Trustees for the Trusts, in the following capacities:

1.    Under the direction of the Board of Trustees, and to the extent delegated pursuant to a written agreement with the Board of Trustees, shall be in charge of the day-to-day operation of the Plans and Trusts.

2.    Under the direction of the Secretary, shall be responsible for the permanent file of minutes, be in charge of all correspondence, serve as chief liaison with the Board of Directors for the Plan Sponsor, and assist the Secretary in carrying on the ordinary functions of that office.

3.    Under the direction of the Treasurer, shall maintain accurate and detailed records of accounts of all Trust assets and of all investments, receipts, disbursements and other transactions hereunder and shall prepare regular financial reports as instructed.

The Executive Secretary-Treasurer, or any such other person(s) as may be designated by resolution of the Board of Trustees or in writing by an authorized Officer or Committee of the Board of Trustees, to assist the Board of Trustees or Officer in carrying out any of their ordinary functions, may do all things and sign all documents necessary or expedient to facilitate or assist in carrying out such functions (except as otherwise expressly provided in the Bylaws for signature of a specific document), including without limitation, making deposits, authorizing, initiating or certifying the taking of actions, certifying the validity of Trust documents or the grant of rights, responsibilities, or other matters authorized by the Board of Trustees, and may endorse checks, drafts, orders or other documents for payment, transfer or investment that have

31615876-6

been appropriately authorized, or that are necessary or reasonable to carry out their functions or the ordinary business and affairs of the Plans and Trusts.

**B.    Election of Officers.**

The Board of Trustees shall each year at its first meeting after the beginning of a new Plan Year elect officers who shall serve until the end of the year.

**C.    Meetings.**

The Board of Trustees shall meet at least three (3) times per year. At the request of any two (2) of its members, a special meeting will be called by the Secretary. The President/CEO of CSI and Executive Secretary-Treasurer shall be entitled to attend and participate in all meetings and other deliberations of the Board of Trustees without voting rights; provided that such attendance shall not limit the Board of Trustees or any individual Trustee from exercising the full discretionary authority conferred by any Plan or Trust, and this instrument and the Board of Trustees or prevent the Board of Trustees from going into closed session to discuss sensitive matters or preserve any potential claim to attorney client privilege.

**D.    Quorum.**

Fifty Percent (50%) of the Trustees present at a regular or special meeting shall constitute a quorum. All action of the Board of Trustees shall be lawfully taken upon the vote of a majority of the membership of the Board of Trustees and, to the extent taken at a meeting, upon a majority of the membership present at the meeting.

**E.    Method of Transacting Business.**

The powers granted to the Board of Trustees shall be exercised at a regular meeting, or at any meeting of which the Secretary provides at least five (5) days written notice. In an emergency, business may be transacted by mail, telephone or electronic means, provided any vote on a proposed action is approved by a quorum and voting results are recorded.

## II. SPECIAL COMMITTEES

**A.    Finance and Investments Committee.**

1.    This committee, consisting of at least three members of the Board of Trustees and the Executive Secretary-Treasurer, shall be constituted each year by the Board of Trustees during its first meeting after the beginning of a new Plan Year. The committee each year shall effect its own organization.

2.    The Executive Secretary-Treasurer shall be a non-voting member of the Committee.

A-2

3.      Any two members of the Committee may jointly sign promissory notes or any other instruments necessary for obtaining short-term loans.

4.      The Committee shall have the authority to invest and reinvest, to sell securities, to explore new investments, acting on its best judgment and ability, within the applicable provisions of the Plan or Trust.

5.      All actions of the Committee denoted under 4, above, shall be reported for review at each Board of Trustees' meeting.

**B.      Plan Benefits and Policy Study Committee.**

1.      This committee, consisting of at least three members of the Board of Trustees, and the Executive Secretary-Treasurer, shall be constituted each year by the Board of Trustees during its first meeting after the beginning of the new Plan Year. The committee each year shall effect its own organization.

2.      The Executive Secretary-Treasurer shall be a non-voting member of the Plan Benefit and Policy Study Committee.

3.      The committee's function shall be to make periodic reviews of all Plan benefits and policies with respect to the features, operations, and practices of the Trust except in areas designated as responsibilities of the Finance Committee.

**C.      Member Relations and Promotion Committee.**

1.      This committee, consisting of at least three members of the Board of Trustees, and the Executive Secretary-Treasurer, shall be constituted each year by the Board of Trustees during its first meeting after the beginning of the new Plan Year. The Committee each year shall effect its own organization.

2.      The Executive Secretary-Treasurer shall be a non-voting member of the Member Relations and Promotion Committee.

3.      The committee's function with respect to the Plans shall be to direct such activities as may be necessary to foster good relationships with members.

**D.      Contributions Committee.**

1.      This Committee, consisting of at least three members of the Board of Trustees and the Executive Secretary-Treasurer, shall be constituted by the Board of Trustees from time to time as needed. The Committee shall effect its own organization.

2.      The Executive Secretary-Treasurer shall be a non-voting member of the Committee.

3.      Any member of the Committee may sign a settlement agreement or document of similar effect on behalf of the Committee or the Board of Trustees, to the

A-3

extent the Committee has been authorized to act on behalf of the Board of Trustees and has authorized the member to sign.

       4.     The Committee shall have the authority described in procedures approved by the Board of Trustees, including, but not limited to, taking all actions necessary to collect amounts due in connection with the Plans and Trusts.

       5.     Actions of the Committee denoted under 4, above, shall be reported for review at each Board of Trustees' meeting.

**E.**    **Other Committees.**

The President shall, with the advice and consent of the Board of Trustees, appoint such other committees as from time to time are required by the Board of Trustees or deemed desirable by them.

## III. ADMINISTRATION

**A.**    The office and place of the records of the Plans and Trusts in the state of Michigan shall be 2969 Prairie Street, S.W., Suite 102, Grandville, MI 49418.

**B.**    The seal of a Trust shall be circular in form with the Trust name imprinted on the face.

**C.**    The Executive Secretary-Treasurer shall maintain appropriate records and accounts for all assets held under the Trusts.

**D.**    Christian Schools International and any third party service provider hired to perform plan administration services shall be compensated for any reasonable expenses it incurs in connection with the administration and operation of the Plan and the Trust to the extent permitted by applicable law.

**E.**    The Executive Secretary-Treasurer shall be accountable for all funds and securities of the Trust. When necessary and proper, the Executive Secretary-Treasurer shall endorse on behalf of the Trust for collection, checks, notes, and other obligations, and shall deposit the same to the credit of the Trust in such bank(s) or depository as the Board of Trustees may designate.

**F.**    The Board of Trustees shall have power to establish a reserve(s) fund for any proper purpose and to increase, decrease, or abolish any such reserve so established.

**G.**    At the expense of the Trust, the Treasurer, the Executive Secretary-Treasurer, and any other member of the Board of Trustees and others authorized to endorse checks, drafts, orders and other documents for payment, transfer or investment shall be required to furnish surety bonds to the satisfaction of the Board of Trustees and the Board of Directors of Christian Schools International.

**H.**   The Trustees shall be reimbursed for expenses involved in attending meetings or otherwise discharging the function of their offices.

**I.**   These bylaws may be amended at any lawful meeting of the Board of Trustees by a majority vote of the membership, provided the proposed amendment(s) shall have been described fully in notice of the meeting. Such amendment(s) shall be subject to the approval of the Board of Directors of Christian Schools International. Capitalized terms in these bylaws that are not defined shall be defined under the terms of the Plan or Trust.

31615876-6